Richard B. Specter, SBN 114090
Diane L. Ellis, SBN 130628
CORBETT, STEELMAN & SPECTER
A Professional Law Corporation
18200 Von Karman Avenue, Suite 900
Irvine, California 92612-1023
Telephone:  (949) 553-9266
Facsimile:  (949) 553-8454
rspecter@corbsteel.com

Attorneys for Plaintiffs
LOS ANGELES TURF CLUB, INCORPORATED,
LOS ANGELES TURF CLUB II, INC.,
PACIFIC RACING ASSOCIATION, PACIFIC RACING
ASSOCIATION II, GULFSTREAM PARK RACING
ASSOCIATION, INC., OREGON RACING, INC.,
MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
and LAUREL RACING ASSOCIATION, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES TURF CLUB, INCORPORATED, a  California Corporation, LOS ANGELES TURF CLUB II, INC., a California Corporation, PACIFIC RACING ASSOCIATION, a California Corporation, PACIFIC RACING ASSOCIATION II, a California Corporation, GULFSTREAM PARK RACING ASSOCIATION, INC., a Florida Corporation, OREGON RACING, INC., a Delaware Corporation, MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC., a Maryland Corporation, LAUREL RACING ASSOCIATION, INC., a Maryland Corporation, and DOES 1 through 10, inclusive,<br><br>           Plaintiffs,<br><br>    vs.<br><br>HORSE RACING LABS, LLC, a Delaware Limited Liability Company, | Case No.: 2:15-cv-9332 SJO (JEMx)<br><br>Hon. S. James Otero<br>Courtroom No. 1<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND TO STRIKE**<br><br>Hearing Date: April 25. 2016<br>Hearing Time: 10:00 a.m.<br>Ctrm.: 1 |

also known as, IMMERSE, LLC, doing )
business as DERBYWARS, and Does 1 )
through 10, )
                                )
              Defendants. )

_____

         Plaintiffs LOS ANGELES TURF CLUB, INCORPORATED, LOS ANGELES TURF CLUB II, INC., PACIFIC RACING ASSOCIATION, PACIFIC RACING ASSOCIATION II, GULFSTREAM PARK RACING ASSOCIATION, INC., OREGON RACING, INC., MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC., and LAUREL RACING ASSOCIATION, INC.  ("Plaintiffs"), hereby submit their Opposition to Defendant HORSE RACING LABS, LLC's ("Defendant"), Motion to Dismiss and to Strike pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f) (the "Motion").

        Also, Plaintiffs respectfully object to the Motion on the grounds that it is in violation of this Court's Initial Standing Order because it is in excess of 20 pages. *Initial Standing Order,* ¶21.

                                            Respectfully submitted,

DATED:  April 4, 2016              CORBETT, STEELMAN & SPECTER
                                      A Professional Law Corporation

                                 By:     */s/ Richard B. Specter*
                                         Richard B. Specter
                                         Attorneys for PLAINTIFFS

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION AND BACKGROUND…………………………………1

II.   DEFENDANT'S MOTION TO DISMISS MUST BE DENIED………....5

    A.    Plaintiffs Have Adequately Pleaded A Pattern Of Racketeering Activity Under *RICO*…………………………………………………6

    B.    Plaintiffs Have Adequately Pleaded A Pattern Of Racketeering Activity Under *RICO*………………………………………………..10

    C.    Plaintiffs Have Adequately Pleaded A *RICO* Injury ……………….11

    D.    Plaintiffs Have Adequately Pleaded A Claim For Intentional Interference With Prospective Economic Advantage………. 14

III.  DEFENDANT'S MOTION TO STRIKE MUST BE DENIED…………17

IV.   CONCLUSION …………………………………………………………20

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Allison v. California Adult Authority* (9th Cir.  1969)
   419 F.2d 822 ................................................................................................ 6

*Allwaste, Inc. v. Hecht* (9th Cir. 1995)
   65 F.3d 1523 ................................................................................................ 8

*Alvarez v. Hill* (9th Cir. 2008)
   518 F.3d 1152 ............................................................................................ 14

*Anza v. Ideal Steel Supply Corp.* (2006)
   547 U.S. 451 ...................................................................................... 10, 11

*Architectural Mailboxes, LLC v. Epoch Design, LLC*, (S.D. Cal. Apr. 28, 2011)
   2011 U.S. Dist. LEXIS 46180 ................................................................. 17

*Asghari v. Volkswagen Grp. Of Am., Inc.* (C.D.Cal. 2013)
   42 F.Supp.3d 1306 ................................................................................... 18

*Boyle v. United States* (U.S. 2009)
   556 U.S. 938 ............................................................................................... 9

*Broam v. Bogan* (9th Cir. 2003)
   320 F.3d 1023 ............................................................................................. 5

*Colgan v. Leatherman Tool Group, Inc.* (2006)
   135 Cal. App. 4th 663 .............................................................................. 20

*Della Penna v. Toyota Motor Sales U.S.A., Inc.* (1995)
   11 Cal. 4th 376 ......................................................................................... 14

*Doe v. United States Dept. of Justice* (DC Cir. 1985)
   753 F.2d 1092 ........................................................................................... 19

*H.J. Inc. v. Northwestern Bell Telephone Co.* (1989)
   492 U.S. 229 ........................................................................................... 8, 9

*Hemi Group, LLC v. City of New York* (2010)
   559 U.S. 1 ................................................................................ 10

*Hibbs-Rines, v. Seagate Technologies, LLC* (N.D. Cal. Mar. 2, 2009)
   2009 U.S. Dist. LEXIS 19283 .................................................... 18

*Ideal Steel Supply Corp. v. Anza* (2d Cir. 2011)
   652 F.3d 310 ............................................................................ 12

*In re National Mortg. Equity Corp. Mortg. Pool Certificates
Sec. Litigation* (C.D. Cal. 1987)
   682 F. Supp. 1073……………………………………………………..11

*Jalili v. Far East Nat'l Bank* (N.D. Cal. Sept. 23, 2013)
   2013 U.S. Dist. LEXIS 136031 .................................................. 13

*Kearney v. Foley & Lardner, LLP* (9th Cir. 2015)
   607 Fed. Appx. 757 .................................................................... 7

*Lectrodryer v. Seoulbank* (2000)
   77 Cal. App. 4th 723.................................................................. 20

*Lightning Lube v. Witco Corp.* (3d Cir. 1993)
   4 F.3d 1153 .............................................................................. 13

*Massey v. Banning Unified School Dist.* (CD Ca 2003)
   256 F. Supp.2d 1090.................................................................. 19

*Nami v. Fauver* (3rd Cir. 1996)
   82 F.3d 63 ................................................................................ 6

*Oracle Am., Inc. v. Cedarcrestone, Inc.* (N.D. Cal. June 26, 2013)
   2013 U.S. Dist. LEXIS 89986 ............................................ 16, 17

*Peloza v. Capistrano Unified School District* (9th Cir. 1994)
   37 F.3d 517 .............................................................................. 5

*People v Fanduel, Inc.* (N.Y. Sup. Ct. Dec. 11, 2015)
   2015 N.Y. Misc. LEXIS 4521. ................................................ 3

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

*Peterson v. Grisham* (10th Cir. 2010)
   594 F.3d 723 ……………………………………………………………………….6

*Pradhan v. Citibank, N.A.* (N.D. Cal. Jan. 10, 2011)
   2011 U.S. Dist. LEXIS 2350 ……………………………………………… 11

*Rescuecom Corp. v. Google Inc.* (2nd Cir. 2009)
   562 F.3d 123 …………………………………………………………………… 5

*Rezner v. HVB Am., Inc*. (N.D. Cal. Apr. 6, 2015)
   2015 U.S. Dist. LEXIS 44835 …………………………………………… 10

*Roth v. Rhodes* (1994)
   25 Cal. App. 4th 530……………………………………………………… 14

*Sanabria v. United States*, (1978)
   437 U.S. 54 ………………………………………………………………… 9

*Sedima S.P.R.L. v. Imrex Co*., (1985)
   473 U.S. 479, 87 L. Ed. 2d 346, 105 S. Ct. 3275 ………………………… 6, 13

*Shersher v. Superior Court* (2007)
   154 Cal. App. 4th 1491………………………………………………… 19

*Starr v. Baca* (9th Cir. 2011)
   652 F.3d 1202 …………………………………………………………… 6,16

*Sybersound Records, Inc. v. UAV Corp.* (9th Cir. 2008)
   517 F.3d 1137 ……………………………………………………… 10, 11, 13

*United States v. Bennett*, (8th Cir. 1980)
   623 F.2d 52 ……………………………………………………………… 9

*United States v. Corinthian Colleges* (9th Cir. 2011)
   655 F.3d 930 …………………………………………………………… 6

*Whittlestone, Inc. v. Handi-Craft Co*. (9th Cir. 2010)
   618 F.3d 970 ……………………………………………………… 5, 18, 19

Statutes

15 U.S.C. § 3004 ……………………………………………………………1

18 U.S.C. § 1955 ........................................................................ 7, 15

31 U.S.C. § 5361……………………………………………………….4

31 U.S.C. § 5362……………………………………………………….4

*Federal Rules of Civil Procedure* Rule 12................................. passim

*Federal Rules of Civil Procedure* Rule 15................................. 9

*Business & Professions Code* § 17200 ................................ 2, 12, 17

*Business & Professions Code* § 19590 ................................... 1

*Business & Professions Code §* 19595 ............................... 1, 7, 17

*Business & Professions Code* §19604 ................................... 2

**Other**

California Horse Racing Board, Rule 2070………………………………2

California Horse Racing Board, Rule 2081………………………………2

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

## I.   **INTRODUCTION AND BACKGROUND.**

While daily fantasy sports have been in existence for some time, it is only in the last year that state regulators and attorneys general have begun to scrutinize whether such activity is actually legal.  A number of jurisdictions – Nevada, New York, Illinois, and Texas – have already determined that daily fantasy sports constitute illegal gambling.  The State of Indiana has recently passed legislation legalizing certain daily fantasy sports based upon statistical data, while expressly forbidding using the results of horse races in daily fantasy contests.[1]  Thus, fantasy contests on horse racing have additional legal impediments beyond those faced by fantasy sports wagering on football or other team sports: fantasy sports betting on the actual outcome of games or events (rather than statistics from those games or events) is specifically forbidden, and because wagering on horse racing itself is uniquely subject to extensive regulation on both the state and federal level, even where daily fantasy sports betting is allowed, Defendant's "fantasy league competition based on professional horse racing," will remain unauthorized and in violation of various laws.

As set forth in the Complaint and the *RICO* Statement submitted by Plaintiffs, horse racing (and the related wagering) is a heavily regulated industry in the United States, on both the federal and state level.[2]  <u>Complaint, ¶ 13</u>. In order to offer off-track wagering on horse races, one must obtain the proper consents and licenses from numerous groups, including host racing associations like Plaintiffs, and licensing

---

[1] http://www.indystar.com/story/sports/2016/03/24/daily-fantasy-sports-law-fanduel-draftkings-mike-pence/82205488/

[2] To accept an interstate off-track wager on horse racing, Section 3004 of the *Interstate Horseracing Act of 1978* (15 U.S.C. § 3001 *et seq.*) (the "IHA"),  requires the consent of: 1) the host racing association (and its respective horsemen's group), 2) the host racing commission, and 3) the off-track racing commission. 15 U.S.C. § 3004. Complaint, ¶ 17.  Defendant has none of the required consents, and is operating in violation of the IHA.  Complaint, ¶ 22.  DerbyWars does not hold, nor has it ever held, a license to conduct wagering on horse racing in California, Florida, Maryland, or Oregon.  Complaint, ¶ 22.  Defendant is also operating in violation of state gambling laws, including California *Business & Professions Code* §§ 19590 and 19595.  Complaint, ¶ 37.

agencies like the California Horse Racing Board.  Complaint, ¶ 17.  One of the many requirements to obtaining the required consents and licenses, so that one can legally accept off-track wagers, is an agreement to pay the legally required fees.  Without the proper consents and licenses, you cannot legally accept wagers on horse races.

Defendant does not comply with either state or federal regulations: it does not have the required consents and licenses, and it is not paying the required fees.  This failure has caused, and continues to cause, direct injury to Plaintiffs by depriving them of, *inter alia,* the Host Fees and Source Market Fees (collectively, the "Fees"), to which they are legally entitled for any legal bet placed on a horse running at their tracks, or for any legal bet placed by a resident of their home states on a race run in their home state or in another state.[3]  Complaint, ¶ 25.  These violations of law equate to a "pattern of racketeering activity" for purposes of the *RICO* statute, and also provide the basis for Plaintiffs' claims of violation of *Business & Professions Code* § 17200, and intentional interference with prospective economic advantage.

These actions also violate the IHA, and Defendant has not moved to dismiss, or to strike, any allegations of the first claim for relief for violation of the IHA.  As a result, for the purposes of the Motion, Defendant has conceded that its actions are wrongful, and it only disputes which claims for relief may be pursued against it.  Thus, regardless of the outcome of the Motion, Plaintiffs will continue to pursue their claims for damages and injunctive relief against Defendant.

In the Motion, Defendant ignores the damages to Plaintiffs directly caused by its actions, and opines that Plaintiffs have not been damaged at all because Defendant is simply growing the sport to the benefit of Plaintiffs.  Motion, 20:14-15.  It asserts that it is possible that all of the participants at the DerbyWars website never previously

---

[3] See, e.g., California *Business & Professions Code* §19604; California Horse Racing Board Rules 2070 and 2081.  In recognition of the requirement that these Fees must be paid, DerbyWars has now begun entering into agreements with race tracks to contribute a portion of contest revenue for distribution to both the racetrack and the horsemen.  http://www.paulickreport.com/horseplayers-category/derbywars-hawthorne-announce-contest-simulcast-agreement/

placed a legal parimutuel wager on horse racing.  That, however, ignores the fact that the Fees to which Plaintiffs are entitled are due from any bet, even those placed by first-time gamblers.  *Id.* These damages are neither speculative nor difficult to determine:  Defendant must keep track of the bets placed on its site and the individuals who place those bets, including their location, since it is prohibited from taking bets from residents of certain states where betting on horse racing is illegal.  Statement, § 10.  Thus, there is no mystery as to the identity of the bettors with whom Defendant has interfered.  Defendant has already surveyed its customers to determine their betting habits, including whether they have previously placed parimutuel bets.  Statement, § 11(b).

Defendant also attempts to hide behind the curtain of "fantasy" sports, claiming that it offers fun contests for cash prizes, ignoring the millions of dollars bet on its website, from which it retains a percentage.[4]  Motion, 1:13-20.  It is true that fantasy sports have been popular for some time, particularly fantasy football.[5]  Complaint, ¶ 27.  After Congress enacted the *Unlawful Internet Gambling Enforcement Act of 2006*

---

[4] As the court said in the lawsuit brought by the Attorney General of the State of New York, in distinguishing traditional fantasy leagues, which "involved seasonal fantasy sports in which the players paid a nonrefundable one time entry fee from daily fantasy betting,"  "the participants pay a fee every time they play, potentially multiple times daily instead of one seasonal entry fee, with a percentage of every entry fee being paid to Fanduel, Inc. and Draftkings, Inc.  . . .  The payment of an 'entry fee' as high as $10,600.00 on one or more contests daily could certainly be deemed risking 'something of value.' . . . [daily fantasy] involves illegal gambling."  *People v Fanduel, Inc.* (N.Y. Sup. Ct. Dec. 11, 2015).  2015 N.Y. Misc. LEXIS 4521, 16-18  The States of Nevada, Illinois and Texas have also determined that daily fantasy is gambling.

[5] Generally, in fantasy football, a player "drafts" football players from different teams throughout the National Football League, and competes against other players and their "teams." Each week, a player accumulates points based upon the output of the players in the starting line-up that he has selected for the week.  The contest can continue over the course of the NFL season.  Complaint, ¶ 27.  Importantly, in fantasy sports, the participants are never betting that a certain NFL team will win the game; that would undeniably violate the laws against online sports betting.  Complaint, ¶ 30.  By contrast, at DerbyWars, players indeed pick the winners of various races; they aren't compiling points based upon which horse ran the fastest first quarter mile, or which horse left the gates the fastest.  They are placing a bet on which horses will win a series of races at any number of tracks, in a parlay bet of sorts.  Complaint, ¶¶ 34-37.

(the "UIGEA") to restrict internet gambling, daily fantasy sites such as Draft Kings and FanDuel popped up and quickly became a multi-billion dollar industry. Complaint, ¶ 28.  While the UIGEA does not prohibit fantasy sports betting, it also does not legalize it, if it is otherwise illegal under another anti-gambling law.   31 U.S.C. § 5361(b).  Complaint, ¶ 29.

The "carve-out" for fantasy sports betting is found in Section 5362 (ix),  of the UIGEA, wherein excluded from the definition of  "Bet" or "Wager" is participation in a fantasy game or contest, so long as, among other requirements, winning outcomes are determined by statistical results of the performance of individuals in multiple games, ***and the winning outcome is not based on the "score, point-spread, or any performance or performances of any single real-world team or any combination of such teams, or solely on any single performance of an individual athlete in any single real-world sporting or other event."***  (Emphasis added).  Complaint, ¶ 30. However, it does not permit a wager on the outcome of a sporting event, such as a horse race, or a combination of outcomes of multiple sporting events (horse races), such as a "parlay" bet.[6]  Complaint, ¶ 30.  Thus, even if daily fantasy football were legal, DerbyWars' model of betting on the winners of horse races is not. [7]  Complaint, ¶¶ 34-37.

Defendant has been operating the DerbyWars website since 2011, and Defendant estimates that DerbyWars has grown at a rate of 100% each year. Statement, § 4.  Defendant estimates that the online horse racing contest market will be approximately $25 million annually, and that its site, DerbyWars, can gain 40% of

---

[6] Section 5362 (D) of the UIGEA also specifically addresses horse racing, and expressly states that it is not the intent of the UIGEA to legalize betting on horse racing that would otherwise be illegal under the IHA.  The plain language also preserves any state prohibition against gambling on horse races that existed at the time of the UIGEA's enactment (31 U.S.C. § 5362 (D)).

[7] This was recently codified in Indiana, where a new law legalizing daily fantasy betting on pro sports, specifically forbids using the results of horse races in daily fantasy contests. http://www.indystar.com/story/sports/2016/03/24/daily-fantasy-sports-law-fanduel-draftkings-mike-pence/82205488/

that. <u>Statement</u>, § 4.  But every bet placed through DerbyWars (instead of through Plaintiffs, or an authorized operator) on a race meet run by Plaintiffs results in monetary damages to Plaintiffs, and ill-gotten gains to Defendant. <u>Statement</u>, § 16. Plaintiffs are also damaged, and the Defendants unlawfully enriched, when a bet is placed by a resident of California, Oregon, Maryland or Florida on a horse race, regardless of whether such horse race is conducted at Plaintiffs' tracks, because Derby Wars does not pay the required Source Market Fees.

By its Motion, Defendant seeks to dismiss the claims for relief for violation of the *RICO* statute, and for intentional interference with prospective economic relations. Plaintiffs maintain that they have adequately pleaded both claims, and that the Motion to Dismiss should be denied.  Should the Court grant any part of the Motion to Dismiss, Plaintiffs respectfully request leave to amend.  Defendant's Motion to Strike should also be denied in its entirety as procedurally improper (see *Whittlestone, Inc. v. Handi-Craft Co*. (9th Cir. 2010) 618 F.3d 970, 971; and *Initial Standing Order, ¶*21), and because Plaintiffs have sufficiently pleaded a right to disgorgement and restitution.

## II.    <u>DEFENDANT'S MOTION TO DISMISS MUST BE DENIED.</u>

A Motion to Dismiss under 12(b)(6) is a disfavored motion because of the lesser role pleadings play in federal practice, and the liberal policy regarding amendment. *Broam v. Bogan* (9th Cir. 2003) 320 F.3d 1023, 1028 (a Rule 12(b)(6) dismissal with prejudice is proper only in "extraordinary" circumstances).  In considering a Motion to Dismiss, the court must "accept as true all of the factual allegations set out in the complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google Inc.* (2nd Cir. 2009) 562 F.3d 123, 127.  Courts must assume that all general allegations "embrace whatever specific facts might be necessary to support them."  *Peloza v. Capistrano Unified School District* (9th Cir. 1994) 37 F.3d 517, 521.  When a complaint's allegations are capable of more than one inference, the court must adopt

whatever plausible inference supports a valid claim. *Starr v. Baca* (9th Cir. 2011) 652 F.3d 1202, 1216. A plaintiff's ability to prove his or her allegations, or possible difficulties in making such proof, is generally of no concern in ruling on a 12(b)(6) motion: "In considering a 12(b)(6) motion, we do not inquire whether the plaintiff will ultimately prevail, only whether they are entitled to offer evidence to support their claims." *Nami v. Fauver* (3rd Cir. 1996) 82 F.3d 63, 65; *Allison v. California Adult Authority* (9th Cir. 1969) 419 F.2d 822, 823; *Peterson v. Grisham* (10th Cir. 2010) 594 F.3d 723, 727 (court does not weigh potential evidence that the parties may present at trial).

Applying these standards, the Court should deny Defendant's Motion to Dismiss. And should the Court grant the Motion in whole or in part, Plaintiffs must be given leave to amend. *United States v. Corinthian Colleges* (9th Cir. 2011) 655 F.3d 984, 995.

### A.   Plaintiffs Have Adequately Pleaded A Pattern Of Racketeering Activity Under *RICO*.

Plaintiffs have pleaded a pattern of racketeering activity based on the internet wagers accepted by Defendant on a daily basis since 2011, in violation of various state and federal laws. <u>Statement</u>, § 5. A plaintiff need not allege that the defendant has been convicted of the predicate act – in this case gambling in violation of state and federal law – to bring a civil claim. *Sedima, S.P.R.L. v. Imrex Co.* (1993) 473 U.S. 479, 488-493. *RICO* is not designed to punish a single bad act; a *RICO* claim requires a "pattern of racketeering activity," which has been described by the Supreme Court as encompassing illegal acts that have the "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.,* at 496, n. 14. The *RICO* statute provides that:

"As used in this chapter

(1) **'racketeering activity' means (A) any act or threat involving**  . . .

**gambling**, which is chargeable under State law and punishable by imprisonment for more than one year; (B) **any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1955 (relating to the prohibition of illegal gambling businesses)**, . .

. . .

    (5) 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961 (emphasis added)."

Defendant's actions in accepting interstate bets is "racketeering activity" that involves gambling; specifically, gambling that is in violation of the *Illegal Gambling Business Act of 1970*, 18 U.S.C. § 1955.  An "illegal gambling business" means a gambling business which: (i) is a violation of a state law; (ii) involves five or more persons; and (iii) has been in operation in excess of thirty days or has a gross revenue of $2,000 in any single day.  Statement, §5.

Defendant violates California *Business & Professions Code* § 19595, and therefore, also violates 18 U.S.C. § 1955, inasmuch as it is not licensed by the State of California to accept wagers on horse racing, and it has been operating for more than 30 days – since 2011 – and it has conducted business that made more than $2,000. Statement, §5.  It also violates the laws of the states of Florida, Oregon and Maryland. Complaint, ¶ 21.  Despite what Defendant claims (Motion, 2:6-15), Plaintiffs need not plead that Defendant is conducting multiple schemes with multiple enterprises:

    "Plaintiff is not required to show multiple schemes and multiple victims to demonstrate a pattern of racketeering activity. 'Pattern' does not require multiple schemes 'so long as the predicate acts involved are not isolated or sporadic.' The acts here were not isolated or sporadic; they occurred consistently, without break, for two years. Likewise, a pattern does not require multiple victims."

*Kearney v. Foley & Lardner, LLP* (9th Cir. 2015) 607 Fed. Appx. 757, 758-759 (citations omitted).

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

A "pattern" requires that the predicate criminal acts be "related" and "continuous." *H.J. Inc. v. Northwestern Bell Telephone Co*. (1989) 492 U.S. 229, 239. (Allegations that Northwestern Bell bribed utility officials for four years, in exchange for which the officials allowed Northwestern Bell to charge its customers, one of which was H.J. Inc., excessive rates, stated *RICO* claim.)  "Continuity" can be closed or open-ended, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition.  *Id*. at 241. "Closed-ended" continuity is established by showing that related predicate acts occurred over a "substantial period of time." *Id*. at 242.  Where long-term criminal conduct cannot be established, "open-ended" continuity may be proved.  *Id*.  Open-ended continuity is the threat that criminal conduct will continue into the future. It is established by showing either that the predicate acts "include a specific threat of repetition extending indefinitely into the future" or that the predicate acts were "part of an ongoing entity's regular way of doing business." *Id*.  ***RICO's continuity requirement does not require multiple criminal schemes in the commission of the predicate acts, but that continuity may be established with predicate acts that are part of a single scheme***.  *Id*. at 240.  See, also, *Allwaste, Inc. v. Hecht* (9th Cir. 1995) 65 F.3d 1523, 1527-1528[8]

Plaintiffs have pleaded that Defendant is violating state laws and violating Section 1955 on a daily basis since 2011, and that the acts are likely to continue without intervention.  Plaintiffs have pleaded facts sufficient to establish either closed-

---

[8]  In *Allwaste,* the dismissal of a *RICO* claim was reversed on appeal. Plaintiff recycling companies sued defendant for violating *RICO*. The court of appeal held that plaintiffs' allegations satisfied the open ended continuity requirement as to two defendants because it held that plaintiffs' allegations would suffice to establish that extorting kickbacks had become their regular way of doing business and that the activities would not have ceased unless plaintiffs had intervened, and that such a showing would satisfy the open-ended continuity requirement. The court also held that denying plaintiffs leave to amend the complaint was an abuse of discretion because under Fed. R. Civ. P. 15(a), plaintiffs were entitled to the right to amend once as a matter of course before responsive pleadings were filed.

ended or open-ended continuity.

Defendant has failed to cite a single case that supports its assertion that Plaintiffs have not adequately pleaded a pattern of racketeering activity.  Defendant asserts that there must be multiple schemes (Motion, 9:18-26), but that is incorrect. *H.J. Inc.*, 492 U.S. at 240-41.  Indeed, Defendant relies on two non-*RICO* cases addressing double jeopardy under 18 U.S.C. Section 1955.

In *Sanabria v. United States*, (1978) 437 U.S. 54, the defendant was charged in a single-count indictment for violating 18 U.S.C. § 1955 by his involvement in horse and numbers betting. The trial court struck all evidence on the numbers betting charges, believing that activity to be legal under state law, and then entered a judgment of acquittal because there was insufficient evidence linking the defendant to the horse betting activity. The Supreme Court held that a retrial on the numbers theory would constitute double jeopardy.  In *United States v. Bennett*, (8th Cir. 1980) 623 F.2d 52, 53**,** Defendant operated an illegal gambling business, and he was convicted on three separate counts of violation of § 1955 for conducting three crap games on different days.  After serving his prison sentence, defendant filed a motion to correct the sentence that was denied by the district court, but reversed on appeal. [9]

---

[9]   Defendant also relies on *Boyle v. United States* (U.S. 2009) 556 U.S. 938, 949. Boyle is a case involving the definition of an "enterprise;" it does not attempt to define a pattern of racketeering activity.   Defendant was charged in connection with a series of bank thefts that were allegedly conducted by a group that was loosely organized and did not appear to have had a leader or hierarchy. The trial court instructed the jury that an association of individuals without structural hierarchy could form an enterprise. The Supreme Court held that an association-in-fact enterprise had to have a "structure." However, the instructions did not have to include the term "structure," and the jury was correctly and adequately instructed. The Court did note that: "Proof that a defendant violated § 1955 does not necessarily establish that the defendant conspired to participate in the affairs of a gambling enterprise through a pattern of racketeering activity. In order to prove the latter offense, the prosecution must prove either that **the defendant committed a pattern of § 1955 violations or a pattern of state-law gambling crimes**. See § 1961(1). No such proof is needed to establish a simple violation of § 1955." *Id.*  (Emphasis added).

While it is unclear, it appears that Defendant is asserting that in order to constitute a violation of the *RICO* statute, the defendant must be operating at least two separate illegal enterprises.  However, that assertion contradicts both the language of the statute and established case law.  Plaintiffs have adequately pleaded a pattern of racketeering activity under *RICO*.

### B.    Plaintiffs Have Adequately Pleaded Causation Under *RICO*.

In addressing Section 1962(c) claims, courts have developed a three-part test for *RICO* causation: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful  conduct; and  (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *Anza v. Ideal Steel Supply Corp.* (2006) 547 U.S. 451; *Hemi Group, LLC v. City of New York* (2010) 559 U.S. 1; *Sybersound Records, Inc. v. UAV Corp.* (9th Cir. 2008) 517 F.3d 1137; *Rezner v. HVB Am., Inc*. (N.D. Cal. Apr. 6, 2015) 2015 U.S. Dist. LEXIS 44835, 5-6.[10]

The key to each of these decisions is the first factor:  whether there is a more direct victim of the wrongful conduct:

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiff's injuries. . . . As for proximate cause, the facts pleaded in the

---

[10] In *Anza*, plaintiff alleged that defendant had filed fraudulent state sales tax returns, and had avoided the payment of sales tax, thereby incurring lower costs and giving defendant an unfair advantage over the plaintiff, its direct competitor.  The Court found that plaintiff lacked standing, and that its injury was too indirect.  It reasoned that the direct victim of the tax fraud was the State of NY, which could itself sue to recover damages.  *Anza,* 547 U.S. at 461.  Similarly, in *Sybersound,* the parties were competitors that produced and sold karaoke records to distributors and retail stores (customers).  The producer asserted that defendants misrepresented to the customers that their karaoke records were 100 percent licensed.   The court, applying the three factors, found that causation was lacking, noting that it was the copyright holders who were the direct victims.  *Sybersound,* 517 F.3d at 1148.

FAC make it plausible that Defendants' conduct led directly to the Pradhans' injury. Therefore, Defendants' motion to dismiss the Pradhans' *RICO* claim based on lack of statutory standing is denied."

*Pradhan v. Citibank, N.A.* (N.D. Cal. Jan. 10, 2011)  2011 U.S. Dist. LEXIS 2350, 18-19 (Allegations that plaintiffs lost $200,000 in home equity due to defendants' fraudulent conduct, which is actionable under California *Business & Professions Code* § 17200, constitutes a concrete financial loss).

In the instant case, there is no more direct victim of Defendant's acts than Plaintiffs.  It is Plaintiffs that have been, and continue to be, deprived of the Fees to which they are entitled by the actions of Defendant in accepting online wagers on horse races, without the required consents and licenses, and without paying to Plaintiffs the legally required Host and Source Market Fees.  <u>Complaint,</u> ¶ 25; <u>Statement</u>, § 4. Plaintiffs have adequately pleaded causation.

## C.    Plaintiffs Have Adequately Pleaded A *RICO* Injury.

Although there is a split in authority as to whether a plaintiff must plead that it suffered injury as a result of the investment of racketeering income in the enterprise (Section 1962(a)), or as a result of the acquisition, maintenance of an interest in, or control over the enterprise (Section 1962(b)), rather than from the underlying predicate acts,[11] Plaintiffs herein have adequately pleaded a *RICO* injury under either analysis.

---

[11] See, *In re National Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litigation* (C.D. Cal. 1987)  682 F. Supp. 1073, 1081-1082:  "The Court declines to follow these cases in imposing a separate standing requirement for § 1962(a), (b) and (d). To impose such a requirement would be to revive the concept of a "distinct racketeering injury" rejected by the Supreme Court in *Sedima S.P.R.L. v. Imrex Co*., (1985) 473 U.S. 479, 87 L. Ed. 2d 346, 105 S. Ct. 3275. . . . The Ninth Circuit has also implicitly rejected a "separate injury" requirement for § 1962(a) and (d). In *Wilcox v. First Interstate Bank*, (9th Cir. 1987) 815 F.2d 522, the court reversed summary judgment in defendant's favor on § 1962(a), (b) and (d) claims. In doing so, the court stated: The Supreme Court recently expressly rejected the "racketeering enterprise injury" rule relied on by the district court . . . . The Court emphasized that a plaintiff must still allege each element prescribed in the statute to state a claim. The statute, however,

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

In *Ideal Steel Supply Corp. v. Anza* (2d Cir. 2011) 652 F.3d 310, 327, the Second Circuit concluded that plaintiff stated a 1962(a) claim based on the following: Plaintiff Ideal alleged that in 1999 and 2000, the Anzas and National, in violation of Section 1962(a), invested funds derived from National's Queens store's cash-no-tax scheme to establish National's store in the Bronx.  The opening of that facility caused Ideal to lose a substantial amount of business at its Bronx store.  Said the Court in finding this was adequate:   "With respect to Ideal's subsection (a) claim, however, the act constituting the violation is the very act that causes the harm: the use or investment of the funds derived from the pattern of mail and wire frauds to establish and operate the Bronx store is both the violation and the cause of Ideal's lost sales."  Similarly, Plaintiffs allege a Section 1962 (a) injury resulting from Defendant's investment of the racketeering income in DerbyWars has allowed it to grow its business, thereby injuring Plaintiffs:[12]

> "Horse Racing Labs invests the income that it derives from this racketeering activity into DerbyWars, to entice more bettors to spend their available bankrolls on fantasy contests, instead of legal parimutuel betting.  Initially, Horse Race Labs obtained its customers through house ads placed on its own website, Horse Racing Nation. With the investment of the income that it derives from its racketeering activity, it is able to promote and maintain its fantasy contests and grow its business by an

requires no more. The compensable injury is the harm caused by the predicate act relied upon. *Id.* at 529. The court drew no distinction between the plaintiff's claims under § 1962(a), (c) and (d). See also *Virden v. Graphics One*, 623 F. Supp. 1417, 1420-21, 1430 (C.D. Cal. 1985) (post-*Sedima* case denying defendants' motion for summary judgment on § 1962(a), (b), (c) and (d) claims; rejecting defendants' argument that plaintiffs failed to state claims under those subsections because of their "failure to allege that they suffered 'racketeering-type' injuries distinct from and in addition to their injuries suffered as a result of the . . . predicate acts").

[12] As discussed *infra*, *Sybersound* is inapposite.  In that case, unlike the case at bar, plaintiff Sybersound was *not* the direct victim of defendant's wrongful activity.  "Sybersound's competitive injury stems from the alleged copyright infringement for which it does not have statutory standing to bring a RICO claim." *Sybersound*,  517 F.3d at 1150.

estimated one hundred percent each year, to the detriment of Plaintiffs."
Statement, §2.

"Horse Racing Labs receives the income generated by its racketeering
activities.  More specifically, Horse Racing Labs retains a portion of each
bet, ranging from 7% – 17 % of the amount wagered.  DerbyWars has
used and invested the income that it has received from its racketeering
activities to lure away parimutuel bettors from Plaintiffs, to Plaintiffs'
injury.  DerbyWars estimates that its customers now split their available
bankrolls 80/20 in favor of parimutuel wagering vs. contest play.
DerbyWars claims that this is as a result of the money that it has spent on
'fan education, product exposure and cross-promotional marketing.' "
Statement, §11.

As to Section 1962 (b), Plaintiffs allege:

"In 2011, Horse Racing Labs expanded its operations from operating the
Horse Racing Nation website, to operating DerbyWars, an internet
website for fantasy sports betting on horse races, including races run at
race meets operated by Plaintiffs.  DerbyWars offers online wagering
opportunities throughout the United States, including on races run at race
meets operated by Plaintiffs.  Horse Racing Labs acquired and maintains
its interest in, and control over, DerbyWars, through the income that it
generates by operating an interstate gambling site.  Plaintiffs have been
damaged by Horse Racing Labs' acquisition and maintenance of such an
interest, as well as by the illegal gambling itself, because it allows and
encourages individuals who would legally bet on the races run at
Plaintiffs' racing meets to instead engage in online gambling to the
detriment of Plaintiffs."[13] Statement, § 12.

_____

[13] As set forth above, and contrary to Defendant's claim (Motion, 16:21 – 17:12),
Plaintiffs have indeed alleged that Defendant maintains control over an enterprise
through its racketeering activity.  Statement, § 12.  Moreover, Defendant's reliance on
*Lightning Lube v. Witco Corp.* (3d Cir. 1993) 4 F.3d 1153, is misplaced.  In that case,
the trial court had incorrectly dismissed the 1962(b) claim, finding that the "person"
and "enterprise" must be two separate entities.  That position has been rejected by the
Courts, which have held that for 1962(a) and (b) cases, the enterprise and person can
be one and the same.  *Lightning Lube,* 4 F.3d at1190-1191.  Defendant's reliance on
*Jalili v. Far East Nat'l Bank* (N.D. Cal. Sept. 23, 2013) 2013 U.S. Dist. LEXIS
136031, is also misplaced.  In *Jalili,* the case was dismissed because the Court found
that Plaintiff had not adequately plead a pattern of racketeering activity, nor had it

-13-

Either of these is sufficient to support a *RICO* claim. *Alvarez v. Hill* (9th Cir. 2008) 518 F.3d 1152. (Motion to dismiss should be denied if the facts alleged support any valid theory).

### D. Plaintiffs Have Adequately Pleaded A Claim For Intentional Interference With Prospective Economic Advantage.

To plead an actionable wrong for interference with a noncontractual economic relationship, the plaintiff must allege that (1) he or she had an economic relationship with a third party containing the probability of a future economic benefit to plaintiff; (2) defendant had knowledge of this relationship; (3) defendant committed intentional acts designed to disrupt the relationship, and those acts were wrongful by some measure other than the interference with the plaintiff's interest itself; (4) actual disruption of the relationship occurred; and (5) plaintiff suffered damages as a result. *Della Penna v. Toyota Motor Sales U.S.A., Inc.* (1995) 11 Cal. 4th 376, 392-393. "[A]n essential element of the tort of intentional interference with prospective business advantage is the existence of a business relationship with which the tortfeasor interfered. (*Asia Investment Co. v. Borowski* (1982) 133 Cal.App.3d 832, 840-841). Although this need not be a contractual relationship, an existing relationship is required. (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815)." *Roth v. Rhodes* (1994) 25 Cal. App. 4th 530, 546.

Plaintiffs pleaded that there exists a non-contractual, economic relationship between Plaintiffs and prospective bettors on the horse races run at the race meets operated by Plaintiffs containing a probability of future economic benefits accruing to Plaintiffs in the form of compensation that Plaintiffs receive from legal bets placed on those races. Complaint, ¶ 68. Defendant knew of this economic relationship because

---

pleaded a *RICO* injury, not because it had not pleaded control. *Id.,* at 21-22.

the individuals associated with Defendant have experience in the horse racing industry.  Complaint, ¶ 69.  Defendant intentionally disrupted these beneficial relationships when it offered bettors a means to place bets on horse races that violated the IHA, and California *Business & Professions Code* § 17200 *et seq.*, California *Business & Professions Code* § 19595, *RICO* and 18 U.S.C. § 1955.  Complaint, ¶ 70.  The above actions of Defendant has caused a disruption of the above described economic relationship in that many prospective bettors have placed bets through the DerbyWars website, rather than placing bets through proper channels, thereby depriving Plaintiffs of their compensation.  Complaint, ¶ 71.  As a direct result, Plaintiffs have suffered damages as a proximate result of the actions of Defendant in a sum to be determined at trial  Complaint, ¶ 72.

Defendant claims that "Plaintiffs' Intentional Interference claim fails for at least these reasons," (Motion, 17:24-25):  Plaintiffs have failed to plead an existing economic relationship with a third party; and Plaintiffs fail to allege that Defendant's conduct was the proximate cause of  harm.  Both are incorrect.  Plaintiffs pleaded that they had an economic relationship with prospective bettors - third parties who legally wager on the horse races run at their tracks, and residents of their state who place wagers on races run in their state or races run in another state, who would be likely to place legal wagers in the future, but for the wrongful actions of Defendant.  Plaintiffs are directly harmed by Defendant's actions because Defendant deprives them of both Host Fees and Source Market Fees to which they are entitled when these third parties place a bet with Defendant, because Defendant does not comply with the legal requirements for accepting wagers.  Defendant has intentionally interfered with these relationships and with this expectation - Defendant admits that it lures bettors to its site with the promise of lower take-out.  Statement, § 4.  Defendant advertises its success – its bettors now "split their available bankrolls 80/20." [14]  Statement, § 4.

---

[14] Defendant asserts that "prospective bettors" can only mean "new" bettors, who

Plaintiffs' have sufficiently pleaded a claim for intentional interference with economic relations.  See, *Oracle Am., Inc. v. Cedarcrestone, Inc.* (N.D. Cal. June 26, 2013) 2013 U.S. Dist. LEXIS 89986, 10-13 (The complaint asserts that CedarCrestone used its partnership status to both misappropriate Oracle's intellectual property, by selling infringing software updates for Oracle's software, and to attract customers to whom it could provide services using the misappropriated software, thus interfering with Oracle's customer relationships.)

> "CedarCrestone argues that Oracle merely alleges interference 'with the broader market for Oracle's products and services,' and that 'such hazy market-based allegations, unconnected to any particular business relationship, do not state a viable interference claim. CedarCrestone's attempt to portray Oracle's claim as based on a generalized, non-actionable, "market interference" theory is unavailing. The complaint alleges that CedarCrestone targeted and took licensees of Oracle's PeopleSoft-branded software and Oracle support customers. These were actual customers with whom Oracle had an existing economic relationship as Oracle software licensees Oracle alleges that, absent CedarCrestone's unlawful conduct, there is a substantial probability that Oracle support customers would have initiated, renewed, or expanded their support contracts and software licenses with Oracle, rather than with CedarCrestone.

> "These allegations, construed in the light most favorable to Oracle, adequately plead the requisite economic relationship between Oracle and some third party with the probability of future economic benefit, namely, the specific group of Oracle software licensees and support customers that became CedarCrestone's customers.  By definition, this is a limited group of customers whose identities should be in CedarCrestone's possession, or could be obtained through discovery. CedarCrestone's assertion that it has no way of defending against Oracle's intentional interference claim because Oracle has not pleaded the elements of the claim specifically as

---

never previously engaged in legal parimutuel wagering.  That is nonsensical, but regardless, when a complaint's allegations are capable of more than one inference, the court must adopt whatever plausible inference supports a valid claim.  *Starr*, 652 F.3d at1216.  But it is also irrelevant.  Plaintiffs are entitled to Host and Source Market Fees from those new bettors, too.

to each customer has no merit. See *Humboldt Wholesale, Inc. v. Humboldt Nation Distribution, LLC*, No. 11-cv-4144 EMC, 2012 U.S. Dist. LEXIS 91483, 2012 WL 2572065, at *6 (N.D. Cal. July 2, 2012) (allegations that manufacturer and seller of hydroponic goods had existing and prospective business relationships with third-party distributors and retailers, that competitor knew or should have known of those relationships, and that competitor disrupted those relationships by registering domain names and diverting Internet traffic from plaintiff to competitor through those names, stated a claim for intentional interference); *PhoneDog v. Kravitz*, No. 11-cv-03474 MEJ, 2012 U.S. Dist. LEXIS 10561, 2012 WL 273323, at *1 (N.D. Cal. Jan. 30, 2012) (interference claim was sufficiently based on alleged relationship between PhoneDog and its current and prospective advertisers which was disrupted by defendant, causing plaintiff the loss of advertising revenue)."

*Oracle Am., Inc. v. Cedarcrestone, Inc*. (N.D. Cal. June 26, 2013) 2013 U.S. Dist. LEXIS 89986, 10-13 (some citations omitted). See, also, *Architectural Mailboxes, LLC v. Epoch Design, LLC*, (S.D. Cal. Apr. 28, 2011) 2011 U.S. Dist. LEXIS 46180 ("With respect to element (1), Defendant contends Plaintiff has failed to allege an existing economic relationship. Although the phraseology of the Complaint is not as clear as it could be, the Court finds Plaintiff has properly pleaded an existing economic relationship. (See Compl., ¶ 60.) Specifically, Plaintiff alleges it has existing business relationships with third-parties, including Ace Hardware. (*Id*.) Accordingly, this element has been properly pleaded.")

Similarly, Plaintiffs have adequately pleaded an existing economic relationship with a third party, and that Defendant's conduct was the proximate cause of its harm.

## III.   DEFENDANT'S MOTION TO STRIKE MUST BE DENIED.

*Federal Rules of Civil Procedure* Rule 12(f) provides that: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   Instead of following this rule, Defendant seeks to strike from the claim for unfair competition Plaintiffs' requests for disgorgement, "damages" and attorney fees, ignoring the controlling authority: "*[W]e hold that Rule 12(f) of the Federal Rules of Civil Procedure does not authorize a district court to*

*strike a claim for damages on the ground that such damages are precluded as a matter of law."* *Whittlestone, Inc. v. Handi-Craft Co*. (9th Cir. Cal. 2010) 618 F.3d 970, 971.[15]   Regardless, Plaintiffs have properly asserted a claim for disgorgement, and they are entitled to damages and attorney's fees under other claims for relief.

In *Whittlestone,* plaintiff seller sued for breach of contract when the buyer unilaterally withdrew from the contract two years into the 20 year term. The seller requested damages that included loss of the value of the 20 year contract, lost profits, consequential damages, and restitution. The district court granted the buyer's Rule 12(f) motion and struck the seller's lost profits and consequential damages claims, finding that these damages were not recoverable as a matter of law. On appeal, the court held that Rule 12(f) did not authorize a district court to strike a claim for damages on the ground that such damages were precluded as a matter of law, because they are not an insufficient defense, redundant, immaterial, impertinent, or scandalous under Rule 12(f). Said the Court:

> "It is quite clear that none of the five categories covers the allegations in the pleading sought to be stricken by Handi-Craft. . . .Notwithstanding this, Handi-Craft argues that Whittlestone's claim for lost profits and consequential damages should be stricken from the complaint, because such damages are precluded as a matter of law. Thus, Handi-Craft's 12(f) motion was really an attempt to have certain portions of Whittlestone's complaint dismissed or to obtain summary judgment against Whittlestone as to those portions of the suit-- actions better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion. Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading (as Handi-Craft would have us do here), we would be creating redundancies within the Federal Rules of Civil

---

[15] Defendant ignores *Whittlestone*, and instead relies on inapplicable case law.  In *Hibbs-Rines, v. Seagate Technologies, LLC* (N.D. Cal. Mar. 2, 2009) 2009 U.S. Dist. LEXIS 19283 the doe defendants and the word "disgorgement" were dismissed by stipulation.  In *Asghari v. Volkswagen Grp. Of Am., Inc.* (C.D.Cal. 2013) 42 F.Supp.3d 1306, the plaintiff failed to respond to the motion to strike her claim for restitution, and the Court determined it had been abandoned.  Plaintiffs herein have not abandoned their claim for restitution.

Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already serves such a purpose. . . .  We therefore hold that Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law."

*Whittlestone,* 618 F.3d at, 973-975.  A 12(b)(6) motion to dismiss is also not appropriate because a plaintiff requests a remedy to which it is not entitled.  "[I]t need not appear that the plaintiff can obtain the *specific* relief demanded as long as the court can ascertain from the face of the complaint that some relief can be granted."  *Doe v. United States Dept. of Justice* (DC Cir. 1985) 753 F.2d 1092, 1104; *Massey v. Banning Unified School Dist.* (C.D. Cal 2003) 256 F. Supp.2d 1090, 1092.

Nevertheless, Plaintiffs have properly pleaded a right to disgorgement:

"The unfair competition law (UCL) authorizes a court to "make such orders … as may be necessary to prevent the use or employment  by any person of any practice which constitutes unfair competition, … or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (*Bus. & Prof. Code*, § 17203.)  Nothing in *Korea Supply* conditions the recovery of restitution on the plaintiff having made direct payments to a defendant who is alleged to have engaged in false advertising or unlawful practices under the UCL. The only requirements the UCL and the false advertising law impose on such recovery are that the plaintiff must be a "person in interest" (that is, the plaintiff must have had an ownership interest in the money or property sought to be recovered), and the defendant must have acquired the plaintiff's money or property "by means of … unfair competition" or some other act prohibited by the UCL or the false advertising law. Plaintiff in this case has  alleged that he paid money to a retailer to purchase Microsoft 's product based on false or misleading statements on the product package. This assertion, if true, supports a claim for restitution."

*Shersher v. Superior Court* (2007) 154 Cal. App. 4th 1491, 1494.

"Whether restitution is in the form of an equitable remedy or legal remedy, the relief is based on a specific amount found owing.  . . . when in equity, the plaintiff can

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS

seek in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal. App. 4th 663, 699.  See, also *Lectrodryer v. Seoulbank* (2000) 77 Cal. App. 4th 723, 726, cited by Defendant ("Evidence also supported the conclusion that Lectrodryer satisfied the elements for a claim of unjust enrichment: receipt of a benefit and unjust retention of the benefit at the expense of another.)

The amount owing to Plaintiffs for wagers placed on horse races run at their tracks, or by residents of the states where they operate, can easily be determined.  That money belongs to Plaintiffs, not Defendant, and Plaintiffs are entitled to restitution.

## IV.  <u>CONCLUSION.</u>

For the foregoing reasons, Plaintiffs respectfully request that the Motion to Dismiss be denied, that the Motion to Strike be denied, or in the alternative, that Plaintiffs be granted leave to amend.

Respectfully submitted,

DATED:  April 4, 2016                 CORBETT, STEELMAN & SPECTER
                                      A Professional Law Corporation


                                      By:    */s/ Richard B. Specter*
                                             Richard B. Specter
                                             Attorneys for PLAINTIFFS

PLAINTIFFS' OPP TO DEFENDANT'S MOTION TO DISMISS