Richard B. Specter, SBN 114090
Diane L. Ellis, SBN 130628
CORBETT, STEELMAN & SPECTER
A Professional Law Corporation
18200 Von Karman Avenue, Suite 900
Irvine, California 92612-1023
Telephone:  (949) 553-9266
Facsimile:  (949) 553-8454
rspecter@corbsteel.com

Attorneys for Plaintiffs
LOS ANGELES TURF CLUB, INCORPORATED,
LOS ANGELES TURF CLUB II, INC.,
PACIFIC RACING ASSOCIATION, PACIFIC RACING
ASSOCIATION II, GULFSTREAM PARK RACING
ASSOCIATION, INC., OREGON RACING, INC.,
MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
and LAUREL RACING ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES TURF CLUB, INCORPORATED, a California Corporation, LOS ANGELES TURF CLUB II, INC., a California Corporation, PACIFIC RACING ASSOCIATION, a California Corporation, PACIFIC RACING ASSOCIATION II, a California Corporation, GULFSTREAM PARK RACING ASSOCIATION, INC., a Florida Corporation, OREGON RACING, INC., a Delaware Corporation, MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC., a Maryland Corporation, and LAUREL RACING ASSOCIATION, INC., a Maryland Corporation, | Case No.:  2:15-cv-9332<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1. Violation of the *Interstate Horseracing Act*, (15 U.S.C. §3001, *et seq.*)**;  and<br><br>**2. Violation of California *Business & Professions Code* Sections 17200, *et seq.***<br><br>**DEMAND FOR JURY TRIAL** |

-1-
FIRST AMENDED COMPLAINT, DEMAND FOR JURY TRIAL

|   |   |   |
|---|---|---|
| | Plaintiffs, | ) |
| | | ) |
| | vs. | ) |
| | | ) |
| HORSE RACING LABS, LLC, a | | ) |
| Delaware Limited Liability Company, | | ) |
| (also known as IMMERSE, LLC), doing | | ) |
| business as DERBYWARS, and DOES 1 | | ) |
| through 10, inclusive, | | ) |
| | | ) |
| | Defendants. | ) |
| | | ) |
| | | ) |
| | | ) |

Plaintiffs Los Angeles Turf Club, Incorporated, Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing, Inc., Maryland Jockey Club Of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "PLAINTIFFS"), allege as follows:

## JURISDICTION AND VENUE

1.  Jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. § 1331, because the claims herein arise under federal law (the *Interstate Horseracing Act,* 15 U.S.C. § 3007) (the "IHA"), and the Court's supplemental jurisdiction (28 U.S.C. § 1367).

2.  Venue is proper in this Central District because a substantial part of the events or omissions giving rise to the claims alleged in this First Amended Complaint occurred in this District.

## THE PARTIES

3.  Plaintiff Los Angeles Turf Club, Incorporated ("LATC") is, and at all times mentioned herein was, a corporation, organized and existing under the laws of the State of California, and maintaining its principal place of business in Los Angeles

County, California.  LATC operates a horse racing meet at Santa Anita Park race track in said county.

4.     Plaintiff Los Angeles Turf Club II, Inc. ("LATC II") is, and at all times mentioned herein was, a California corporation, organized and existing under the laws of the State of California, and maintaining its principal place of business in Los Angeles County, California.  LATC II also operates a horse racing meet at the Santa Anita Park race track in said county.

5.     Plaintiff Pacific Racing Association ("PRA") is, and at all times herein mentioned was, a California corporation, with its principal place of business in Alameda County, California.  PRA operates a horse racing meet at the Golden Gate Fields race track in said county.

6.     Plaintiff Pacific Racing Association II ("PRA II") is, and at all times herein mentioned was, a California corporation, with its principal place of business in Alameda County, California.  PRA II operates a horse racing meet at the Golden Gate Fields race track in said county.

7.     Plaintiff Gulfstream Park Racing Association, Inc. ("GPRA") is, and at all times herein mentioned was, a Florida corporation, with its principal place of business in Broward County, Florida.  GPRA operates a horse racing meet at the Gulfstream Park race track in said county, and also operates a horse racing meet at Calder Race Course in that same county for a portion of each year, under the name "Gulfstream Park West."

8.     Plaintiff Oregon Racing, Inc. ("ORI") is, and at all times herein mentioned was, a Delaware corporation, with its principal place of business in Multnomah County, Oregon.  ORI operates a horse racing meet at the Portland Meadows race track in said county.

9.     Plaintiff Maryland Jockey Club of Baltimore City, Inc. ("MJC") is, and at all times herein mentioned was, a Maryland corporation with its principal place of business in Baltimore City, Maryland.  MJC operates a horse racing meet at the

Pimlico Race Course in said city.

10. Plaintiff Laurel Racing Association, Inc. ("LRA") is, and at all times herein mentioned was, a Maryland corporation with its principal place of business in Anne Arundel County, Maryland. LRA operates a horse racing meet at the Laurel Park race track in said county.

11. Defendant Horse Racing Labs, LLC (also known as Immerse, LLC), doing business as DerbyWars, is, and at all times mentioned herein was, a Delaware limited liability company with its principal place of business in Louisville, Kentucky.

12. PLAINTIFFS do not presently know the true names and capacities of the Defendants sued herein as Does 1 – 10, inclusive. PLAINTIFFS will seek leave of court to further amend this First Amended Complaint to allege said Defendants' true names and capacities as soon as PLAINTIFFS ascertain them. Defendant Horse Racing Labs, LLC, and Does 1 – 10, are collectively referred to herein as "DerbyWars" or "Defendant."

## INTRODUCTION

13. DerbyWars is operating an illegal gambling website. While DerbyWars claims to be offering "daily fantasy" sports, that is simply not true. Fantasy sports are based on statistics; *e.g.*, how many touchdowns the wide receiver on your NFL fantasy team scored, regardless of whether his team won the game. ***Fantasy sports cannot be based on the actual outcome of a game or contest.*** See, the *Unlawful Internet Gambling Enforcement Act of 2006* (the "UIGEA"), 31 U.S.C. § 5362 (ix).

14. The "carve-out" for fantasy sports contests is found in Section 5362 (ix), of the UIGEA, wherein *excluded* from the definition of "Bet" or "Wager" is participation in a fantasy game or contest, *so long as* the player's "team" is not based on an actual team, and . . . ***the winning outcome is not based on the "score, point-spread, or any performance or performances of any single real-world team or any combination of such teams, or solely on any single performance of an individual athlete in any single real-world sporting or other event***." (Emphasis added). Thus, it

does not permit a wager on the outcome of a sporting event (including a horse race), or a combination of outcomes of multiple sporting events, such as a "parlay" bet.

15.     Therefore, DerbyWars' "contests" are "Bets" or "Wagers," and they are illegal, *unless* DerbyWars complies with the strict requirements imposed by state and the federal governments for *legal* betting on horse racing, which *inter alia*, requires DerbyWars to obtain the required licenses and consents, which it has not done.

16.     Wagering on horse racing is uniquely subject to extensive regulation on both the state and federal level.  Thus, even where daily fantasy sports betting is allowed for football, baseball or basketball, DerbyWars' "fantasy league competition based on professional horse racing" will remain unauthorized and in violation of various laws.

17.     This is because horse racing (and the related wagering) is a heavily (and specifically) regulated industry in the United States, on both the federal and state level. In order to offer off-track wagering on horse races (that is, wagers placed at a location other than the race track where the race is actually being run), one must obtain the proper consents and licenses from numerous groups, including host racing associations such as PLAINTIFFS, as well as licensing agencies such as the California Horse Racing Board.

18.     One of the many requirements to obtaining the required consents and licenses, so that one can legally accept off-track wagers, is an agreement to pay the legally required fees, including certain fees due to PLAINTIFFS: the Host Fee (a percentage of the "handle" or amount of wagers placed on a race or races); and the Source Market Fee (a fee required for any legal bet placed by a resident of the racing association's home state on a race run in any state) (the Host Fee and Source Market Fee are collectively referred to herein as the "Fees").  Without the proper consents and licenses, one cannot legally accept wagers on horse races.

19.     Approximately twenty percent (20 %) of all wagers on horse races are placed on legal online platforms that comply with state laws and regulations.  In

California, *Business & Professions Code* § 19604 sets forth the standards for Advance Deposit Wagering, the format used for legal online betting on horse racing. Under this system, a bettor must first deposit funds into an authorized account, and then is able to place bets online. Section 19604 requires that an online provider like DerbyWars be licensed by the California Horse Racing Board, and that it have a valid contract with racing associations, like PLAINTIFFS. *Business & Professions Code* § 19604 (b) (1) & (2). Section 19604 also requires the payment of the Fees.

20. There are only five companies which can legally offer online wagering in the State of California: (1) Xpressbet, LLC; (2) ODS Technologies, L.P. d/b/a TVG Network; (3) Churchill Downs Technology Initiatives Company d/b/a TwinSpires; (4) WatchandWager.com, LLC; and (5) Lien Games Racing, LLC. All five of these online wagering websites have obtained the proper consents and licenses as legally required. All five of these online wagering websites pay the required Fees to PLAINTIFFS.

21. Other than these five licensed online providers, the only legal means of placing a wager on a horse race in California is at a racetrack, or at one of the racetrack-operated off-track wagering locations. Thus, no matter where a bet on a horse race is placed in California, if it is placed legally, PLAINTIFFS receive compensation.

22. In recognition of the requirement that these Fees must be paid, DerbyWars has only recently started to enter into agreements with at least some race tracks to contribute a portion of DerbyWars' revenue which it receives for distribution to both the race track and the horsemen. DerbyWars has no such agreements with any of PLAINTIFFS.

### THE REGULATION OF HORSE RACING

23. The *Federal Wire Act*, 18 U.S.C. § 1084, prohibits the transmission of wagering information across state lines:

> "Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both."

24. The IHA creates an exception to the prohibition of the *Federal Wire Act* for wagering on horse racing, <u>but limits that exception to wagering that is in strict compliance with the IHA</u>:

> "No person may accept an interstate off-track wager except as provided in this Act." 15 U.S.C. § 3003.

25. The IHA defines an "interstate off-track wager" as:

> "a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any pari-mutuel wagering pools;" 15 U.S.C. § 3002(3).

26. In order to accept an interstate off-track wager on horse racing, Section 3004 of the IHA requires the consent of: (1) the host racing association (and its respective horsemen's group), (2) the host racing commission, and (3) the off-track racing commission. 15 U.S.C. § 3004. DerbyWars has neither any such consents nor any such licenses.

27. Defendant does not hold, nor has it ever held, a license to conduct wagering on horse racing in California, Florida, Maryland, or Oregon, or in any other state. Defendant is also operating in violation of state gambling laws, including California *Business & Professions Code* §§ 19590, 19595 and 19604.

28. Parimutuel wagering on horse racing was legalized in California in 1933, and has been specifically exempted from California *Penal Code* § 337a, which criminalizes bookmaking. As set forth in California *Business & Professions Code* § 19411: "'Parimutuel wagering' is a form of wagering in which bettors either purchase tickets of various denominations, or issue wagering instructions leading to the placement of wagers, on the outcome of one or more horse races. The association distributes the total wagers comprising each pool, less the amounts retained for purposes specified in this chapter, to winning bettors based on the official race results."

29. California *Business & Professions Code* § 19590 provides that, "Parimutuel wagering shall be conducted only by a person or persons licensed under this chapter to conduct a horse racing meeting or authorized by the board to conduct advance deposit wagering."

30. California *Business & Professions Code* § 19595 provides that: "[a]ny form of wagering or betting on the result of a horse race other than that permitted by this chapter is illegal." Thus, under California law, only licensed racing associations and licensed advance deposit wagering companies are authorized to accept wagers from the State of California on horse racing.

31. California *Business & Professions Code* § 19604 sets forth the requirements for advanced deposit wagering in California, including that a provider like DerbyWars be licensed by the California Horse Racing Board, and that it have a

valid contract with racing associations, like PLAINTIFFS.  *Business & Professions Code* §§ 19604 (b) (1) & (2).

32.     The States of Florida, Maryland and Oregon all similarly restrict wagering on horse racing to licensed entities.  *See Fla. Stat. Chapter* 550 *Pari-Mutuel Wagering*; *Md. BUSINESS REGULATION Code Ann*. § 11-801, 804; and *ORS* § 462.140.

33.     DerbyWars does not presently hold, nor has it ever held, a license to conduct wagering on horse racing in the States of California, Florida, Maryland, or Oregon, or in any other state.

## PLAINTIFF RACING ASSOCIATIONS

34.     PLAINTIFF racing associations operate horse racing meets in California, Florida, Maryland, or Oregon, at various times of the year.

35.     All wagering with PLAINTIFFS, and with wagering entities that have a contractual or statutory relationship with PLAINTIFFS, on the horse races run at PLAINTIFFS' tracks, is conducted in compliance with all applicable laws, including the receipt of consents under the IHA when required.  When consents are granted under the IHA to other entities to accept wagers on horse races at PLAINTIFFS' tracks, PLAINTIFFS and their horsemen condition such consents upon the receipt of compensation from those entities.

36.     DerbyWars does not comply with either state or federal regulations:  it does not have the required consents and licenses, and it is not paying the required Fees.  This failure has caused, and continues to cause, direct injury to PLAINTIFFS by depriving them of, *inter alia,* the Fees to which they are legally entitled for any legal bet placed on a horse running in a race at their tracks, or for any legal bet placed by a resident of their home states on a race run in their home state or in another state.

## **"FANTASY" SPORTS BETTING AND THE UIGEA**

37. Generally, in fantasy football, a player "drafts" football players from different teams throughout the National Football League, and competes against other players and their "teams." Each week, a player accumulates points based upon the output of the players in the starting line-up that he has selected for the week. The contest can continue over the course of the NFL season.

38. Importantly, in fantasy sports, the participants are never betting that a certain NFL team will win the game; that would undeniably violate the laws against online sports betting. By contrast, at DerbyWars, players indeed pick the winners of various races; they are not simply compiling statistical points based upon which horse ran the fastest first quarter mile, or which horse left the gates the fastest. Players are placing a bet on which horses will win a series of races at any number of tracks, in effect placing a "parlay" bet.

39. In 2006, Congress enacted the UIGEA to restrict internet gambling. By its language, the UIGEA made only two changes in the law of internet gambling: (1) it created a new federal crime of receiving money by an operator of an illegal gambling website; and (2) it ordered federal regulators to enact regulations to identify and block money transfers by bettors in the United States to those outlaw gambling sites. 31 U.S.C. §5361.

40. While the UIGEA does not prohibit fantasy sports contests, it also does not legalize them, if otherwise illegal under another anti-gambling law. By its express language, the UIGEA was not intended to change any other anti-gambling law:

> "(b) Rule of construction. No provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b).

41. The "carve-out" for fantasy sports contests is found in Section 5362 (ix), of the UIGEA, wherein excluded from the definition of "Bet" or "Wager" is participation in a fantasy game or contest, so long as the player's "team" is not based on an actual team, and (1) the prizes and awards are known in advance and the value is not based on the number of participants or the amount of the fees; (2) winning outcomes reflect the skill of the participants and are determined by statistical results of the performance of individuals in multiple games; and (3) *the winning outcome is not based on the "score, point-spread, or any performance or performances of any single real-world team or any combination of such teams, or solely on any single performance of an individual athlete in any single real-world sporting or other event*." (Emphasis added). Thus, it does not permit a wager on the outcome of a sporting event (including a horse race), or a combination of outcomes of multiple sporting events, such as a "parlay" bet.

42. Section 5362 (D) of the UIGEA also specifically addresses horse racing, and expressly states that it is not the intent of the UIGEA to legalize betting on horse racing that would otherwise be illegal under the IHA. The plain language also preserves any state prohibition against gambling on horse races that existed at the time of the UIGEA's enactment (31 U.S.C. § 5362 (D)).

## DERBYWARS

43. DerbyWars is an internet website for betting on horse races, including races run at race meets operated by PLAINTIFFS. DerbyWars has been in business since 2011, and offers online wagering opportunities throughout the United States, including on races run at the race meets operated by PLAINTIFFS, and to the residents of California, Oregon, Florida and Maryland. According to DerbyWars:

> "DerbyWars is a skill based fantasy league competition based on professional horse racing, where winners are awarded based on their abilities to skillfully pick horses and compete against other players over a series of races.

In each contest, you pick horses which serve as fantasy bets and you move up and down a leaderboard depending on how skillfully you pick those races. It also takes skill to understand the dynamics of the contest and the leaderboard. We currently offer contests several days each week and players can win real money."[1]

"Each contest (collectively the "Contests") is a skill-based competition in which players ("Players") can demonstrate their knowledge of pari-mutuel horse racing information and rules in several Contest formats. ***Prizes will be awarded to Players who are most successful in selecting winning horses in actual horse races at actual licensed tracks***, under the Tournament Structures described more fully below. Players will choose to participate in one or more Contests from a menu of Contests available. Each Contest will have a fixed entry fee, a fixed prize pool and a maximum number of entries. Some contests may also have a minimum of number of entries which will be published in advance on the Website."[2] (Emphasis added).

44. The format used by DerbyWars is simple: players select a horse to win in each race of the tournament, and each winning selection adds to their point total. Players can go head-to-head, or play against larger numbers of bettors. At the end of the tournament, the player with the most points wins a cash prize. DerbyWars keeps a percentage of the tournament "pool" for itself, and does not pay any Host Fees or Source Market Fees.

---

[1] http://blog.derbywars.com/about-us/
[2] http://blog.derbywars.com/official-rules-1/

45. This is indisputably a form of wagering on the results of horse races, which is not in compliance with federal or state laws because the consents required under the IHA have not been given, and DerbyWars does not hold a license permitting it to accept wagers from California, Florida, Maryland, or Oregon.

46. It also does not come within the fantasy sport carve out set forth in the UIGEA, because the winning contestant is determined by being the player who is "*most successful in selecting winning horses in actual horse races at actual licensed tracks*" which takes the player out of the fantasy sports carve out found in the UIGEA, which does not apply if the winning outcome is based on "*any performance or performances of any single real-world team or any combination of such teams, or solely on any single performance of an individual athlete in any single real-world sporting or other event*."

47. The only reasonable interpretation of the term "team" as used in the UIGEA, as applied to horse racing, is that a "team" is defined as a horse or as a horse and its jockey. Thus, DerbyWars' handicapping tournaments (which are essentially "parlays" based upon selecting the winning "teams"), fall outside of the exceptions set forth in Section 5362 (ix), in that the winning outcome is based on the performances of a combination of teams (horses). In the same manner that the fantasy carve-out does not allow selecting six winning teams from six football games, it cannot allow selecting six winning horses from six horse races.

48. As currently conducted, DerbyWars is in violation of the IHA, California *Business & Professions Code* §§ 19595 and 19604 and the *Illegal Gambling Business Act of 1970*, 18 U.S.C. § 1955 which criminalizes an "illegal gambling business," which is a gambling business in violation of state law.

49. Every bet placed through DerbyWars (instead of through PLAINTIFFS or an operator that has received PLAINTIFFS' consent) on a race run by PLAINTIFFS, and every bet from a resident of California, Florida, Maryland, or Oregon on a race run in any state, results in monetary damages to PLAINTIFFS, and ill-gotten gains to

Defendant, because DerbyWars fails to pay the required Fees due and owing to PLAINTIFFS. Moreover, Defendant promotes DerbyWars as a way for bettors to avoid the higher take out rates of parimutuel betting (the take out rate is the portion of the bet that is not redistributed to the winning bettors).

50. The "take out rate" for legal wagering on horse racing is set by law, which provides not only the requisite percentage, but also the recipients of the take out. The parties who receive the take out include the racing association, the horsemen, state and local government, and charitable organizations that provide for the health and welfare of the horses, as well as the jockeys and other behind the scenes race track workers. However, the take out rate for DerbyWars contests is set solely by DerbyWars (generally between 13 – 17 %, but can be as low as 7% for head to head games), and the entirety of the take out is retained solely by DerbyWars. This is depriving not only PLAINTIFFS of these monies, but the horsemen, state and local governments, and many benevolent organizations that depend upon the monies received from the take out.

51. The amount of the take out is significant to bettors. For instance, at a 2015 horse racing industry conference, a participant informed the attendees that he now splits his bankroll between DerbyWars and legal parimutuel betting, and no longer participates exclusively in legal parimutuel betting: "[Brett] Wiener said that his total pari-mutuel handle has dropped about 25% because he would rather play in contests with a better return on investment. He said wagering into pools 'with 30% takeout that goes to the house doesn't appeal to me.' . . . Weiner said he now has no reason to go to the races to watch them live."[3] Of course, the state sets the take out rate for entities that legally accept wagers, while DerbyWars sets its own take out rates, which it simply keeps for itself.

---

[3] www.bloodhorse.com/horse-racing/articles/197528/innovation-in-racing-not-without-obstacles.

-14-
FIRST AMENDED COMPLAINT, DEMAND FOR JURY TRIAL

52. DerbyWars' surveys indicate that its own customers now split their available bankrolls 80/20 in favor of parimutuel versus contest play. According to DerbyWars, entry fees into its contests start at $1 and go up to hundreds of dollars. The contests now include prizes up to $250,000. Defendant estimates that DerbyWars has grown at a rate of 100% each year. Defendant also estimates that the online horse racing contest market will be around $25 million annually, and that its site, DerbyWars, can gain 40% of that.

**FIRST CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS**

(Violation of the *Interstate Horse Racing Act*, 15 U.S.C. §3001, *et seq.*)

53. PLAINTIFFS incorporate paragraphs 1 – 52 above, as if set forth in full herein.

54. The IHA permits only interstate wagering on horse racing that has received the authorizations required under the IHA. Section 3003 of the IHA provides that: "No person may accept an interstate off-track wager except as provided in this Act."

55. Section 3004 of the IHA requires interstate wagering to receive authorization from: 1) the host racing association (and its respective horsemen's group), 2) the host racing commission, and 3) the off-track racing commission. 15 U.S.C. § 3004.

56. The states of California, Florida, Maryland and Oregon allow only wagering on horse racing with licensed entities.

57. DerbyWars accepts interstate off-track wagers that do not comply with the IHA or applicable state law on race meets at the horse tracks operated by PLAINTIFFS in California, Florida, Maryland and Oregon.

58. PLAINTIFFS do not receive any compensation from the amounts bet at DerbyWars, even though the bettors are wagering on the races run at PLAINTIFFS' race meets. Therefore, the actions and omissions of DerbyWars have (and continue to) directly cause damages to PLAINTIFFS by depriving them of the compensation to

-15-

which they are entitled under state and federal law.

59. 15 U.S.C. §3005 sets forth the damages recoverable by PLAINTIFFS for these violations of the IHA by DerbyWars. Section 3005 provides that:

> "Any person accepting any interstate off-track wager in violation of this Act shall be civilly liable for damages to the host State, the host racing association and the horsemen's group. Damages for each violation shall be based on the total of off-track wagers as follows:
>
> . . . .
>
> (2) If such interstate off-track wager was of a type not accepted at the host racing association, the amount of damages shall be determined at the rate of takeout prevailing at the off-track betting system for that type of wager and shall be distributed according to the same formulas as in paragraph (1) above."

60. 15 U.S.C. §3006 further provides that host racing associations, like PLAINTIFFS, may commence a civil action against any person in violation of the IHA, for both injunctive relief and damages.

61. As a direct and proximate result of the acts and omissions of DerbyWars PLAINTIFFS are entitled to injunctive relief and an award of damages in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS
**(Violation of California *Business & Professions Code* §§ 17200, *et. seq.*)**

62. PLAINTIFFS incorporate paragraphs 1 – 61 above, as if set forth in full herein.

63. California *Business & Professions Code* § 17200 provides that:
> "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and

Professions Code."

64. DerbyWars' wrongful acts as alleged in this First Amended Complaint constitute unfair competition and unfair business practices both under the common law of the State of California, within which these acts have occurred, and statutory law, of which DerbyWars is in violation, including the IHA, California *Business & Professions Code* §§ 19595 and 19604 and the *Illegal Gambling Business Act of 1970*, 18 U.S.C. § 1955, as well as California *Business & Professions Code* §§ 17200, *et seq.,* making its actions unlawful.

65. California *Business & Professions Code* § 17203 expressly provides that "[t]he court may make such orders or judgments . . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." DerbyWars' acts of unfair business practices have resulted in DerbyWars receiving Fees that rightfully belong to PLAINTIFFS, and which are being unjustly and inequitably retained by DerbyWars.

66. California *Business & Professions Code* § 17203 also expressly provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." PLAINTIFFS seek a permanent injunction, as expressly permitted by such law, enjoining and restraining DerbyWars.

67. As a direct and proximate result of the acts and omissions of DerbyWars in violation of common law and California *Business & Professions Code* § 17200, *et seq.,* PLAINTIFFS are entitled to restitution of monies wrongfully obtained and retained by DerbyWars, and a permanent injunction.

**WHEREFORE**, PLAINTIFFS pray for Judgment against DerbyWars, as follows:

**First Claim for Relief – Violation of the IHA:**

1. For monetary damages as set forth in 15 U.S.C. § 3005, in an amount to be proven at trial;

2. For injunctive relief as provided in 15 U.S.C. §3006;

**Second Claim for Relief – Violation of *Business & Professions Code* §17200, *et seq*.:**

1. For restitution of monies wrongfully obtained and retained by Defendant;

2. For injunctive relief;

**All Claims for Relief:**

1. For such other, further and different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

PLAINTIFFS hereby demand a jury trial as provided by Rule 38(a) of the *Federal Rules of Civil Procedure*.

DATED: May 16, 2016

CORBETT, STEELMAN & SPECTER
A Professional Law Corporation

By: /s/ Richard B. Specter
Richard B. Specter
Attorneys for PLAINTIFFS