1  Richard B. Specter, SBN 114090
   Diane L. Ellis, SBN 130628
2  CORBETT, STEELMAN & SPECTER
   A Professional Law Corporation
3  18200 Von Karman Avenue, Suite 900
   Irvine, California 92612-1023
4  Telephone:  (949) 553-9266
   Facsimile:  (949) 553-8454
5  rspecter@corbsteel.com

6

7  Attorneys for Plaintiffs
   LOS ANGELES TURF CLUB, INCORPORATED,
8  LOS ANGELES TURF CLUB II, INC.,
   PACIFIC RACING ASSOCIATION, PACIFIC RACING
9  ASSOCIATION II, GULFSTREAM PARK RACING
   ASSOCIATION, INC., OREGON RACING, INC.,
10 MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
11 and LAUREL RACING ASSOCIATION, INC.

12

               UNITED STATES DISTRICT COURT
13
               CENTRAL DISTRICT OF CALIFORNIA
14

15  LOS ANGELES TURF CLUB,            )  Case No.: 2:15-cv-9332 SJO (JEMx)
    INCORPORATED, a  California       )
16  Corporation, LOS ANGELES TURF     )  Hon. S. James Otero
    CLUB II, INC., a California Corporation, )  Courtroom No. 10C
17  PACIFIC RACING ASSOCIATION, a     )
    California Corporation, PACIFIC    )
18  RACING ASSOCIATION II, a California )
    Corporation, GULFSTREAM PARK      )  **PLAINTIFFS' NOTICE OF MOTION**
19  RACING ASSOCIATION, INC., a       )  **AND MOTION FOR PARTIAL**
    Florida Corporation, OREGON RACING,)  **SUMMARY JUDGMENT;**
20  INC., a Delaware Corporation,      )  **MEMORANDUM OF POINTS AND**
    MARYLAND JOCKEY CLUB OF           )  **AUTHORITIES IN SUPPORT**
21  BALTIMORE CITY, INC., a Maryland  )  **THEREOF; [PROPOSED] ORDER**
22  Corporation, LAUREL RACING        )
    ASSOCIATION, INC., a Maryland      )  Date Filed: December 3, 2015
23  Corporation, and DOES 1 through 10,)  Discovery Cutoff: March 27, 2017
24  inclusive,                         )  Final Pretrial Conf.: June 19, 2017
                                       )  Trial Date: June 27, 2017
25          Plaintiffs,                )
                                       )
26      vs.                            )  **DATE: April 24, 2017**
                                       )  **TIME: 10:00 a.m.**
27                                     )  **CTRM: 10C**
28  HORSE RACING LABS, LLC, a         )
    Delaware Limited Liability Company, )

                                  -1-

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

also known as, IMMERSE, LLC, doing )
business as DERBYWARS, and Does 1 )
through 10, )
                  )
       Defendants. )
                  )

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN THAT on April 24, 2017, at 10:00 a.m., in

Courtroom 10C of the above entitled Court, located at 350 West First Street, in Los

Angeles, California, Plaintiffs Los Angeles Turf Club, Incorporated, Los Angeles Turf

Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream

Park Racing Association, Inc., Oregon Racing, Inc., Maryland Jockey Club Of

Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs"),

will and hereby do move this Court for an Order adjudicating the following

issues:

1. That the contests offered by Defendant Horse Racing Labs, LLC,
   ("Defendant" or "Derby Wars") on its Derby Wars website are wagers under
   the *Interstate Horseracing Act of 1978*, 15 U.S.C. §§ 3001, *et seq.* (the
   "IHA").

2. That Defendant is operating an off-track betting system as defined in Section
   3002(7) of the IHA.

3. That Defendant is required to obtain the consent of Plaintiffs prior to
   accepting wagers on Plaintiffs' horseraces.

4. That Defendant is in violation of Section 3004(a) of the IHA, because it is
   accepting wagers on Plaintiff host racing associations' horseraces, without
   the consent of Plaintiffs.

5. That Defendant is liable to Plaintiffs for damages under Section 3005 of the
   IHA.

6. That Defendant is in violation of California *Business & Professions Code* Section 17200, *et seq.*

This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities attached hereto; the Separate Statement of Uncontroverted Material Facts and Conclusions of Law served herewith, the Declarations of Scott J. Daruty, Richard B. Specter and Diane L. Ellis served herewith, the pleadings on file herein, and any evidence or argument presented at the hearing on this Motion.

Pursuant to Local Rule 7-3, this Motion is made following the in-person conference of counsel, which took place on March 9, 2017.  During the conference, counsel for the parties thoroughly discussed the substance of the arguments set forth herein, as well as potential resolutions of the disagreements, in an attempt to eliminate the need for this Motion.  The parties were unable to reach an agreement, necessitating this Motion.

DATED:  March 20, 2017

Respectfully submitted,

CORBETT, STEELMAN & SPECTER
A Professional Law Corporation


By:   */s/ Richard B. Specter*
      Richard B. Specter
      Attorneys for PLAINTIFFS

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.      STATEMENT OF ISSUES TO BE DECIDED ………………………….....1

II.     PRELIMINARY STATEMENT ………………………………………….....1

III.    INTRODUCTION ……………………………………………………… 2

IV.     RELEVANT LEGAL STANDARDS RELATED TO MOTION FOR
        PARTIAL SUMMARY JUDGMENT…………………………………….4

V.      PROCEDURAL BACKGROUND AND RELEVANT FACTS…………….6

        A. Horseracing and Plaintiff Host Racing Associations……………………6

        B. Derby Wars…………………………………………………………….8

VI.     LEGAL ARGUMENT…………………………………………………….11

        A.    The IHA………………………………………………………….11

        B.    Defendants' Contests Are Wagers On Horseracing Under The *IHA*…...12

        C.    Defendant Is Operating An Off-Track Betting System Under
              Section 3002(7) Of The IHA……………………………………….....14

        D.    Defendant Is Required To Obtain The Consent Of Plaintiffs Prior To
              Accepting Wagers On Plaintiffs' Horseraces…………………..……….15

        E.    By Accepting Wagers Without The Consent Of Plaintiffs, Defendant Is In
              Violation Of Section 3004(A) Of The IHA…………………………....16

        F.    Defendant Is Liable To Plaintiffs For Damages Under
              Section 3005 Of The IHA………………………………………….....16

        G.    Defendant is in violation of B&P Section 17200, *et. seq*………………17

VII.    CONCLUSION…………………………………………………………....18

# TABLE OF AUTHORITIES

Page

## CASES

### Federal

*Cabazon Band of Mission Indians v. Wilson*,
    124 F.3d 1050 (9th Cir. 1997)…………………………………………7

*Coyote Valley Band of Pomo Indians v. United States*,
    639 F. Supp. 165, 167 (E.D. Cal. 1986)………………………………..5

*FMC Corp. v. Vendo Co.*, 196 F. Supp.2d 1023 (E.D. Cal. 2002)………………….4

*Hill v. Boeing Co.*, 765 F. Supp. 2d 1208 (C.D. Cal. 2011)……………………….6

*Horseman's Benevolent & Protective Ass'n - Ohio Div. v. Dewine*,
    666 F.3d 997 (6th Cir. 2012)………………………………….......15

*New Suffolk Downs Corp. v. Rockingham Venture, Inc.*,
    656 F. Supp. 1190 (D.N.H. 1987)……………………………..…….15

*Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990)………………………….4

*Schlothan v. Alaska*, 276 F.2d 806, 815 (9th Cir. 1960)……………………………5

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
    718 F.3d 1006 (9th Cir. 2013)……………………………… …..5, 6

### State

*Brown v. Board of Police Comm'rs*, 58 Cal.App.2d 473 (1943)………………….13, 14

*Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377 (1992)………………….......17

*Finster v. Keller*, 8 Cal. App. 3d 836, 844 (1971)……………………………….13

*Misner v. Knapp*, 13 Or. 135 (1885)…………………………………………….13

*People v. Lomento*, 155 Cal App 2d 740 (1957)………………………………...12

*State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093 (1996)………17

*Western Telcon, Inc. v. Cal. State Lottery,* 13 Cal. 4th 475 (1996).....................13

## STATUTES

### Federal

*Interstate Horseracing Act of 1978*, 15 U.S.C. §§ 3001, *et seq*.....................*passim*

*Federal Wire Act*, 18 U.S.C. § 1084.........................................................18

### State

*Business & Professions Code* Section 17200, *et seq.* .............................1, 4, 17

*Business & Professions Code* Section 19604...........................................8, 17

*Cal. Const, Art.* IV § 19..........................................................................7

California Horse Racing Board, Rule 2081.................................................8

## RULES

*Federal Rules of Civil Procedure*, Rule 56.................................................4

## OTHER AUTHORITIES

*Report on the Interstate Horseracing Act of 1977,*

   S. Rep. No. 95-554 (Oct. 27 (legislative day, Oct. 21), 1977).....................12

I.      **STATEMENT OF ISSUES TO BE DECIDED**

By this Motion,   Plaintiffs request the Court to adjudicate the following issues:

1. That the contests offered by Defendant Horse Racing Labs, LLC ("Defendant" or "Derby Wars"), on its Derby Wars website are wagers under the *Interstate Horseracing Act of 1978*, 15 U.S.C. §§ 3001, *et seq.* (the "IHA").

2. That Defendant is operating an off-track betting system as defined in Section 3002(7) of the IHA.

3. That Defendant is required to obtain the consent of Plaintiffs prior to accepting wagers on Plaintiffs' horseraces.

4. That Defendant is in violation of Section 3004(a) of the IHA, because it is accepting wagers on Plaintiff host racing associations' horseraces, without the consent of Plaintiffs.

5. That Defendant is liable to Plaintiffs for damages under Section 3005 of the IHA.

6. That Defendant is in violation of California *Business & Professions Code* Section 17200, *et seq.*

II.     **PRELIMINARY STATEMENT.**

Joe the Bookmaker accepts a $110 bet from 2 bettors, who are wagering as to which one can select more winners than the other out of 6 races at Santa Anita.  Joe keeps $20 as his fee for booking the bet (called the "Vigorish" or "Juice" in gambling parlance; that is, the amount kept by the Bookie for accepting a bet), and the remaining $200 is paid to that bettor who picked more winners than the other.  It is beyond dispute that this is a wager involving horseracing, and that the person running this game is a bookmaker.  Defendant runs a head-to-head contest, for 2 entrants, whereby Defendant accepts an "entry fee" of $110 per player; the Defendant retains $20 (called the "take out" or "rake" in Defendant's parlance; that is the amount kept by Derby

Wars for running the contest); and the "prize" is $200 for the entrant who picks the most winners in 6 races.  And Defendant asserts that this is not a wager involving horseracing, but is just a contest.  Plaintiffs submit by this Motion that the IHA expressly governs "wagering on horseracing", and that Defendant's "contests" are indeed wagering on horseracing, and are thus subject to the requirements of the IHA.

## III.   INTRODUCTION.

While sports gambling is generally prohibited in the United States (except in the State of Nevada), wagering on horseracing only is permitted under specified, and limited, circumstances. Thus, horseracing is a highly regulated industry in the United States, on both the federal and state levels. (California legalized betting on horseracing in 1933 by an Amendment to the California State Constitution. See, *Cal. Const, Art.* IV § 19.) Unlike other sports, horseracing is almost exclusively funded by wagering.  Undisputed Fact ("UF"), No. 40.

The IHA is the exclusive Federal law governing interstate wagering on horseracing. The stated purpose of the IHA is to protect the stakeholders in horseracing - the host State, the host racing association (such as Plaintiffs), and the horsemen's group - from persons (such as Defendant) who seek to accept interstate wagers on horseracing without obtaining the required consents.  See, 15 *U.S.C.* §§ 3001 – 3006.  "*It is the policy of the Congress in this Act to regulate interstate commerce with respect to wagering on horse racing*, in order to further the horseracing and legal off-track betting industries in the United States." 15 *U.S.C.* § 3001(b).  Congress also noted that:  "*the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.*" 15 *U.S.C.* § 3001(a).

The IHA provides that no one can accept an "interstate off-track wager," defined as a wager placed or accepted in one state with respect to the outcome of a horserace taking place in another state, except as permitted by the IHA.   And the IHA only permits acceptance of such wagers if consent is obtained from, *inter alia*, the

1 | racetrack where the race is taking place.  The failure to obtain such consent renders the
2 | entity accepting the wager liable to the racetrack for damages (either the amount that
3 | the race track normally collects as its percentage of such wagers or the amount that the
4 | offender actually collected as its percentage of such wagers), and also injunctive relief
5 | to prevent future violations. ***Defendant admits that it does not comply with the IHA.***
6 | UF, No. 52.

7 | Plaintiffs operate horserace tracks in the states of California, Florida, Maryland
8 | and Oregon.  UF, No. 59. Defendant, located in an office building in Kentucky, holds
9 | what it calls "contests", whereby bettors across the country pay an "entry fee" (a
10 | wager) to Defendant (in Kentucky), and then select the winners of a series of horse
11 | races run at various tracks, including Plaintiffs' race tracks.  UF, Nos. 5 and 6.
12 | Defendant operates the Derby Wars website for its contests, which has been in
13 | operation since 2011. UF, No. 4.  Defendant does not have any agreements with any of
14 | the Plaintiffs. UF, No. 66. The first page of Defendant's Derby Wars' website
15 | (www.derbywars.com) proclaims:

**"Horse Racing Handicapping Contests"**

**"Play for free or real money"**

**"Pick a horse in each race"**

**"Over $20-million paid out in winnings!"**

UF, No. 7.

In Defendant's contests, each bettor is credited with the dollar value of what a
$2 bet at the race track would pay. UF, No. 27.  The winner of the contest is the person
whose selected horses return the most money, based upon the actual odds, results and
payoffs of the actual horseraces run at Plaintiffs' tracks. UF, No. 19. Simply,
Defendant is operating an interstate wagering pool on horseracing conducted at
Plaintiffs' racetracks, yet Defendant has never obtained the consent of any racetracks,
including any of the Plaintiff racetracks, as required by the IHA. UF, Nos. 67 and 68.
And Defendant does not hold a license to conduct wagering on horseracing in

California, Florida, Maryland or Oregon.  UF, No.11.

Although Defendant tries to dress up its operations, by sometimes (but not always), substituting terms like "contests," "entry fees," and "prizes" for horseracing parlance, in the "contests," the participants pay an "entry fee" (a wager) to Defendant, and then select the winners of a series of horseraces run at various tracks, including Plaintiffs' race tracks.  Defendant has attempted to erect an artifice by which it can avoid sharing the takeout with the stakeholders, and instead keep the entire takeout for itself.

Plaintiffs' claim under the IHA is simple: Defendant's acceptance of wagers on horseracing, without the requisite consent, violates the IHA, rendering Defendant liable for damages to Plaintiffs, and subject to an injunction against its continuing operation.  In fact, Defendant even admits that it does not comply with the IHA.  UF, No. 52.  Further, such unlawful activity under the IHA and related statutes renders Derby Wars subject to injunction under California *Business & Professions Code* §17200.

## IV.   RELEVANT LEGAL STANDARDS RELATED TO MOTION FOR PARTIAL SUMMARY JUDGMENT.

Upon a showing that there is no genuine issue of material fact as to a particular "claim" or "defense," the *Federal Rules of Civil Procedure* state that the court may also grant summary judgment in the party's favor on any part of a claim or defense. *Fed. R. Civ. Proc.*, Rule 56(a).  Pursuant to Rule 56 (g), the Court may also "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  This language indicates that such Rule 56 motions can relate to the summary adjudication of specific issues within a claim, and the Ninth Circuit follows that rule.  *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1441-1442 (9th Cir. 1990); *FMC Corp. v. Vendo Co.*, 196 F. Supp.2d 1023, 1029-1030 (E.D. Cal. 2002).

"Federal Rule of Civil Procedure 56(c) provides that summary judgment

may be granted when it is demonstrated that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' **Questions of statutory construction and legislative history present legal questions which are properly resolved by summary judgment."**

*Coyote Valley Band of Pomo Indians v. United States*, 639 F. Supp. 165, 167 (E.D. Cal. 1986); see also, *Schlothan v. Alaska*, 276 F.2d 806, 815 (9th Cir. 1960) ("The interpretation of a statute presents a question of law.")

"'Statutory interpretation begins with the language of the statute.' When terms are not defined within a statute, they are accorded their plain and ordinary meaning, which can be deduced through reference sources such as general usage dictionaries. "[S]tatutory language must always be read in its proper context," and "[i]n determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy," We must, if possible, interpret a statute such that all its language is given effect, and none of it is rendered superfluous."

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1026 (9th Cir. 2013) (citations omitted).

"Once the moving party meets its initial burden, Rule 56(e) shifts the burden to the nonmoving party and requires it to "set out specific facts showing a genuine issue for trial" beyond those alleged in its pleading. Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ("[O]pponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). Further, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment [and] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted). For a summary judgment motion, a court does not make credibility determinations or weigh conflicting evidence. *See Anderson*,

-5-

477 U.S. at 249. A court is required to draw all inferences in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587 (citation omitted)."

*Hill v. Boeing Co.*, 765 F. Supp. 2d 1208, 1212 (C.D. Cal. 2011).

## V.   <u>PROCEDURAL BACKGROUND AND RELEVANT FACTS.</u>

This action was filed on December 2, 2015.  The operative pleading, the First Amended Complaint, was filed on May 16, 2016, and consists of two causes of action: Violation of the IHA; and Violation of California *Business & Professions Code* Sections 17200, *et seq.*  The facts of how Defendant's contests operate are not in dispute, and the application of these facts to the IHA is a question of law for the Court. *UMG Recordings, supra.*  Again, Defendant admits that it does not comply with the IHA.  UF, No. 52.

### A. Horseracing And Plaintiff Host Racing Associations.

Plaintiffs operate horserace meetings at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows).  UF, No. 59. Each Plaintiff is a Host Racing Association within the meaning of the IHA.  UF, No. 60.  Each Plaintiff has the approval of its host State to conduct racing.  UF, No. 61. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA.  UF, No. 62.

The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race).  UF, No.45. Any type of wager other than Win, Place or Show is called an exotic wager.  UF, No. 46.  Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races),

"Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.)  UF, No. 47.  The total amount wagered is the "handle."  UF, No. 41.  Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed *wagers* when placed at the racetrack.  UF, No. 48.

By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers.  UF, No. 42.  The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the racetrack.  UF, No. 43.  The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers.[1]  UF, No. 44.

Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager.  UF, No. 49.  Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run.  UF, No. 50.  Thus, in 1978, Congress enacted the IHA, which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing."  UF No., 51. As provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA.  UF, No. 51.

From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW").  UF, No. 53.  In ADW, a

---

[1] "California permits such wagering, having established an extensive state regulatory scheme to dictate how the money wagered on these races is distributed."  *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1053 (9th Cir. 1997).

customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the customer's account.  UF, No. 54.  If the wager is successful, the winning funds are deposited directly into the customer's account.  UF, No. 55.  The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator) which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs.  UF, No. 56.  It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers.  UF, No. 57.  Defendant has never been licensed as an ADW.[2]  UF, No. 58.  Defendant does not hold a license to conduct wagering on horseracing in California, Florida, Maryland or Oregon.  UF, No.11.

**B. Derby Wars.**

Defendant is a Delaware limited liability company, doing business in Louisville, Kentucky.  UF, No. 1.  Since 2009, Defendant has operated HorseRacingNation.com, a website for horseracing.  UF, Nos. 2 and 3.  Defendant launched the Derby Wars website in October, 2011.  UF, No. 4.  As noted above, Derby Wars advertises itself as conducting horse racing handicapping contests.  In these contests, one stakes money and picks horses to win in actual races, for the chance to receive cash winnings.  UF, No. 7.  Defendant operates from an office building in Kentucky.  UF, No. 5.  Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky)

---

[2] As set forth in California *Business & Professions Code* Section 19604, no ADW provider shall accept wagers or wagering instructions on races conducted in or outside of California from a resident of California unless specified conditions are met, **including being licensed by the California Horse Racing Board**, and entering into agreements with the racing association that have been approved by the Horsemen's Group, in accordance with the IHA.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

in order to wager on races run at race tracks, including those operated by Plaintiffs.[3]
UF, No. 6.  To participate in the contests, a player must first create an account with
Defendant and deposit funds to the account. UF, No. 8.   Defendant maintains players'
funds in a bank account consisting only of players' funds, and when the player enters a
contest, his account is deducted by the amount of the wager (the "entry fee"). UF, No.
9.   If the player eventually wins his wager (the "prize"), his account is credited with
his winnings. UF, No. 10.  The player can thereafter request a withdrawal from his
account, in which case a check is sent to him from the Derby Wars account. UF, No.
10. All of this is exactly as an ADW operates.  In agreements with third parties,
Defendant even refers to its players as "bettors."  UF, No. 26.

Defendant touts its contests as allowing players to "win real money," and the
players in fact do win real money. UF, No. 12.   Defendant primarily offers contests
that are "head-to-head". UF, No. 13.  In these contests, two players pay an entry fee
for a fixed prize. UF, No. 14.  As an example, for a $40 prize, two players each pay a
$22 entry fee to compete with each other.  UF, No. 15.  The remaining $4 is the "take
out" or "rake" retained by Defendant.  UF, No. 16.  In a "lockdown" contest, all
selections must be made before the post (scheduled start) time of the first race.  UF,
No. 22.  In "bullet" or "open" contests, the players must select a horse in each race no
later than one minute before post time of that race.  UF, No. 23.  Defendant offers
head-to-head contests with the prize up to $1,500, and with entry fees of $799.  UF,
No. 17.  Defendant also offers "high stakes" contests for up to $300,000, with a $2,200

---

[3] When a licensed ADW accepts a wager from a resident of California, Florida,
Maryland or Oregon, the host racing association in that state receives a "Market
Access Fee" or "Source Market Fee."  See, e.g., California Horse Racing Board Rule
2081:  "The entity taking the wager shall pay to the appropriate California Licensee a
market access fee based upon the amount of the handle generated by a resident of
California as stipulated in the contractual agreement between the entity and the
California Licensee and as specified and approved by the Board."  A copy of Rule
2081 is attached to the Declaration of Diane L. Ellis as Exhibit 9.

entry fee. UF, No. 24. Derby Wars offers about 150 contests per day on average. UF, No. 25.

Depending upon the contest, the players must select horses in 6 to 10 different races at various racetracks, including Plaintiffs' tracks. UF, No. 18. In the contests, "the scores are calculated according to the actual payouts on actual races at actual race tracks." UF, No. 19. The scores are calculated in dollars, and are what one would have won if he placed a $2 win wager, a $2 place wager, and a $2 show wager (if applicable) on the horses that he selected. UF, Nos. 20 and 27. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. UF, No. 28. Derby Wars uses "points or dollars interchangeably". UF, No. 29. The player with the biggest bankroll (the most winnings) at the end of the contest wins the "prize." UF, No. 21.

The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win any of the races. UF, No. 30. The winner of the contest will be determined by future events. UF, No. 31.

Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. UF, No. 32. For instance, on March 16, 2017, in head-to-head contests alone, Defendant offered 24 contests using only races being run that same day at Plaintiff's Gulfstream Park. UF, No. 33. The entry fees ranged from $11 to $799 per player, and the prizes ranged from $20 to $1500. UF, No. 34. That same day, Defendant offered 26 head-to-head contests using only races being run that day at Plaintiff's Santa Anita Park. UF, No. 35. The entry fees ranged from $11 to $799 per player, and the prizes ranged from $20 to $1500. UF, No. 36. On March 16, 2017, Defendant also offered 11 head-to-head contests using races run at two of Plaintiffs' race tracks – Santa Anita Park and Golden Gate Fields. UF, No. 37. For these races, the entry fees ranged from $11 to $430 per player, and the prizes ranged from $20 to $800. UF, No. 38.

Defendant has never requested nor received consent from any Plaintiff to accept

wagers on races run at the Plaintiffs' race tracks.  UF, No. 68.  Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races.  UF, No. 69.  Defendant has never requested nor received consent from any off-track racing association to conduct its contests.  UF, No. 70.  No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks.  UF, No. 63.  No Plaintiff has ever provided consent to Defendant to accept a wager (or entry fee) from a resident of the States of California, Florida, Maryland or Oregon. UF, No. 64.  No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant.  UF, No. 65.  In fact, Defendant does not have any agreements with any of the Plaintiffs. UF, No. 66. And Defendant does not hold a license to conduct wagering on horseracing in California, Florida, Maryland or Oregon.  UF, No.11.

## VI.   LEGAL ARGUMENT.

### A. The IHA.

The stated purpose of the IHA is to protect the stakeholders in horseracing - the host State, the host racing association (such as Plaintiffs), and the horsemen's group - from persons (such as Defendant), who accept interstate wagers on horseracing without obtaining the state required consents, and without obtaining the consent of the host racing association.  See, 15 *U.S.C.* §§ 3001 – 3006.   **It is the policy of the Congress in this Act to regulate interstate commerce *with respect to wagering on horseracing*,** in order to further the horseracing and legal off-track betting industries in the United States." 15 *U.S.C.* § 3001(b).  Congress also noted that: ***"the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders."***  15 *U.S.C.* § 3001(a).

That Defendant is offering wagering ***on horseracing*** is apparent from the first page of the Derby Wars' website, where it proclaims (UF, No. 7):

**"Horse Racing Handicapping Contests"**

**"Play for free or real money"**

**"Pick a horse in each race"**

**"Over $20-million paid out in winnings!"**

The IHA was enacted because Congress found that there was a need for such regulation on interstate *wagering* on horseracing, and to insure that the stakeholders continued to receive the fees to which they are entitled, because "the horseracing industry in the United States is a significant industry which provides employment opportunities for thousands of individuals, provides substantial revenue to the States. . . . The reported bill is designed to assure the continued flow of revenue from parimutuel wagering in those States which conduct horse racing and further, the horse racing industry in the United States," by providing for a private right of action to recover "damages to the State hosting the race, to the host racing association, and to any horse owner whose horse participated in the horserace on which interstate off-track parimutuel horse racing was accepted."  *Report on the Interstate Horseracing Act of 1977*, S. Rep. No. 95-554 (Oct. 27 (legislative day, Oct. 21), 1977).

And as acknowledged by Defendant in its Motion for Judgment on the Pleadings:  *"Thus, the IHA creates civil liability where a person accepts an otherwise legal interstate bet without obtaining consents of the relevant parties specified in the statute."*  Defendant's Motion for Judgment on the Pleadings, (Docket No. 37) 6:16-17.

**B.  Defendants' Contests Are Wagers On Horseracing**
**Under The *IHA*.**

According to 15 U.S.C. §3002 (3):  "For the purposes of [the IHA] the term… 'interstate off-track wager' means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State and includes pari-mutuel wagers." It is noteworthy that the IHA is not limited to pari-mutuel wagers, but simply *includes* pari-mutuel wagers.[4]

---

[4] The IHA defines "pari-mutuel" as "any system whereby wagers with respect to the

The definition of a "wager" is well established, and clearly includes what Defendant calls its entry fees.  A wager is an agreement between two or more persons that a sum of money or other valuable thing, contributed by those taking part, shall become property of one of them, **depending on the happening of some future event, at present uncertain.** *People v. Lomento,* 155 Cal App 2d 740 (1957). A bet or wager involves gain or loss, between known participants, of money or property **staked upon a happening in the future of an event at the time uncertain.** *Brown v. Board of Police Comm'rs*, 58 Cal.App.2d 473, 477 (1943). "Betting may be defined as 'promise[s] to give money or money's worth **upon the determination of an uncertain or unascertained event** in a particular way, and (unlike a lottery) may involve skill or judgment." *Western Telcon, Inc. v. Cal. State Lottery,* 13 Cal. 4th 475, 485 (1996). Oregon and other states have similar definitions:  "there must be two or more contracting parties, having mutual rights in respect to the money or other thing wagered, or, as sometimes said, "staked," and each of the parties necessarily risks something, and has a chance to make something, **upon the happening or not happening of an uncertain event.**"  *Misner v. Knapp*, 13 Or. 135, 139 (1885). Merriam Webster defines "wager" as "something (as a sum of money) **risked on an uncertain event.**"  The Oxford English Dictionary defines a bet or wager as to "risk a sum of money or valued item against someone else's **on the basis of the outcome of an unpredictable event such as a race or game.**"

As conceded by Defendant, which horse will win a race (or multiple races), is an uncertain future event, out of the control of the bettor or contest player.  Once a

---

outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator." Derby Wars' contests seem to fit within this description, but regardless, the IHA is not limited to pari-mutuel wagering.

horse is selected by the contest player, "any further skill or judgment displayed thereafter are those of the jockeys," even if the participant's initial decision was based on extensive knowledge about the horses, jockeys, weather conditions, and other matters. *Finster v. Keller*, 8 Cal. App. 3d 836, 844 (1971). The actual outcomes of any race "depends upon elements *wholly beyond the control of the player*." *Id.* (emphasis added). Thus, it is "uncertain."

Many of the contests offered by Defendant are "head-to-head;" that is, two players each wagering a certain sum of money on uncertain future events – the outcomes of 6 to 8 horse races. The winner of the contest is the person whose selected horses return the most money, based upon the actual results and payoffs of the actual horse races run at Plaintiffs' tracks. For instance, if a contest player selected a horse running in the first race at Santa Anita Park to win at 4 to 1 odds (the odds offered at Santa Anita), he would "win" $10 for his $2 wager (4 times the amount wagered, plus the amount wagered), the same amount that he would win for that wager placed at Santa Anita. The player with the most money at the end of the contest then wins the amount pooled.

Simply, Defendant is running the exact same operation as Joe the Bookmaker in the original scenario; the only difference is the chosen terminology. Defendant is operating a wagering pool on horse racing conducted at Plaintiffs' racetracks, yet Defendant has never been licensed nor obtained the consent of any of the Plaintiff racetracks, as required by the IHA.

In its contests, Defendant accepts *wagers* (which it calls "entry fees'), because the players are in fact wagering "real money" on uncertain outcomes – the winning horses in a number of horseraces. As above, a wager or bet is money staked upon an uncertain future event. *Brown, supra.* The determination of the winner of Derby Wars' contests is based upon the outcome of future events (the horse races), and the player is neither a participant in, nor has any control over, the outcome of these future events. UF, No. 39.

**C.    Defendant Is Operating An Off-Track Betting System Under Section 3002(7) Of The IHA.**

According to 15 U.S.C. §3002 (7):  "For the purposes of this Act the term . . . 'off-track betting system' means any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run." It is well-established that the plain language of a statute controls.  Defendant is in the business of accepting wagers, in the form of its contests, and its operations are located in a suite in an office building in Louisville, Kentucky, and not at any race track where a horserace is run.

**D.    Defendant Is Required To Obtain The Consent Of Plaintiffs Prior To Accepting Wagers On Plaintiffs' Horseraces.**

According to 15 U.S.C. §3003:  "No person may accept an interstate off-track wager except as provided in this Act."   According to 15 U.S.C. §3004: "**An interstate off-track wager may be accepted by an off-track betting system *only if consent is obtained from . . . the host racing association.***  A host racing association is defined in 15 U.S.C. §3002 (This is because the IHA "was created for the 'especial benefit' of those groups to insure that states which desire to run off-track betting operations do not pirate the races of the host state without providing adequate compensation therefor." *New Suffolk Downs Corp. v. Rockingham Venture, Inc.*, 656 F. Supp. 1190, 1192-1193 (D.N.H. 1987).  Federal law preempts any contrary state law.  *Horseman's Benevolent & Protective Ass'n - Ohio Div. v. Dewine*, 666 F.3d 997, 999 (6th Cir. 2012).[5]

_____

[5] "15 U.S.C.S. § 3004(a) of the federal Interstate Horseracing Act prohibited off-track betting on races at either racetrack without the racetrack's consent, and before the racetracks could give their consent, they had to have a written agreement with the association allowing them to give it. However, Ohio Rev. Code Ann. § 3769.089(G) envisioned a process by which racetracks could secure authorization to simulcast races even if they have not obtained consent from the horsemen's group, which is what the racetracks did after the association withheld its consent because it disliked the

Defendant is an "off-track betting system," and Defendant "[accepts] interstate off-track wagers" on races run at Plaintiffs' horserace tracks, where Plaintiffs are the "host racing associations." Under the IHA, Defendant can do so, ***only if consent is obtained from . . . the host racing association."***

Defendant is required to, and does not have, the consent of any of the Plaintiffs.

### E.    By Accepting Wagers Without The Consent Of Plaintiffs, Defendant Is In Violation Of Section 3004(A) Of The IHA.

As noted above, Defendant is required to and does not have the consent of any of the Plaintiffs: "No person may accept an interstate off-track wager except as provided in this Act."   15 U.S.C. §3003.  As the Court said in *Horseman's Benevolent,*

> "Beulah Park and River Downs are 'host racing association[s]' under the Act, *id.* § 3002(9), and the Association is the exclusive "horsemen's group" affiliated with each one, *id.* § 3002(12). ***The federal law thus prohibits off-track betting on races at either racetrack without the host racing association's consent,*** and before Beulah Park and River Downs can give their consent, they must have a written agreement with the Association allowing them to give it." (emphasis added).

*Id.* Defendant has none of the stakeholders' consent to accept interstate off-track wagers, including Plaintiffs.  Without such consent, Defendant is in violation of the IHA, and is liable to Plaintiffs.

### F.    Defendant Is Liable To Plaintiffs For Damages Under Section 3005 Of The IHA.

---

proposed off-track betting terms. The horsemen's veto was an integral part of the Interstate Horseracing Act, and because the Ohio statute would have negated the veto in certain circumstances, it was preempted." *Horseman's Benevolent & Protective Ass'n - Ohio Div. v. Dewine*, 666 F.3d 997, 998 (6th Cir. 2012).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

According to Section 3005 of the IHA:

"Any person accepting any interstate off-track wager in violation of this Act shall be civilly liable for damages to the host State, the host racing association and the horsemen's group. Damages for each violation shall be based on the total of off-track wagers as follows:

(1) If the interstate off-track wager was of a type accepted at the host racing association, damages shall be in an amount equal to that portion of the takeout which would have been distributed to the host State, host racing association and the horsemen's group, as if each such interstate off-track wager had been placed at the host racing association.

(2) If such interstate off-track wager was of a type not accepted at the host racing association, the amount of damages shall be determined at the rate of takeout prevailing at the off-track betting system for that type of wager and shall be distributed according to the same formulas as in paragraph (1) above."

Defendant is in violation of the IHA. It is required to comply with its provisions, and it admits that it does not. On a daily basis, it accepts interstate off-track wagers, but it does not do so "as provided in this Act." It does not have the consents of any of the stakeholders, including Plaintiffs. While Plaintiffs seek an adjudication from this Court that they are entitled to damages, the actual damages must be determined at trial. It must be determined if Plaintiffs are entitled to the amount that the race track normally collects as its percentage of such wagers (Section 3005(1)), or the amount that the offender collected as its percentage of such wagers (Section 3005(2)), and then such amount must be calculated.

## G.   Defendant Is In Violation Of B&P Section 17200, *et. seq.*

"Section 17200 of the *Business and Professions Code* broadly defines "unfair competition" as, inter alia, any "unlawful, unfair or fraudulent business practice ...." "Unlawful business activity" proscribed under section 17200 includes " 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992). "In essence, an action based on Business and Professions Code section 17200 to redress an

unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder." *Id.;* See also, *State Farm Fire & Cas. Co. v. Superior Court,* 45 Cal. App. 4th 1093, 1103 (1996). Thus, should the Court find that Defendant is liable under the IHA, then Defendant is also in violation of *Business and Professions Code* Section 17200. Moreover, Defendant also fails to comply with *Business and Professions Code* Section 19604, inasmuch as Defendant is not licensed as an ADW, which provides an alternative basis for Defendant's liability under Section 17200.

Plaintiffs do not herein contend that Defendant's entry fees are illegal wagers, or that Defendant is engaged in a criminal gambling operation. Rather, Plaintiffs are simply asserting that Defendant is accepting wagers on horseracing at Plaintiffs' racetracks without Plaintiffs' consent. Defendant, however, has indicated in its prior Motion for Judgment on the Pleadings that it may actually take the position that the IHA does not apply to it because Defendant's contests are ***illegal***. In other words, Defendant may actually argue that because its conduct is illegal, the IHA cannot apply to it because the IHA is intended to only cover lawful actions (and thus, this Court should be powerless to impose legal sanctions upon illegal activity). While Plaintiffs obviously disagree with this, if Defendant is not subject to the IHA for this reason, then it would in fact be in violation of the *Federal Wire Act*, 18 U.S.C. § 1084, which prohibits the transmission of wagering information across state lines. The IHA creates an exception to the prohibition of the *Federal Wire Act* for wagering on horseracing, *but limits that exception to wagering that is in strict compliance with the* IHA: "No person may accept an interstate off-track wager except as provided in this Act." 15 U.S.C. § 3003.

## VII.  <u>CONCLUSION</u>.

Defendant has attempted to devise an artifice, by which its off-track betting

system is disguised by inapt terminology, in an effort to avoid the legal obligations arising from the system of interstate wagering enacted by the IHA. Defendant has attempted to camouflage its acceptance of interstate wagers on horseracing by changing terms its uses, and inserting differences without significance. Form cannot prevail over substance. Accordingly, Plaintiffs respectfully submit that they are entitled to partial summary judgment, and request that the Court find as follows:

1. That the contests offered by Defendant Horse Racing Labs, LLC, on its Derby Wars website are wagers under the *Interstate Horseracing Act of 1978*, 15 U.S.C. §§ 3001, *et seq.* (the "IHA").

2. That Defendant is operating an off-track betting system as defined in Section 3002(7) of the IHA.

3. That Defendant is required to obtain the consent of Plaintiffs prior to accepting wagers on Plaintiffs' horseraces.

4. That Defendant is in violation of Section 3004(a) of the IHA, because it is accepting wagers on Plaintiff host racing associations' horseraces, without the consent of Plaintiffs.

5. That Defendant is liable to Plaintiffs for damages under Section 3005 of the IHA.[6]

6. That Defendant is in violation of *Business & Professions Code* Section 17200, *et seq.*

//
//
//
//

---

[6] While Plaintiffs seek an adjudication from this Court that they are entitled to damages, the amount of damages must be determined at trial.

1   DATED:  March 20, 2017                    Respectfully submitted,

2

3                                              CORBETT, STEELMAN & SPECTER
                                               A Professional Law Corporation
4

5
                                               By:    /s/ Richard B. Specter
6                                                     Richard B. Specter
                                                      Attorneys for PLAINTIFFS
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT