Richard B. Specter, SBN 114090
Diane L. Ellis, SBN 130628
CORBETT, STEELMAN & SPECTER
A Professional Law Corporation
18200 Von Karman Avenue, Suite 900
Irvine, California 92612-1023
Telephone: (949) 553-9266
Facsimile: (949) 553-8454
rspecter@corbsteel.com

Attorneys for Plaintiffs
LOS ANGELES TURF CLUB, INCORPORATED,
LOS ANGELES TURF CLUB II, INC.,
PACIFIC RACING ASSOCIATION, PACIFIC RACING
ASSOCIATION II, GULFSTREAM PARK RACING
ASSOCIATION, INC., OREGON RACING, INC.,
MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
and LAUREL RACING ASSOCIATION, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES TURF CLUB, INCORPORATED, a California Corporation, LOS ANGELES TURF CLUB II, INC., a California Corporation, PACIFIC RACING ASSOCIATION, a California Corporation, PACIFIC RACING ASSOCIATION II, a California Corporation, GULFSTREAM PARK RACING ASSOCIATION, INC., a Florida Corporation, OREGON RACING, INC., a Delaware Corporation, MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC., a Maryland Corporation, LAUREL RACING ASSOCIATION, INC., a Maryland Corporation, and DOES 1 through 10, inclusive,<br><br>　　　　　　Plaintiffs,<br><br>　　vs.<br><br>HORSE RACING LABS, LLC, a Delaware Limited Liability Company, | Case No.: 2:15-cv-9332 SJO (JEMx)<br><br>Hon. S. James Otero<br>Courtroom No. 10C<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Separate Statement of Additional Undisputed Facts and Statement of Genuine Disputes filed herewith]<br><br>Date Filed: December 3, 2015<br>Discovery Cutoff: March 27, 2017<br>Final Pretrial Conf.: June 19, 2017<br>Trial Date: June 27, 2017<br><br>**DATE: April 24, 2017**<br>**TIME: 10:00 a.m.**<br>**CTRM: 10C** |

also known as, IMMERSE, LLC, doing                )
business as DERBY WARS, and Does 1                )
through 10,                                       )
                                                 )
                    Defendants.                   )
_____          )

 

     Plaintiffs Los Angeles Turf Club, Incorporated, Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing, Inc., Maryland Jockey Club Of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs"), hereby submit their Opposition to Defendant Horse Racing Labs, LLC's ("Defendant" or "Derby Wars") Motion for Summary Judgment.

 

DATED:  April 3, 2017          Respectfully submitted,

                               CORBETT, STEELMAN & SPECTER
                               A Professional Law Corporation

                               By:   */s/ Richard B. Specter*
                                    Richard B. Specter
                                    Attorneys for PLAINTIFFS

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF ARGUMENT…...……………………………………1

II.   INTRODUCTION. ……………………………………………………2

III.   RELEVANT LEGAL STANDARDS RELATED TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT……………………………3

IV.   ADDITIONAL MATERIAL FACTS………………………………...4

   A.   Plaintiffs And Horseracing……………………………………..4

   B.   Derby Wars…………………………………………………...6

V.   LEGAL ARGUMENT. ……………………………………………8

   A. Defendant Has Not And Cannot Establish A Right To Judgment On
   Plaintiffs' IHA Claim. ……………………………………………..8

      1.   Defendants' Contests Are Wagers On Horseracing
      Under The IHA…………...…………………………………..8

      2.   The Entry Fees Are Wagers..……………………………...9

      3.   By Its Express Terms, The IHA Is Not Limited To Parimutuel
      Wagers, And Encompasses Derby Wars' Entry Fees…..…...……11

      4.   Defendant's Contests Do Not Fall Within the Fantasy Sports
      Exception To The UIGEA. ……………………………..…………12

      5.   Defendant Is Operating An Off-Track Betting System. ……………14

   B. Defendant Is Not Entitled To Judgment On Plaintiffs' Claim For
   Violation Of The UCL………...………………………………...14

      1.   As The Court Has Ruled, Plaintiffs Have Standing Under The UCL,
      And The Court's Supplemental Jurisdiction Is Proper. ……………14

      2.   All Of The Plaintiffs Can Seek Relief Under The UCL……………..15

      3.   Even If Defendant Is Not Subject To The IHA, It Is Still Subject To
      The UCL…………………………………………………...16

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**C. Defendant Is Not Entitled To Judgment On Its Affirmative Defenses Of Statute Of Limitations, Estoppel And Waiver**………..……...…………..17

   **1.  Plaintiffs' Claims Are Not Barred By The Statute Of Limitations**…17

   **2.  Plaintiffs' Claims Are Not Barred By Waiver Or Estoppel**………...17

**D. The Court Should Not Abstain From Adjudicating This Matter**…..……18

**E. Defendant Intentionally Violated This Court's Orders; Its Third Violation.** ……………………………………………………………...19

**VI.**   **CONCLUSION**………………………………………………………..20

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

## CASES

### Federal

*Fontenot v. Upjohn Co.,* 780 F.2d 1190 (1986). ……………………………..…..4

*Gross v. Symantec Corp.,* No. C 12-00154 CRB,
    2012 U.S. Dist. LEXIS 107356, (N.D. Cal. July 31, 2012). ………………..…15

*Horseman's Benevolent & Protective Ass'n - Ohio Div. v. Dewine*,
    666 F.3d 997 (6th Cir. 2012) ……………………………………....…….…..14

*Humphrey v. Viacom, Inc*., No. 06-2768 (DMC),
    2007 U.S. Dist. LEXIS 44679  (D.N.J. June 19, 2007)…….…….…..……9, 10

*Langone v. Patrick Kaiser & Fanduel, Inc*., No. 12 C 2073,
    2013 U.S. Dist. LEXIS 145941 (N.D. Ill. Oct. 9, 2013)…………………….…10

*Petrella v. MGM*, 572 U.S. __, 134 S.Ct. 1962 (2014) ……………………….2, 17

*Quest Software, Inc. v. DirecTV Operations, LLC,* No. SACV 09-1232 AG (ANx),
    2011 U.S. Dist. LEXIS 110888, at *(C.D. Cal. Sep. 26, 2011)……………….4

### State

*Bell Gardens Bicycle Club v. Dep't of Justice,* 36 Cal. App. 4th 717 (1995)…....…..11

*Brown v. Board of Police Comm'rs*, 58 Cal. App. 2d 473 (1943)……..……………8

*DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.*,
    30 Cal. App. 4th 54 (1994) ……..……………………………………..2, 18

*Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377 (1992). ………..…………14

*Finster v. Keller*, 18 Cal. App. 3d 836 (1971)……………………….…..……...9, 11

*Misner v. Knapp*, 13 Or. 135 (1885)……….…………………………..9

*Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999)…….…..……16

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*,
    144 Cal. App. 4th 1175 (2006)……………………………………………2, 1

*People v. Fanduel, Inc.*, 2015 NY Slip Op 32332(U), ¶ 7 (Sup. Ct.). …………..……10

*People v. Lomento,* 155 Cal. App. 2d 740 (1957)………...……………………………1, 8

*Spray, Gould & Bowers v. Associated Internat. Ins. Co.*,
    71 Cal. App. 4th 1260 (1999)……………………………….………..18

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191 (2011)…………………………………..16

*Western Telcon, Inc. v. Cal. State Lottery,* 13 Cal. 4th 475 (1996). ……………1, 9, 13

**STATUTES**

**Federal**

*Interstate Horseracing Act of 1978*, 15 U.S.C. §§ 3001, *et seq*..………………passim

*Federal Wire Act*, 18 U.S.C. § 1084………………………………………………16

18 U.S.C. §1955 …………………………………………………………………..16

*Unlawful Internet Gambling Enforcement Act of 2006,*
    31 U.S.C. §§ 5361, *et seq*..……………………………..………………passim

**State**

*Business & Professions Code §§ 17200, et seq.* ………………………………..passim

*Business & Professions Code § 19604*……………………………………....……..16

*Business & Professions Code §§ 19604.5-19604.7*…………..…………….…....…5. 12

*Fla. Stat. Ann.* § 849.25 …………………………………………………….………9

*Penal Code §319* …………………………………………………………………..11

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## I.  **SUMMARY OF ARGUMENT.**

Defendant has failed to establish its right to summary judgment on Plaintiffs' claims for violation of the *Interstate Horseracing Act of 1978*, 15 U.S.C. §§3001, *et seq.* (the "IHA"), and California *Business & Professions Code* §§17200, *et seq.,* ("*B&P Code*") (the "UCL").  Defendant's Motion for Summary Judgment (the "MSJ") must be denied because:

- Defendant's entry fees for its contests are in fact "wagers" subject to the IHA because they are "an agreement between two or more persons that a sum of money or other valuable thing, contributed by those taking part, shall become property of one of them, depending on the happening of some future event, at present uncertain." *People v. Lomento,* 155 Cal. App. 2d 740 (1957). And it is irrelevant whether these contests also "may involve skill or judgment."  *Western Telcon, Inc. v. Cal. State Lottery,* 13 Cal. 4th 475, 485 (1996).

- Defendant's contests are not saved by the *Unlawful Internet Gambling Enforcement Act of 2006,* 31 U.S.C. §§ 5361, *et seq*., (the "UIGEA"), as Plaintiffs have not even sued under the UIGEA.  And the UIGEA expressly exempts both federal and state horseracing laws from its application, which laws form the basis for Plaintiffs' claims.  And Defendant's unsupported assertion that its horseracing contests are somehow exempt from regulation under the IHA because they require skill is false and would lead to the ludicrous conclusion that the IHA can never be enforced even on wagering on horseracing, because wagering on horseracing does require skill.

- Under the clear language of the IHA, Defendant is operating an "off-track betting system," and the IHA applies to wagering on horseracing, including, ***but not limited to***, parimutuel wagering.

- Plaintiffs are entitled to relief under the UCL so long as the Court finds that Defendant violated either the IHA, or any other statute.

- The Court has previously rejected Defendant's assertion that Plaintiffs lack standing under the UCL.

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

- Defendant has not, and cannot, establish its affirmative defenses of statute of limitations, waiver and estoppel, which under Defendant's theory, would provide it with a perpetual right to use Plaintiffs' races in its contests and to violate the IHA:

  - Plaintiffs' claims under the IHA are not barred by the statute of limitations because the statute of limitations under Section 3006 (c), runs from each violation of the IHA, not simply the first violation. *Petrella v. MGM*, 572 U.S. __, 134 S.Ct. 1962 (2014);

  - Waiver requires that Defendant prove the "intentional relinquishment of a known right after full knowledge of the facts," (*Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc*., 144 Cal. App. 4th 1175, 1189-90 (2006)), which Defendant has not even attempted to establish; and

  - Estoppel requires proof of four elements, including that Defendant must rely upon the conduct to his injury. Defendant offers no undisputed facts to establish these elements, including that the conduct of Plaintiffs caused it injury. *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 59 (1994).

- The Court should not abstain from adjudicating Defendant's liability. Defendant cites no authority to support abstention from determining Defendant's liability under the IHA, or that the Court abstain from issuing an injunction under the UCL. Moreover, while various legislatures are indeed considering the legality of daily fantasy sports ("DFS"), states like Indiana and New York that have legalized DFS *have expressly excluded DFS involving horseracing.*[1]

## II.   __INTRODUCTION.__

The parties have submitted cross-motions for Summary Judgment (Defendant) and Partial Summary Judgment (Plaintiffs, due to the remaining issue of damages). Plaintiffs submit that they should prevail on both Motions because Defendant's

---

[1] In fact, in response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, Additional Undisputed Fact ("AUF"), No. 129.

contests (in which it receives "entry fees"), based upon the outcome and payoffs of horseraces, constitute wagering on horseracing. The facts regarding Defendant's operation of these contests are not in dispute, and are the same for both Motions, and the Motions simply require this Court's application of the law to those facts.

Wagering on horseracing is the only permissible form of sports gambling in most states, and even then, it is allowed only under specified, and limited, circumstances, subject to strict regulation. The IHA is the exclusive Federal law governing interstate wagering on horseracing, and is expressly not limited to parimutuel wagering. If the contests are indeed wagering on horseracing, then Plaintiffs must prevail on both motions. While Defendant admits that it does not comply with the IHA (AUF, No. 111), it claims that this Court is powerless to regulate its actions. Defendant should not escape liability by flaunting its refusal to follow the licensing laws required of those entities that accept interstate wagers on horseracing.

Defendant's scheme is clear: those who lawfully accept wagers on horseracing must pay the tracks, who ultimately share a portion of the wagers (the "takeout") with the state and worker welfare funds, among others. AUF, Nos. 101, 102 and 103. By claiming its entry fees are not wagers, Defendant keeps the entire takeout for itself.

Plaintiffs' claim under the IHA is simple: Defendant's acceptance of wagers on horseracing, without the requisite consent, violates the IHA, rendering Defendant liable for damages to Plaintiffs, and subject to an injunction against its continuing operation. Further, such unlawful activity under the IHA and related statutes renders Derby Wars subject to injunction under the UCL. Defendant has not established a right to judgment in its favor, and Defendant's MSJ must be denied.

## III.    RELEVANT LEGAL STANDARDS RELATED TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

"The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If, and only if, the moving party meets its burden, then the nonmoving party must produce enough evidence to rebut the moving party's claim and create a

genuine issue of material fact. *Id.* at 322-23. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000)."

*Quest Software, Inc. v. DirecTV Operations, LLC,* No. SACV 09-1232 AG (ANx), 2011 U.S. Dist. LEXIS 110888, at *6 (C.D. Cal. Sep. 26, 2011).  Defendant has the burden of establishing each element of its affirmative defenses.  *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (1986).

## IV.    **ADDITIONAL MATERIAL FACTS.**[2]

### A. Plaintiffs And Horseracing.

Plaintiffs operate horserace meetings at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows).  AUF, No. 118.  Each Plaintiff is a Host Racing Association within the meaning of the IHA. AUF, No.119. Each Plaintiff has the approval of its host State to conduct racing. AUF, No. 120.  Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. AUF, No. 121.

The type of wagering available on horseracing includes betting on a horse to "Win" (finish first) "Place" (finish first or second) and "Show" (first, second or third). AUF, No. 104.   Any type of wager other than Win, Place or Show is called an Exotic Wager.  AUF, No. 105.   Exotic Wagers include the "Daily Double" (picking the winner in two consecutive races), "Exacta" (picking the first two horses in the exact order), "Trifecta" (picking the first three horses to finish), "Pick Three" (picking the winning horse in three races), "Pick Four" (picking the winning horse in four races), and a "Pick Six" (picking the winning horse in six races).  AUF, No. 106.  The total amount wagered is the "handle."  AUF, No. 100.  Defendant concedes that all Win,

---

[2] Many of these Material Facts are also set forth in Plaintiffs' Separate Statement of Uncontroverted Facts and Contentions of Law filed in Support of Plaintiffs' Motion for Partial Summary Judgment.  They are repeated here for the Court's convenience, and to the extent necessary for the Court's consideration of Defendant's MSJ.

Place, Show and Exotic Wagers are indeed *wagers* when placed at the racetrack. AUF, No. 107.

Exchange wagering is another form of permitted wagering on horseracing, where the licensee (the organizer who pits the players against each other, like Derby Wars) matches two players to bet directly against each other on a horserace.   See *B&P Code* §§19604.5-19604.7.

Historically, wagering on horses only took place at the track where the race was being run, such that bettors had to attend the race to place a wager.  AUF, No. 108. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run.  AUF, No. 109.  Thus, in 1978, Congress enacted the IHA, which was explicitly to "regulate interstate commerce with respect to wagering on horseracing." AUF, No. 110. As therein, no one "may accept an interstate off-track wager except as provided in" the IHA.  AUF, No. 110.

From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW").  AUF, No. 112.  In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the customer's account.  AUF, No. 113. If the wager is successful, the winning funds are deposited directly into the customer's account.  AUF, No. 114.  The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator) which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs.  AUF, No. 115.  It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers.  AUF, No. 116.  Defendant has never been licensed as an ADW.  AUF, No. 117.  When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source

Market Fee." AUF, No. 133.  Unlike other sports, horseracing is almost exclusively funded by wagering.  AUF, No. 99.

### B. Derby Wars.

Defendant is a Delaware limited liability company, doing business from an office building in Louisville, Kentucky.  AUF, Nos. 72 and 73.  Defendant launched the Derby Wars website in October, 2011.  AUF, No. 134.  Defendant admits that that it has continually operated these contests on a daily basis since 2011.  AUF, No. 135. Derby Wars advertises itself as conducting horse racing handicapping contests.  The first page of Derby Wars' website (www.derbywars.com) proclaims:

**"Horse Racing Handicapping Contests"**

**"Play for free or real money"**

**"Pick a horse in each race"**

**"Over $20-million paid out in winnings!"**

AUF, No. 75.  In these contests, one stakes money and picks horses to win in actual races, for the chance to receive cash winnings.  AUF, No. 75.  Players from across the country (including California, Florida, Maryland and Oregon), pay entry fees interstate (to Derby Wars in Kentucky) to wager on races run at race tracks.  AUF, No. 74. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon.  AUF, No. 98.

To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. AUF, No. 76.  Defendant maintains players' funds in a bank account, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry fee"). AUF, No. 77.  If the player wins his wager (the "prize"), his account is credited with his winnings. AUF, No. 78. The player can then request a withdrawal from his account, and a check is sent to him from the Derby Wars account. AUF, No. 78. All of this is exactly as an ADW operates.  In agreements with third parties, Defendant even refers to its players as "bettors." AUF, No. 91.  Every visitor to the Derby Wars website has access to the

leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without paying an entry fee.  AUF, No. 130.

Defendant touts its contests as allowing players to "win real money," and the players in fact do win real money.  AUF, No. 80.  Defendant primarily offers contests that are "head-to-head".  AUF, No. 81.  In these contests, two players pay an entry fee for a fixed prize.  AUF, No. 82.  As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other.  AUF, No. 83.  The remaining $4 is the "take out" or "rake" retained by Defendant.  AUF, No. 84.  Defendant offers head-to-head contests with the prize up to $1,500, and with entry fees of $799.  AUF, No. 85.  Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee.  AUF, No. 90.  The prizes offered by Defendant consist of entry fees only; Defendant has no other source of income for the Derby Wars contests.  AUF, No. 131.  Indeed, Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees.  AUF, No. 132.

Depending upon the contest, the players must select horses in 6 to 10 different races at various racetracks, including Plaintiffs' tracks.  AUF, No. 86.  In the contests, "the scores are calculated according to the actual payouts on actual races at actual race tracks."  AUF, No. 87.  The scores are calculated in dollars, and are what one would win if he placed a $2 win wager, a $2 place wager, and a $2 show wager (if applicable) on the horses that he selected.  AUF, Nos. 88 and 92.  For instance, if a horse would pay $6.40, the player is awarded 6.40 points.  AUF, No. 93.  Derby Wars uses "points or dollars interchangeably".  AUF, No. 95.  The player with the biggest bankroll (the most winnings) at the end of the contest wins the "prize."  AUF, No. 89.

The player has no influence over the results of the horse race; when the player enters a contest, it is uncertain as to which horse will win any of the races.  AUF, No. 96.  The winner of the contest will be determined by future events.  AUF, No. 97.

Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks.  AUF, No. 126.  Defendant has never

requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races.  AUF, No. 127.  Defendant has never requested nor received consent from any off-track racing association to conduct its contests.  AUF, No. 128.  No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks.  AUF, No. 122.  No Plaintiff has ever provided consent to Defendant to accept a wager (or entry fee) from a resident of the States of California, Florida, Maryland or Oregon. AUF, No. 123.  No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant. AUF, No. 124.  In fact, Defendant does not have any agreements with any of the Plaintiffs.  AUF, No. 125. Defendant does not hold a license to conduct wagering on horseracing in California, Florida, Maryland or Oregon.  AUF, No. 79.  Indeed, Defendant openly admits that it does not comply with the IHA. AUF, No. 111.

## V.   <u>LEGAL ARGUMENT</u>.

### A. Defendant Has Not And Cannot Establish A Right To Judgment On Plaintiffs' IHA Claim.

#### 1.  Defendants' Contests Are Wagers On Horseracing Under The IHA.

The IHA expressly regulates all wagering on horseracing, and the definition of a "wager" is well established, and clearly includes what Defendant calls its entry fees. While Defendant argues (without support) that its contests are not wagers under the IHA because skill is required to win the contest, whether something is a bet or wager is not dependent upon whether it takes skill to actually win that bet or wager.

A wager is an agreement between two or more persons that a sum of money or other valuable thing, contributed by those taking part, shall become property of one of them, **depending on the happening of some future event, at present uncertain**. *People v. Lomento,* 155 Cal App 2d 740 (1957). A bet or wager involves gain or loss, between known participants, of money or property **staked upon a happening in the future of an event at the time uncertain**. *Brown v. Board of Police*

*Comm'rs*, 58 Cal. App. 2d 473, 477 (1943). "Betting may be defined as 'promise[s] to give money or money's worth **upon the determination of an uncertain or unascertained event** in a particular way, **and (unlike a lottery) may involve skill or judgment.**" *Western Telcon, Inc. v. Cal. State Lottery,* 13 Cal. 4th 475, 485 (1996).[3] Defendant does not dispute this definition. See, <u>MSJ,</u> at 10:6-11.

As conceded by Defendant, which horse will win a race (or multiple races), is an uncertain future event, out of the control of the bettor or contest player.  AUF, Nos. 96 and 97.  Once a horse is selected by the contest player, "any further skill or judgment displayed thereafter are those of the jockeys," even if the participant's initial decision was based on extensive knowledge about the horses, jockeys, weather conditions, and other matters. *Finster v. Keller*, 18 Cal. App. 3d 836, 844 (1971). The actual outcomes of any race "depends upon elements *wholly beyond the control of the player*." *Id.* (emphasis added).  Thus, it is "uncertain."

## 2.  The Entry Fees Are Wagers.

Defendant's reliance on *Humphrey v. Viacom, Inc.*, No. 06-2768 (DMC), 2007 U.S. Dist. LEXIS 44679, at *1-6 (D.N.J. June 19, 2007) is sorely misplaced.  In *Humphrey,* a suit based on the New Jersey state *qui tam* gambling loss-recovery statutes, plaintiff claimed that he was entitled to recover the individual gambling losses of all participants in the defendants' season-long fantasy sports leagues, because he claimed that the registration fees paid by the participants constitute wagers or bets. *Id,*

---

[3] Oregon and other states have similar definitions:  "there must be two or more contracting parties, having mutual rights in respect to the money or other thing wagered, or, as sometimes said, 'staked,' and each of the parties necessarily risks something, and has a chance to make something, **upon the happening or not happening of an uncertain event.**"  *Misner v. Knapp*, 13 Or. 135, 139 (1885). The term 'bookmaking' means the act of taking or receiving, while engaged in the business or profession of gambling, **any bet or wager upon the result of any trial or contest of skill**, speed, power, **or endurance of** human, **beast**, fowl, motor vehicle, or mechanical apparatus or upon the result of any chance, casualty, unknown, or contingent event whatsoever." Fla. Stat. Ann. § 849.25 (1). (Emphasis added).

at *4-5[4]. In these fantasy sports leagues, participants paid a single fee for the entire season, and covered support services and data management services. *Id,* at *3. The prizes for the winning team were nominal – "such as T-shirts or bobble-head dolls." *Id,* at *4. Managers could win even bigger prizes "such as flat-screen TVs or gift certificates." *Id,* at *4. Under these circumstances, the court found that plaintiff could not recover under the *qui tam* statutes, and granted the Motion to Dismiss. *Id,* at *31.

*Humphrey* is easily distinguished as well as criticized, and the decision has been both by subsequent courts. In analyzing *Humphrey* in the daily fantasy sports context, and in another unreported decision, a New York court stated:

> "Contrary to *Humphrey v. Viacom, I*nc., the facts in this action involve DFS, the participants pay a fee every time they play, potentially multiple times daily instead of one seasonal entry fee, with a percentage of every entry fee being paid to Fanduel, Inc. and Draftkings, Inc.. Furthermore the New York State Penal Law does not refer to 'wagering' or 'betting,' rather it states that a person, 'risks something of value.' The payment of an 'entry fee' as high as $10,600.00 on one or more contests daily could certainly be deemed risking 'something of value.'"

*People v. Fanduel, Inc.*, 2015 NY Slip Op 32332(U), ¶ 7 (Sup. Ct.). Also of no avail is *Langone v. Patrick Kaiser & Fanduel, Inc.*, No. 12 C 2073, 2013 U.S. Dist. LEXIS 145941, at *21 (N.D. Ill. Oct. 9, 2013), in which, in *dicta* (the case was dismissed for lack of subject matter jurisdiction), the Court noted that an online fantasy sports website is not a "winner" *for the purposes of the Illinois Loss Recovery Act* since the website does not participate in the risk associated with its fantasy sports games.

None of these out-of-jurisdiction cases support the bold assertion of Defendant that "it is well established that entry fees do not constitute bets or wagers." MSJ, 9:23.

---

[4] The *qui tam* laws were intended to prevent gamblers and their families from becoming destitute due to gambling losses -- and thus becoming wards of the State -- by providing a method for the gambler's spouse, parent or child to recover the lost money from the winner. Plaintiff was not a spouse, parent or child of any of the participants of fantasy sports league.

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Rather. as Defendant points out (<u>MSJ</u> at 10:6-11), a "bet" or "wager" as defined by the California Court in *Bell Gardens Bicycle Club v. Dep't of Justice*, 36 Cal. App. 4th 717, 747 (1995) is:

> "as an 'agreement between two or more that a sum of money or some valuable thing, in contributing with all agreeing to take part, shall become the property of one or more of them, on the happening in the future of an event at the present uncertain; and the stake is the money or thing thus put upon the chance.'"

This clearly applies to Defendant's contests.  Defendant's citation of the *Bell Gardens* case is remarkable. *Bell Gardens* relies upon *Finster v. Keller,* (1971) 18 Cal. App. 3d 836, 842, which held that a contest where the players selected the winners of six horse races in order to win a cash "prize" was a lottery forbidden by *Penal Code* §319, because it was a game of chance, not skill.  This perfectly describes a Derby Wars' contest:  two players pay an entry fee, which becomes the property of the player whose picks return the most dollars in a series of races, the outcome of which is unknown at the time.  This is a bet or wager.  They are not paying a fee for Defendant to provide a chat room, with the hope of winning a bobble head doll at the end of the NFL season.  Entry fees go as high as $2,200.  Players can win up to $300,000.  They are betting real money, for a chance to win real money, not to win a T-shirt or bobble-head doll.

### 3.   By Its Express Terms, the IHA Is Not Limited To Parimutuel Wagers, And Encompasses Derby Wars' Entry Fees.

Defendant argues that its contest entry fees are not parimutuel wagers, and that the IHA only applies to parimutuel wagers.  Defendant is wrong on both counts.  First, as set forth in 15 U.S.C. § 3002:

> "'interstate off-track wager' means a legal wager placed or accepted in one State with respect to the outcome of a horserace taking place in another State *and includes pari-mutuel wagers*, where lawful in each State involved, placed or transmitted by an individual in one State via telephone or other electronic media and accepted by an off-track betting system in the same or another State, as well as the combination of any

-11-

pari-mutuel wagering pools." (Emphasis added).

Thus, the IHA is not limited to parimutuel wagers; the IHA simply includes it.

Moreover, although unnecessary, Defendant's contests are parimutuel as defined by both the IHA and California law.  As set forth in section 3002 of the IHA, "'parimutuel' means any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator."  In Derby Wars' contests, the contestants pay entry fees into a wagering pool, and play against each other for the right to claim the cash prize.

Indeed, the Derby Wars' contests are most similar to exchange wagering. In exchange wagering, the licensee (the organizer, like Derby Wars) matches two players to bet directly against each other on a horserace (like the contest entrants).  *B&P Code* §19604.5(a)(16) uses the exact same definition of parimutuel as the IHA, at 15 USC §3002(13).   This is precisely what Defendant offers to its players, and "Exchange wagering is a form of parimutuel wagering…"  *B&P Code* §19604.5(a)(7).

### 4.   **Defendant's Contests Do Not Fall Within The Fantasy Sports Exception To The UIGEA.** [5]

Much of the MSJ is devoted to the idea that Plaintiffs "cannot recover under the IHA" because Defendants' contests are exempted under the UIGEA.  This is simply

_____

[5] Enacted in 2006, the UIGEA made only two changes in the law of internet gambling: (1) it created a new federal crime of receiving money by an operator of an illegal gambling website; and (2) it ordered federal regulators to enact regulations to identify and block money transfers by bettors in the United States to those outlaw gambling sites. 31 U.S.C. §5361.  The UIGEA does not legalize fantasy sports contests if otherwise illegal under another anti-gambling law.  The UIGEA was not intended to change any other gambling law.  31 U.S.C. §5361(b).

false.  First, Plaintiffs have not sued under the UIGEA.  Second, the plain and unambiguous language of the UIGEA preserves any federal or state prohibition against gambling on horse races that existed at the time of the UIGEA's enactment, including the IHA. *Section 5362 (D) of the UIGEA specifically addresses horse racing, and expressly states that it is not the intent of the UIGEA to legalize betting on horse racing that would otherwise be illegal under the IHA*: "[i]t is the sense of Congress that this subchapter shall not change which activities related to horse racing may or may not be allowed under **Federal** law." 31 USC §5362(10)(D)(iii).   "Nothing in this subchapter may be construed to preempt any **State** law prohibiting gambling." 31 U.S.C. §5362(10)(D)(ii).

Under the UIGEA, the winner must be determined by "accumulated statistical results."  Horseracing does not have the traditional "accumulated statistical results" that are the hallmarks of genuine fantasy contests; i.e., home runs or hits in baseball; touchdowns or passing yards in football. And Derby Wars' contests are not based on accumulated statistical results; they are based on the outcomes of the performances of real horses in real races, which is not permitted under the UIGEA. 31 U.S.C. §5362 (1) (E)(ix)(III). Certainly, a fantasy contest where the player picks the actual winners of six football games would not pass muster under the UIGEA, yet that is precisely what Derby Wars' contests offer on horseracing. The UIGEA does not provide a safe haven for Defendant; in fact, it prohibits any wager in violation of the IHA. 31 U.S.C. §5362 (10)(C)(iv)(I).

Finally, nothing in the UIGEA supports the apparent assertion of Defendant that if its contests reward skill, then it cannot be liable to Plaintiff under the IHA.  See, e.g., *Western Telcon,* 13 Cal. 4th at 485:  "Betting may be defined as 'promise[s] to give money or money's worth upon the determination of an uncertain or unascertained event in a particular way, and (unlike a lottery) *may involve skill* or judgment."

### 5.  Defendant Is Operating An Off-Track Betting System.

Per 15 U.S.C. §3002(7):  "For the purposes of this Act the term . . .  'off-track

betting system' means any group which is in the business of accepting wagers on horseraces at locations other than the place where the horserace is run."  It is well-established that the plain language of a statute controls.  Defendant is in the business of accepting wagers (entry fees), and its operations are located in an office building in Louisville, Kentucky, and not at any race track where a horserace is run. As the Court said in *Horseman's Benevolent & Protective Ass'n - Ohio Div. v. Dewine*, 666 F.3d 997 (6th Cir. 2012):

> "***The federal law thus prohibits off-track betting on races at either racetrack without the host racing association's consent,*** and before Beulah Park and River Downs can give their consent, they must have a written agreement with the Association allowing them to give it." (emphasis added).

*Id.*  Defendant has none of the stakeholders' consent to accept interstate off-track wagers, including Plaintiffs, and is in violation of the IHA, and liable to Plaintiffs. 15 U.S.C. §3003.

### B.  Defendant Is Not Entitled To Judgment On Plaintiffs' Claim For Violation Of The UCL.

"Section 17200 of the *Business and Professions Code* broadly defines "unfair competition" as, inter alia, any "unlawful, unfair or fraudulent business practice …." "Unlawful business activity" proscribed under section 17200 includes "'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992).

### 1.  As The Court Has Ruled, Plaintiffs Have Standing Under the UCL, And The Court's Supplemental Jurisdiction Is Proper.

The Court previously rejected this same argument, based on the same authority:

"Defendant's argument that Plaintiffs lack standing to bring the UCL claim is unavailing. In the FAC, Plaintiffs contend that they are not receiving Fees that they otherwise would be entitled to because Horse Racing Labs is operating an unlawful gambling enterprise, an unfair business practice under California Business and Professions Code Section

17200. Assuming Plaintiffs' allegations are true, as is required on a motion for judgment on the pleadings, Plaintiffs are currently losing money as a result of Defendant's failure to comply with state laws regulating gambling on horse races. *See Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1087 (Cal. 2010) ("While the voters clearly intended to restrict UCL standing, they just as plainly preserved standing for those who had had business dealings with a defendant and had lost money or property as a result of the defendant's unfair business practices.") This is sufficient to establish standing under the UCL."   <u>Order</u>, <u>Docket</u> No. 43, p. 4.

Moreover, the Court's comment that Plaintiffs have not shown that Derby Wars website "would deprive Plaintiffs of customers" (MSJ,16:14-15), related to the Court's dismissal of Plaintiffs' RICO claim, which is no longer in this action.  The Court also determined supplemental jurisdiction was proper.  <u>Order</u>, <u>Docket</u> No. 43, p. 4.

### 2.    All Of The Plaintiffs Can Seek Relief Under The UCL.

It is undisputed that Defendant accepts entry fees for contests that include races run at all of Plaintiffs' tracks, including Santa Anita Park and Golden Gate Fields in California, and that Defendant does not pay the required Host Fees for the use of those races to the California Plaintiffs.  AUF Nos. 74 and 124.  It is also undisputed that Defendant accepts entry fees from residents of California that include races run at all Plaintiffs' non-California racetracks, and that Defendant fails to pay Market Access Fees to the California Plaintiffs, and fails to pay Host Fees to the non-California tracks.  AUF Nos. 74 and 124.  This Court can enjoin this conduct pursuant to *B&P Code* §17203. (All Plaintiffs are also entitled to injunctive relief under the IHA, Section 3005).

> ***The UCL allows claims by non-California plaintiffs when the alleged misconduct or injuries occurred in California.** Doe v. Nestle*, 748 F. Supp. 2d 1057, 1122 (C.D. Cal 2010); *In re Intel Laptop Battery Litig.*, No. 09-2889, 2010 U.S. Dist. LEXIS 132655, 2010 WL 5173930, at *2 (N.D. Cal. Dec. 15, 2010)."

*Gross v. Symantec Corp.,* No. C 12-00154 CRB, 2012 U.S. Dist. LEXIS 107356, at *22-24 (N.D. Cal. July 31, 2012).  ***"In short, the location of the alleged conduct***

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*giving rise to liability controls application of UCL, not the domicile of the plaintiff or defendant*." *Id.*[6]  Defendant accepts wagers on Plaintiffs' horserace tracks in California, and accepts wagers from California on Plaintiffs' racetracks located outside of California.  All of the Plaintiffs are entitled to relief under the UCL.

### 3.    Even If Defendant Is Not Subject To The IHA, It Is Still Subject To The UCL.

Should the Court find that Defendant is liable under the IHA, then Defendant is also in violation of the UCL.  If the Court finds that Defendant need not comply with the IHA, because as Defendants asserts, it is accepting illegal wagers or is not properly licensed, then Defendant is in violation of the *Federal Wire Act*, 18 U.S.C. § 1084, which prohibits the transmission of wagering information across state lines.  The IHA creates an exception to the prohibition of the *Federal Wire Act* for wagering on horseracing*, but limits that exception to wagering that is in strict compliance with the* IHA:  "No person may accept an interstate off-track wager except as provided in this Act."  15 U.S.C. §3003.  Defendant also fails to comply with *B&P Code* §19604, inasmuch as Defendant is not licensed as an ADW, which provides an alternative basis for Defendant's liability under the UCL.  And if Defendant is in violation of state gambling laws, then it is liable under 18 USC §1955.  The violation of any of these statutes means Plaintiffs are entitled to injunctive relief under the UCL.

Plaintiffs do not herein contend that Defendant's entry fees are illegal wagers, or that Defendant runs a criminal gambling operation. Rather, Plaintiffs simply assert that

---

[6] *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999) is distinguishable.  In *Norwest*, the court found that the UCL was not "designed or intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California."  In addition, *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209, 2011) was expressly limited to the facts before the Court: "Accordingly, we answer the third certified question as follows: *Business and Professions Code* section 17200 does not apply to overtime work performed outside California for a California-based employer by out-of-state plaintiffs in the circumstances of this case based solely on the employer's failure to comply with the overtime provisions of the FLSA."

Defendant accepts wagers on horseracing at Plaintiffs' racetracks without Plaintiffs' consent. Defendant, however, takes the position that the IHA does not apply to it because its contests are ***illegal***. In other words, Defendant argues that because its conduct is illegal, the IHA cannot apply to it because the IHA is intended to only cover lawful actions (and thus, this Court is powerless to impose legal sanctions upon its illegal activity).  While Plaintiffs obviously disagree with this, if Defendant is not subject to the IHA for this reason, then it is in violation of criminal laws.

### C.   Defendant Is Not Entitled To Judgment On Its Affirmative Defenses Of Statute Of Limitations, Estoppel And Waiver.

#### 1.   Plaintiffs' Claims Are Not Barred By The Statute Of Limitations.

Under Section 3005 of the IHA, Plaintiffs can recover "Damages for each violation" of the IHA.  The 3 year statute of limitations, under Section 3006 (c), runs from each violation.  "Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs. In short, each infringing act starts a new limitations period." *Petrella, supra,* 134 S. Ct. at 1969.  Separately accruing harm is distinct from "harm from past violations that are continuing." *Id*. Every time that Defendant uses Plaintiffs' horseraces in its contests – and Plaintiffs operate horserace meets year round - Defendant violates the IHA. And Defendant admits that it has continually operated these Contests on a daily basis since 2011, with each separate contest giving rise to a new cause of action and limitations period.

#### 2.   Plaintiffs' Claims Are Not Barred By Waiver Or Estoppel.

"Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party.' Thus, '[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.'"

*Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc*., 144 Cal. App. 4th 1175, 1189-90 (2006). Defendant does not establish in the MSJ that Plaintiffs intentionally

relinquished a known right, nor could it.  Defendant cannot cite to a single undisputed fact that establishes waiver by Plaintiffs of each separate violation of the IHA.

Defendant has also failed to establish estoppel with respect to each violation:

"Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury." [7]

Defendant has not even attempted to satisfy any of these requirements, let alone all of them: (1) Defendant offers no evidence that Plaintiffs knew of each cash contest using Plaintiffs' horseraces for cash prizes; (2) There is no evidence that Plaintiffs intended for Defendant to use their races;[8] (3) Defendant was aware of the public debate on the contests (Defendant's Undisputed Fact, No. 71); and (4) Defendant offers no undisputed facts that the conduct of Plaintiffs caused it injury.

**D.      The Court Should Not Abstain From Adjudicating This Matter.**

Defendant asserts that this Court should abstain from deciding Plaintiffs' IHA and UCL claims.  The cases cited by Defendant are inapposite, and the enforcement of existing laws, as requested herein by Plaintiffs, is hardly the assumption of a legislative or administrative function by the Court; it is its exact judicial function.

---

[7] See, *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café & Takeout III, Ltd.* (1994) 30 Cal. App. 4th 54, 59.

[8] Defendant alleges that Plaintiffs failed to object. While an estoppel may arise from silence where there is a duty to speak, (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.,* 71 Cal. App. 4th 1260, 1268 (1999)), Defendant has failed to identify any duty to speak, even if, *arguendo,* Plaintiffs knew the wrong was being committed. There is no requirement under the IHA that a wronged stakeholder object or provide notice prior to filing suit.

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### E.   Defendant Intentionally Violated This Court's Orders By Disclosing Confidential Material In Its MSJ; Its Third Violation.

Defendant's history of violating this Court's Standing Order is well-documented.  Defendant previously failed to follow the Court's Standing Order when it filed a 25 page brief in support of its Motion to Dismiss, in violation of paragraph 25 of the Standing Order.  See, Plaintiffs' Opposition to Defendant Horse Racing Labs, LLC's *Ex Parte* Application Re: Submission of Plaintiffs' Confidential Evidence and Request to File Same, Docket No. 65.  Then, in connection with its MSJ, Defendant failed to comply with Section 31.e.1 of this Court's Standing Order.  Defendant has sought to excuse both prior acts of misfeasance by claiming inadvertence or mistake.  However, Defendant does not have that same luxury with its third violation of this Court's Standing Order, as well as its violation of the Amended Protective Order.

Section 31.e.1. of this Court's Standing Order provides that no party can file a document containing information  that another party has designated as "Confidential", without complying with the Rules as to advance notice. Section 3 of the Amended Protective Order provides that the confidentiality protections extend to not only the actual material that is designated as Confidential, but **any information copied or extracted therefrom**, or summaries or compilations thereof.  Docket No. 49.

On March 17, 2017, Defendant filed an unprecedented document:  "Notice re: Correction of Inadvertent Non-Compliance with Standing Order Requirement 31(e)(1)." (the "Notice").  Docket No. 61.  The essence of the Notice was stated by Defendant:  "Derby Wars intends to file documents and testimony…designated as "Confidential" pursuant to the Protective Order in this case."  (Notice, 1:19-24).  Amazingly, Defendant claimed that by disclosing this violation in advance, it was free to proceed:  "Having now corrected the inadvertent violation of the Order and provided reasonable accommodation to Plaintiffs, Derby Wars intends to proceed with the filing of documents containing Plaintiffs' Designated Confidential Information with its motion for summary judgment on March 20, 2017."  (Notice, 3:23-26).

And this was no idle threat.  On March 20, 2017, Defendant filed the MSJ and Statement of Undisputed Material Facts in Support ("SUMF").  <u>Docket</u>, No. 63-1. And in Fact Numbers 46, 47, 49 and 52, Defendant identified and set forth the content of 4 different confidential emails, which are Exhibits 8, 10, 13 and 15. (<u>SUMF</u>, Nos. 46, 47, 49 and 52; <u>Declaration of Maura K. Gierl</u>, ¶¶4, 6, 9 and 11, <u>Docket</u>, No. 63-4). All of those Exhibits were marked as Confidential, and are the same Exhibits included in Defendant's *Ex Parte* Application, wherein Defendant sought leave of this Court to file those Confidential Documents.  Thus, in lieu of filing the actual confidential documents, Defendant instead resorted to identifying and describing the contents (apparently ignoring the "information extracted from" restriction).  Of course, by summarizing the contents of those 4 Exhibits, Defendant already granted to itself the relief sought, and indeed violated this Court's Orders, just as Defendant promised.

The Standing Order provides that "Failure to conform with this Order may be deemed a waiver of trial by jury and may result in sanctions." While reserving the latter issue of sanctions, Plaintiffs submit that Defendant's violation of the Standing Order on no less than three occasions compels this Court to deem Defendant to have waived any right to a trial by jury.  A third strike violator of Federal Court Orders simply cannot escape without consequences.

## VI.   **CONCLUSION.**

For the foregoing reasons, Plaintiffs respectfully request that Defendant's Motion for Summary Judgment be denied.


DATED:  April 3, 2017                    Respectfully submitted,

                                         CORBETT, STEELMAN & SPECTER
                                         A Professional Law Corporation


                                         By:   */s/ Richard B. Specter*
                                               Richard B. Specter
                                               Attorneys for PLAINTIFFS

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT