1   Richard B. Specter, SBN 114090
2   Diane L. Ellis, SBN 130628
    CORBETT, STEELMAN & SPECTER
3   A Professional Law Corporation
    18200 Von Karman Avenue, Suite 900
4   Irvine, California 92612-1023
    Telephone: (949) 553-9266
5   Facsimile: (949) 553-8454
    rspecter@corbsteel.com
6
7   Attorneys for Plaintiffs
    LOS ANGELES TURF CLUB, INCORPORATED,
8   LOS ANGELES TURF CLUB II, INC.,
    PACIFIC RACING ASSOCIATION, PACIFIC RACING
9   ASSOCIATION II, GULFSTREAM PARK RACING
    ASSOCIATION, INC., OREGON RACING, INC.,
10  MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
11  and LAUREL RACING ASSOCIATION, INC.

12                    UNITED STATES DISTRICT COURT

13                   CENTRAL DISTRICT OF CALIFORNIA

14

15  LOS ANGELES TURF CLUB,            )  No.: 2:15-cv-9332 SJO (JEMx)
    INCORPORATED, a California        )
16  Corporation, LOS ANGELES TURF     )  **PLAINTIFFS' SEPARATE**
    CLUB II, INC., a California Corporation, )  **STATEMENT OF ADDITIONAL**
17  PACIFIC RACING ASSOCIATION, a     )  **UNDISPUTED MATERIAL FACTS**
    California Corporation, PACIFIC   )  **IN OPPOSITION TO DEFENDANT'S**
18  RACING ASSOCIATION II, a California )  **MOTION FOR SUMMARY**
    Corporation, GULFSTREAM PARK      )  **JUDGMENT**
19  RACING ASSOCIATION, INC., a       )
    Florida Corporation, OREGON RACING,)  [Filed concurrently with Opposition to
20  INC., a Delaware Corporation,     )  Motion for Summary Judgment]
    MARYLAND JOCKEY CLUB OF           )
21  BALTIMORE CITY, INC., a Maryland  )
    Corporation, and LAUREL RACING    )  Date Filed: December 3, 2015
22  ASSOCIATION, INC., a Maryland     )  Discovery Cutoff: March 27, 2017
    Corporation,                      )  Final Pretrial Conf.: June 19, 2017
23                                    )  Trial Date: June 27, 2017
24                                    )
                 Plaintiffs,          )  **DATE: April 24, 2017**
25                                    )  **TIME: 10:00 a.m.**
         vs.                          )  **CTRM: 10C**
26                                    )
27  HORSE RACING LABS, LLC, a         )
    Delaware Limited Liability Company,)
28  (also known as IMMERSE, LLC), doing )

─────────────────────────────────────────────────────────

business as DERBYWARS, and DOES 1 )
through 10, inclusive,                            )
                                                           )
                        Defendants.             )
                                                           )
                                                           )
                                                           )
_____)

     Plaintiffs Los Angeles Turf Club, Incorporated, Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing, Inc., Maryland Jockey Club Of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs"), respectfully submit the following Separate Statement of Additional Undisputed Facts in support of their Opposition to Defendant's Motion for Summary Judgment:

## I.     **ADDITIONAL UNDISPUTED MATERIAL FACTS**

     The uncontroverted facts listed below as 72 - 135, are also proffered by Plaintiffs in support of their Motion for Partial Summary Judgment.  The evidence cited in support of Uncontroverted Facts 72 - 128, was previously submitted to the Court. (Docket Nos. 62 – 62-17).  The evidence supporting uncontroverted facts numbers 129 - 135, is filed herewith.

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

**<u>ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'</u>**

**<u>OPPOSITION TO DEFENDANT'S ISSUE IA - THAT PLAINTIFFS' FIRST</u>**

**<u>CAUSE OF ACTION FOR ALLEGED VIOLATION OF THE INTERSTATE</u>**

**<u>HORSERACING ACT FAILS AS A MATTER OF LAW</u>**

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72.     Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Deposition of Mark Midland, attached to the Declaration of Richard B. Specter, (<u>Docket</u> No. 62-4) as Exhibit "A," (<u>Docket</u> No. 62-5) ("Midland Depo."), 16:19-17:11; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, <u>Docket</u> No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, <u>Docket</u> No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Declaration of Diane L. Ellis ("Ellis Dec."), ¶ 4. <u>Docket</u> No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, <u>Docket</u> No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player | Deposition of Michael R. Shutty, attached to the Declaration of Richard B. Specter (<u>Docket</u> No. 62-4), as Exhibit |

| | |
|---|---|
| enters a contest, his account is deducted by the amount of the wager (the "entry fee"). | "B," (Docket No. 62-6), ("Shutty Depo."), 112:16-113:24; Midland Depo., 168:17-23; 327:15-23, Docket No. 62-5. |
| 78. If the player eventually wins his wager (the "prize"), his Derby Wars account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | Midland Depo., 330:10-331:21, Docket No. 62-5. |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, Docket No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, Docket No. 62-7; Midland Depo., 181:22-24, Docket No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, Docket No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, Docket No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, Docket No. 62-7; and Midland Depo., 180:16-181:21, Docket No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, Docket No. 62-5. |
| 89. The player with the biggest bankroll | Midland Depo., 180:12-22, Docket No. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| (the most winnings) at the end of the contest, wins the "prize." | 62-5. |
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee. | Ellis Dec., ¶ 7, <u>Docket</u> No. 62-7. |
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, <u>Docket</u> No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, <u>Docket</u> No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, <u>Docket</u> No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, <u>Docket</u> No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, <u>Docket</u> No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, <u>Docket</u> No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, <u>Docket</u> No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Declaration of Scott J. Daruty ("Daruty Dec."), ¶¶ 8, 10, <u>Docket</u> No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| stakeholders in the form of commissions paid to the racetracks; purses paid to the owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed **wagers** when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where | Daruty Dec., ¶ 12, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| the race was being run. | |
| 110. In 1978, Congress enacted the IHA, which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing." As provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | Daruty Dec., ¶ 13, <u>Docket</u> No. 62-3. |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | |
| 119. Each Plaintiff is a Host Racing Association within the meaning of the IHA. | Daruty Dec., ¶ 18, Docket No. 62-3. |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, Docket No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, Docket No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, Docket No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, Docket No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, Docket No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, Docket No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, Docket No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, Docket No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, Docket No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Declaration of Diane L. Ellis ("Ellis Dec. Opp. to MSJ"), ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without paying an entry fee. | Ellis Dec. Opp. to MSJ, ¶6. |
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, Docket No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, Docket No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

**ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S ISSUE IB - THAT PLAINTIFFS' SECOND CAUSE OF ACTION FOR ALLEGED VIOLATION OF CALIFORNIA BUSINESS & & PROFESSIONS CODE SECTIONS 17200, *ET, SEQ.* FAILS AS A MATTER OF LAW**

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72. Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Midland Depo., 16:19-17:11, Docket No. 62-5; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, Docket No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, Docket No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br><br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Ellis Dec., ¶ 4. Docket No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, Docket No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry | Shutty Depo., 112:16-113:24, Docket No. 62-6; Midland Depo., 168:17-23; 327:15-23, Docket No. 62-5. |

| | |
|---|---|
| fee"). | |
| 78. If the player eventually wins his wager (the "prize"), his Derby Wars account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | Midland Depo., 330:10-331:21, Docket No. 62-5. |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, Docket No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, Docket No. 62-7; Midland Depo., 181:22-24, Docket No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, Docket No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, Docket No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, Docket No. 62-7; and Midland Depo., 180:16-181:21, Docket No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, Docket No. 62-5. |
| 89. The player with the biggest bankroll (the most winnings) at the end of the contest, wins the "prize." | Midland Depo., 180:12-22, Docket No. 62-5. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee. | Ellis Dec., ¶ 7, <u>Docket</u> No. 62-7. |
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, <u>Docket</u> No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, <u>Docket</u> No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, <u>Docket</u> No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, <u>Docket</u> No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, <u>Docket</u> No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, <u>Docket</u> No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, <u>Docket</u> No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Daruty Dec., ¶¶ 8, 10, <u>Docket</u> No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed *wagers* when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 110. In 1978, Congress enacted the IHA, | Daruty Dec., ¶ 13, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing." As provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | |
| 119. Each Plaintiff is a Host Racing Association within the meaning of the IHA. | Daruty Dec., ¶ 18, Docket No. 62-3. |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, Docket No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, Docket No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, Docket No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, Docket No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, Docket No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, Docket No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, Docket No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, Docket No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, Docket No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, | Ellis Dec. Opp. to MSJ, ¶6. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| and a graphic that displays how many people selected each horse, without paying an entry fee. | |
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, Docket No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, Docket No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

-16-

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

## ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S ISSUE IC - THAT PLAINTIFFS' IHA CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72. Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Midland Depo., 16:19-17:11, Docket No. 62-5; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, Docket No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, Docket No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Ellis Dec., ¶ 4. Docket No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, Docket No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry fee"). | Shutty Depo., 112:16-113:24, Docket No. 62-6; Midland Depo., 168:17-23; 327:15-23, Docket No. 62-5. |
| 78. If the player eventually wins his wager (the "prize"), his Derby Wars | Midland Depo., 330:10-331:21, Docket No. 62-5. |

| | |
|---|---|
| account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, <u>Docket</u> No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, <u>Docket</u> No. 62-7; Midland Depo., 181:22-24, <u>Docket</u> No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, <u>Docket</u> No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, <u>Docket</u> No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, <u>Docket</u> No. 62-7; and Midland Depo., 180:16-181:21, <u>Docket</u> No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, <u>Docket</u> No. 62-5. |
| 89. The player with the biggest bankroll (the most winnings) at the end of the contest, wins the "prize." | Midland Depo., 180:12-22, <u>Docket</u> No. 62-5. |
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee. | Ellis Dec., ¶ 7, <u>Docket</u> No. 62-7. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, <u>Docket</u> No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, <u>Docket</u> No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, <u>Docket</u> No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, <u>Docket</u> No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, <u>Docket</u> No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, <u>Docket</u> No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, <u>Docket</u> No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Daruty Dec., ¶¶ 8, 10, <u>Docket</u> No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed **wagers** when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 110. In 1978, Congress enacted the IHA, which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing." As | Daruty Dec., ¶ 13, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |
| 119. Each Plaintiff is a Host Racing | Daruty Dec., ¶ 18, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| Association within the meaning of the IHA. | |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, Docket No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, Docket No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, Docket No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, Docket No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, Docket No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, Docket No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, Docket No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, Docket No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, Docket No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without paying an entry fee. | Ellis Dec. Opp. to MSJ, ¶7 |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, Docket No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, Docket No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

**ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S ISSUE IB - THAT PLAINTIFFS' SECOND CAUSE OF ACTION FOR ALLEGED VIOLATION OF CALIFORNIA BUSINESS & & PROFESSIONS CODE SECTIONS 17200, *ET, SEQ.* FAILS AS A MATTER OF LAW**

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72. Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Midland Depo., 16:19-17:11, Docket No. 62-5; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, Docket No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, Docket No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Ellis Dec., ¶ 4. Docket No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, Docket No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry | Shutty Depo., 112:16-113:24, Docket No. 62-6; Midland Depo., 168:17-23; 327:15-23, Docket No. 62-5. |

-24-

| | |
|---|---|
| fee"). | |
| 78. If the player eventually wins his wager (the "prize"), his Derby Wars account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | Midland Depo., 330:10-331:21, <u>Docket</u> No. 62-5. |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, <u>Docket</u> No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, <u>Docket</u> No. 62-7; Midland Depo., 181:22-24, <u>Docket</u> No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, <u>Docket</u> No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, <u>Docket</u> No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, <u>Docket</u> No. 62-7; and Midland Depo., 180:16-181:21, <u>Docket</u> No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, <u>Docket</u> No. 62-5. |
| 89. The player with the biggest bankroll (the most winnings) at the end of the contest, wins the "prize." | Midland Depo., 180:12-22, <u>Docket</u> No. 62-5. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee. | Ellis Dec., ¶ 7, <u>Docket</u> No. 62-7. |
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, <u>Docket</u> No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, <u>Docket</u> No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, <u>Docket</u> No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, <u>Docket</u> No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, <u>Docket</u> No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, <u>Docket</u> No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, <u>Docket</u> No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Daruty Dec., ¶¶ 8, 10, <u>Docket</u> No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed *wagers* when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 110. In 1978, Congress enacted the IHA, | Daruty Dec., ¶ 13, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing." As provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | |
| 119. Each Plaintiff is a Host Racing Association within the meaning of the IHA. | Daruty Dec., ¶ 18, <u>Docket</u> No. 62-3. |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, <u>Docket</u> No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, <u>Docket</u> No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, <u>Docket</u> No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, <u>Docket</u> No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, <u>Docket</u> No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, <u>Docket</u> No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, <u>Docket</u> No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, <u>Docket</u> No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, <u>Docket</u> No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, | Ellis Dec. Opp. to MSJ, ¶7. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| and a graphic that displays how many people selected each horse, without paying an entry fee. | |
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, Docket No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, Docket No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

**ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS'**
**OPPOSITION TO DEFENDANT'S ISSUE ID - THAT PLAINTIFFS' CLAIMS**
**ARE BARRED BY THE EQUITABLE DOCTRINE OF ESTOPPEL**

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72. Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Midland Depo., 16:19-17:11, <u>Docket</u> No. 62-5; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, <u>Docket</u> No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, <u>Docket</u> No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Ellis Dec., ¶ 4. <u>Docket</u> No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, <u>Docket</u> No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry fee"). | Shutty Depo., 112:16-113:24, <u>Docket</u> No. 62-6; Midland Depo., 168:17-23; 327:15-23, <u>Docket</u> No. 62-5. |
| 78. If the player eventually wins his wager (the "prize"), his Derby Wars | Midland Depo., 330:10-331:21, <u>Docket</u> No. 62-5. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, <u>Docket</u> No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, <u>Docket</u> No. 62-7; Midland Depo., 181:22-24, <u>Docket</u> No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, <u>Docket</u> No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, <u>Docket</u> No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, <u>Docket</u> No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, <u>Docket</u> No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, <u>Docket</u> No. 62-7; and Midland Depo., 180:16-181:21, <u>Docket</u> No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, <u>Docket</u> No. 62-5. |
| 89. The player with the biggest bankroll (the most winnings) at the end of the contest, wins the "prize." | Midland Depo., 180:12-22, <u>Docket</u> No. 62-5. |
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a $2,200 entry fee. | Ellis Dec., ¶ 7, <u>Docket</u> No. 62-7. |

-32-

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, <u>Docket</u> No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, <u>Docket</u> No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, <u>Docket</u> No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, <u>Docket</u> No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, <u>Docket</u> No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, <u>Docket</u> No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, <u>Docket</u> No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Daruty Dec., ¶¶ 8, 10, <u>Docket</u> No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the owners, trainers and jockeys of the horses in the race; taxes paid to the state; and funds dedicated to equine research, | Daruty Dec., ¶ 10, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed **wagers** when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 110. In 1978, Congress enacted the IHA, which was explicitly intended to "regulate interstate commerce with respect to wagering on horseracing." As | Daruty Dec., ¶ 13, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |
| 119. Each Plaintiff is a Host Racing | Daruty Dec., ¶ 18, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| Association within the meaning of the IHA. | |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, Docket No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, Docket No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, Docket No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, Docket No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, Docket No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, Docket No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, Docket No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, Docket No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, Docket No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without paying an entry fee. | Ellis Dec. Opp. to MSJ, ¶7. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, Docket No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, Docket No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

**ADDITIONAL MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S ISSUE IE - THAT THE COURT SHOULD ABSTAIN FROM ADJUDICATING PLAINTIFFS' CLAIMS, IN DEFERENCE TO LEGISLATIVE FUNCTION**

| UNDISPUTED MATERIAL FACTS | EVIDENCE |
|---|---|
| 72. Horse Racing Labs, LLC ("HRL") is a Delaware limited liability company, doing business in Louisville, Kentucky. | Midland Depo., 16:19-17:11, Docket No. 62-5; Answer to First Amended Complaint, (Docket No. 34), ¶ 11. |
| 73. Defendant operates out of an office building in Kentucky. | Midland Depo., 16:19-17:11; 161:7-12, Docket No. 62-5. |
| 74. Defendant offers contests in which players from across the country (including players in California, Florida, Maryland and Oregon), pay entry fees interstate (to Kentucky) in order to wager on races run at race tracks, including those operated by Plaintiffs. | Midland Depo., 166:9-167:4; 180:12-181:24, Docket No. 62-5. |
| 75. The first page of Defendant's Derby Wars' website (www.derbywars.com) proclaims:<br>**"Horse Racing Handicapping Contests"**<br>**"Play for free or real money"**<br>**"Pick a horse in each race"**<br>**"Over $20-million paid out in winnings!"** | Ellis Dec., ¶ 4. Docket No. 62-7. |
| 76. To participate in the contests, a player must first create an account with Defendant and deposit funds to the account. | Midland Depo., 168:4-19, Docket No. 62-5. |
| 77. Defendant maintains players' funds in a bank account consisting only of players' funds, and when the player enters a contest, his account is deducted by the amount of the wager (the "entry fee"). | Shutty Depo., 112:16-113:24, Docket No. 62-6; Midland Depo., 168:17-23; 327:15-23, Docket No. 62-5. |
| 78. If the player eventually wins his | Midland Depo., 330:10-331:21, Docket |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| wager (the "prize"), his Derby Wars account is credited with his winnings. The player can thereafter request a withdrawal from his account, in which case a check is sent to him from the Derby Wars account. | No. 62-5. |
| 79. Defendant does not hold a license to conduct wagering on horse racing in California, Florida, Maryland or Oregon. | Midland Depo., 229:9-24; 406:21-23, Docket No. 62-5. |
| 80. Defendant touts its contests as allowing players to "win real money," and the players do win real money. | Ellis Dec., ¶ 4, Docket No. 62-7; Midland Depo., 181:22-24, Docket No. 62-5. |
| 81. Defendant primarily offers contests that are "head-to-head". | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 82. In these contests, two players pay an entry fee for a fixed prize. | Midland Depo., 129:11-13, Docket No. 62-5. |
| 83. As an example, for a $40 prize, two players each pay a $22 entry fee to compete with each other. | Ellis Dec., ¶ 6, Docket No. 62-7. |
| 84. The remaining $4 is the "take out" or "rake" retained by Defendant. | Midland Depo., 220:13-22; 233:6-10, Docket No. 62-5. |
| 85. Defendant offers head-to-head contests with the prize up to $1,500, with $799 entry fees. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 86. Depending upon the contest, the players must select horses in 6 to 10 different races running at various race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 5, Docket No. 62-7. |
| 87. In the contests, "the scores are calculated according to the actual payouts at actual race tracks", and are based upon the actual payoff amounts on real horse races at real race tracks, including Plaintiffs' tracks. | Ellis Dec., ¶ 8, Docket No. 62-7; and Midland Depo., 180:16-181:21, Docket No. 62-5. |
| 88. The scores are calculated in dollars. | Midland Depo., 136:9-10; 156:4-6, Docket No. 62-5. |
| 89. The player with the biggest bankroll (the most winnings) at the end of the contest, wins the "prize." | Midland Depo., 180:12-22, Docket No. 62-5. |
| 90. Defendant also offers "high stakes" contests for up to $300,000, with a | Ellis Dec., ¶ 7, Docket No. 62-7. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| $2,200 entry fee. | |
| 91. In agreements with third parties, Defendant even refers to its players as "bettors." | Ellis Dec., ¶ 10, Docket No. 62-7; Exhibit 6, p. 2, "Exhibit 5;" Ellis Dec., ¶ 11, Exhibit 7, p. 2, "Exhibit 5;", Ellis Dec., ¶ 12, Exhibit 8, p. 2, "Exhibit 5." |
| 92. A player is awarded points on the same basis as if he had placed a $2 bet at the racetrack, subject to adjustment for maximum payouts. | Midland Depo., 134:6-135:5, Docket No. 62-5. |
| 93. For instance, if a horse would pay $6.40, the player is awarded 6.40 points. | Midland Depo., 135:18-136:10, Docket No. 62-5. |
| 95. Derby Wars uses "points or dollars interchangeably." | Midland Depo., 136:6-10, Docket No. 62-5. |
| 96. The player has no influence over the actual results of the horse race; at the time when the player enters a contest, it is uncertain as to which horse will win the race. | Midland Depo., 177:21-178:8, Docket No. 62-5. |
| 97. The winner of the contest will be determined by future events. | Midland Depo., 178:9-13, Docket No. 62-5. |
| 98. Many of the races used in the contests take place at Plaintiffs' race tracks in California, Florida, Maryland and Oregon. | Midland Depo., 180:12-181:21, Docket No. 62-5. |
| 99. Unlike other sports, horseracing is almost exclusively funded by wagering. | Daruty Dec., ¶¶ 8, 10, Docket No. 62-3. |
| 100. The total amount wagered is the "handle." | Daruty Dec., ¶ 10, Docket No. 62-3. |
| 101. By law, approximately eighty percent of the handle is returned to the patrons who placed winning wagers. | Daruty Dec., ¶ 10, Docket No. 62-3. |
| 102. The remaining approximately twenty percent is known as the "takeout," the amount initially retained by the race track. | Daruty Dec., ¶ 10, Docket No. 62-3. |
| 103. The takeout is then divided, pursuant to contract and law, among the stakeholders in the form of commissions paid to the racetracks; purses paid to the owners, trainers and jockeys of the horses in the race; taxes paid to the state; | Daruty Dec., ¶ 10, Docket No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| and funds dedicated to equine research, workers' compensation funds, worker health and welfare, etc., that benefit the backstretch workers. | |
| 104. The type of wagering available on horseracing includes "Win" (picking a horse to finish first in the race), "Place" (picking a horse to finish first or second in the race) and "Show" (picking a horse to finish first, second or third in the race). | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 105. Any type of wager other than Win, Place or Show is called an exotic wager. | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 106. Exotic wagers include the "Daily Double" (picking the winning horse in two consecutive races), "Exacta" (picking the first two horses to finish in a single race in the exact order), "Trifecta" (picking the first three horses to finish in a single race in the exact order), "Pick Three" (picking the winning horse in three consecutive races), "Pick Four" (picking the winning horse in four consecutive races), and a "Pick Six" (picking the winning horse in six consecutive races.) | Daruty Dec., ¶ 11, Docket No. 62-3. |
| 107. Defendant concedes that all of these (Win, Place, Show and exotic wagers) are indeed **wagers** when placed at the racetrack. | Midland Depo., 201:23-203:18, Docket No. 62-5; Shutty Depo., 91:2-7; 99:23-100:3; 102:17-19. Docket No. 62-6. |
| 108. Historically, wagering on horses only took place live (at the actual track where the race was being run), such that bettors had to attend the race to place a wager. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 109. Eventually, off-track betting facilities opened, which accepted wagers at locations other than the track where the race was being run. | Daruty Dec., ¶ 12, Docket No. 62-3. |
| 110. In 1978, Congress enacted the IHA, which was explicitly intended to "regulate interstate commerce with | Daruty Dec., ¶ 13, Docket No. 62-3. |

-41-

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| respect to wagering on horseracing." As provided therein, no one "may accept an interstate off-track wager except as provided in" the IHA. | |
| 111. Defendant does not comply with the IHA. | Midland Depo., 190:16-24, <u>Docket</u> No. 62-5; Shutty Depo., 92:9-14, <u>Docket</u> No. 62-6. |
| 112. From the late 1990's through today, the industry has experienced much growth in the area of Advanced Deposit Wagering ("ADW"). | Daruty Dec., ¶ 14. |
| 113. In ADW, a customer deposits funds with a licensed, regulated online/telephone wagering operator, and then issues wagering instructions (via telephone or internet) to that operator to place a wager on a specific race using funds in the account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 114. If the wager is successful, the winning funds are deposited directly into the customer's account. | Daruty Dec., ¶ 14, <u>Docket</u> No. 62-3. |
| 115. The IHA only permits acceptance of interstate wagers on horseraces by an entity (including an ADW operator), which has obtained consent from, *inter alia,* the host racing association on whose races such wagers are placed, such as Plaintiffs. | Daruty Dec., ¶ 16, <u>Docket</u> No. 62-3. |
| 116. It is customary in the industry for a host racing association to grant the required consent only if it receives a payment of money or other value from the entity accepting the wagers. | Daruty Dec., ¶ 17, <u>Docket</u> No. 62-3. |
| 117. Defendant has never been licensed as an ADW. | Midland Depo., 406:21-23. |
| 118. Plaintiffs operate horse racing meets at race tracks in California (Santa Anita Park and Golden Gate Fields), Florida (Gulfstream Park and Gulfstream Park West), Maryland (Pimlico and Laurel Park), and Oregon (Portland Meadows). | Daruty Dec., ¶ 7, <u>Docket</u> No. 62-3. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| 119. Each Plaintiff is a Host Racing Association within the meaning of the IHA. | Daruty Dec., ¶ 18, <u>Docket</u> No. 62-3. |
| 120. Each Plaintiff has the approval of its host State to conduct racing. | Daruty Dec., ¶ 19, <u>Docket</u> No. 62-3. |
| 121. Each Plaintiff has a written agreement with its Horsemen's Group, as required by the IHA. | Daruty Dec., ¶ 20, <u>Docket</u> No. 62-3. |
| 122. No Plaintiff has ever provided consent to Defendant to accept a wager on a race run at any of Plaintiffs' race tracks. | Daruty Dec., ¶ 22, <u>Docket</u> No. 62-3. |
| 123. No Plaintiff has ever provided consent to Defendant to accept a wager from a resident of the States of California, Florida, Maryland or Oregon. | Daruty Dec., ¶ 23, <u>Docket</u> No. 62-3. |
| 124. No Plaintiff has ever received any money from Defendant with respect to wagers (or entry fees) accepted by Defendant | Daruty Dec., ¶ 24, <u>Docket</u> No. 62-3. |
| 125. Defendant does not have any agreements with any of the Plaintiffs. | Daruty Dec., ¶ 25, <u>Docket</u> No. 62-3. |
| 126. Defendant has never requested nor received consent from any Plaintiff to accept wagers on races run at the Plaintiffs' race tracks. | Daruty Dec., ¶ 21, <u>Docket</u> No. 62-3. |
| 127. Defendant has never requested nor received consent of any host racing commission to accept wagers on Plaintiffs' races. | Midland Depo., 211:24-212:7, <u>Docket</u> No. 62-7. |
| 128. Defendant has never requested nor received consent from any off-track racing association to conduct its contests. | Midland Depo., 212:8-11; 213:2-5, <u>Docket</u> No. 62-7. |
| 129. In response to New York's DFS legislation Derby Wars stopped accepting entry fees from residents of New York, | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A; Midland Depo., 353:19-354:5; 485:13-25. |
| 130. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without | Ellis Dec. Opp. to MSJ, ¶7. |

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS

| | |
|---|---|
| paying an entry fee. | |
| 131. The prizes offered by Defendant consist of entry fees only; Defendant has no other source of revenue for the Derby Wars contests. | Ellis Dec. Opp. to MSJ, ¶4, Exhibit B; Shutty Depo., 21:17-22. |
| 132. Defendant admits that its business model is that the cash prize in a contest must be less than the cash entry fees. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A Midland Depo., 149:1-5. |
| 133. When a licensed ADW accepts a wager from a resident of California, Florida, Maryland or Oregon, the host racing association in that state receives a payment as its "Market Access Fee" or "Source Market Fee." | Ellis Dec., ¶13, <u>Docket</u> No. 62-7. |
| 134. In October, 2011, HRL launched the DerbyWars.com website. | Midland Depo., 72:3-5, <u>Docket</u> No. 62-5. |
| 135. Defendant admits that that it has continually operated these contests on a daily basis since 2011. | Ellis Dec. Opp. to MSJ, ¶3, Exhibit A, Midland Depo., 124:24-125:1. |

DATED:  April 3, 2017                    CORBETT, STEELMAN & SPECTER
                                                      A Professional Law Corporation


                                         By:      /s/ *Richard B. Specter*
                                                      Richard B. Specter
                                                      Attorneys for PLAINTIFFS

.

PLAINTIFFS' SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS