1  Richard B. Specter, SBN 114090
2  Diane L. Ellis, SBN 130628
   CORBETT, STEELMAN & SPECTER
3  A Professional Law Corporation
   18200 Von Karman Avenue, Suite 900
4  Irvine, California 92612-1023
   Telephone:  (949) 553-9266
5  Facsimile:  (949) 553-8454
   rspecter@corbsteel.com
6
7  Attorneys for Plaintiffs
   LOS ANGELES TURF CLUB, INCORPORATED,
8  LOS ANGELES TURF CLUB II, INC.,
   PACIFIC RACING ASSOCIATION, PACIFIC RACING
9  ASSOCIATION II, GULFSTREAM PARK RACING
   ASSOCIATION, INC., OREGON RACING, INC.,
10 MARYLAND JOCKEY CLUB OF BALTIMORE CITY, INC.,
   and LAUREL RACING ASSOCIATION, INC.
11

12                     UNITED STATES DISTRICT COURT
13
                       CENTRAL DISTRICT OF CALIFORNIA
14

15 | LOS ANGELES TURF CLUB,                  | ) | No.:  2:15-cv-9332 SJO (JEMx) |
16 | INCORPORATED, a  California             | ) |                               |
   | Corporation, LOS ANGELES TURF           | ) | **PLAINTIFFS' STATEMENT OF** |
17 | CLUB II, INC., a California Corporation, | ) | **GENUINE DISPUTES OF** |
   | PACIFIC RACING ASSOCIATION, a            | ) | **MATERIAL FACTS** |
18 | California Corporation, PACIFIC          | ) |                               |
   | RACING ASSOCIATION II, a California      | ) | [Filed concurrently with Opposition to |
19 | Corporation, GULFSTREAM PARK             | ) | Motion for Summary Judgment] |
   | RACING ASSOCIATION, INC., a              | ) |                               |
20 | Florida Corporation, OREGON RACING,      | ) | Date Filed: December 3, 2015 |
   | INC., a Delaware Corporation,            | ) | Discovery Cutoff: March 27, 2017 |
21 | MARYLAND JOCKEY CLUB OF                  | ) | Final Pretrial Conf.: June 19, 2017 |
   | BALTIMORE CITY, INC., a Maryland         | ) | Trial Date: June 27, 2017 |
22 | Corporation, and LAUREL RACING           | ) |                               |
   | ASSOCIATION, INC., a Maryland            | ) | **DATE: April 24, 2017** |
23 | Corporation,                            | ) | **TIME: 10:00 a.m.** |
24 |                                         | ) | **CTRM: 10C** |
   |                 Plaintiffs,             | ) |                               |
25 |                                         | ) |                               |
   |            vs.                          | ) |                               |
26 |                                         | ) |                               |
   |                                         | ) |                               |
27 | HORSE RACING LABS, LLC, a               | ) |                               |
   | Delaware Limited Liability Company,     | ) |                               |
28 | (also known as IMMERSE, LLC), doing     | ) |                               |

---

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

business as DERBYWARS, and DOES 1 )
through 10, inclusive,                          )
                                                            )
                    Defendants.                    )
                                                            )
                                                            )
                                                            )
_____)

Plaintiffs Los Angeles Turf Club, Incorporated, Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing, Inc., Maryland Jockey Club Of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs"), respectfully submit the following Statement of Genuine Disputes of Material Facts in support of their Opposition to Defendant's Motion for Summary Judgment:

**I. DEFENDANT'S CLAIMED UNDISPUTED FACTS**

**A. Defendant's Claimed Undisputed Facts Allegedly Demonstrating That Plaintiffs' First Cause Of Action For Alleged Violation Of The *Interstate Horseracing Act* Fails As A Matter Of Law**

| DEFENDANT'S FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|
| 1. Plaintiffs Los Angeles Turf Club, Inc., Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing Inc., Maryland Jockey Club of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs") operate horse racing meets at six race tracks located in California, Oregon, Maryland and Florida. Docket No. 31 ("FAC") ¶¶ 3-10; Declaration of Matthew P. Kanny ("Kanny Decl.") ¶ 2, Ex. A ("Daruty | 1. Undisputed. |

| | |
|---|---|
| Dep.") at 121:9-17; Declaration of Maura K. Gierl ("Gierl Decl.") ¶ 3, Ex. B ("Rogers Dep.") at 35:5-12, 36:5-11. | |
| 2. Plaintiffs are all licensed to offer pari-mutuel wagering on horse races at their tracks. Kanny Decl. ¶ 4, Ex. C ("Ritvo Dep.") at 52:6-55:23; Rogers Dep. at 59:22-60:23; Daruty Dep. At 375:10-377:16, 382:11-388:4. | 2. Undisputed. |
| 3. Plaintiffs' race tracks accounted for about $3 billion in "handle" in each of 2015 and 2016. Daruty Dep. At 363:23-364:5, 409:8-24; Gierl Decl. ¶ 2, Ex. A ("Confidential Ritvo Dep.") at 85:12-86:17; Rogers Dep. At 36:12-37:8. | 3. Undisputed. |
| 4. The total handle at all race tracks in the United States was about $10 billion in each of 2015 and 2016. Daruty Dep. At 363:23-364:5, 409:8-24; Confidential Ritvo Dep. at 85:12-86:17; Rogers Dep. at 36:12-37:8. | 4. Undisputed. |
| 5. Plaintiffs are all wholly owned by TSG Developments Investments, Inc. (hereafter, the "Stronach Group"). Daruty Dep at 121:9-17, 126:6-11; Rogers Dep. at 32:16-36:11. | 5. Undisputed. |
| 6. The Stronach Group owns, directly or indirectly, Monarch Content Management ("Monarch"), a simulcast purchase and sales agent for numerous racetracks and wagering outlets; XpressBet, an Advanced Deposit Wagering ("ADW") service provider that allows customers to place pari-mutuel wagers via internet or telephone; Elite Turf Club, an ADW that caters to high volume, computer assisted pari-mutuel wagering ("CAW"); and AmTote, a provider of totalizator services. Daruty Dep. at 68:8-12; 71:16-72:23; 121:18-122:16, 127:22-128:18; Rogers | 6. Undisputed. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| Dep. at 32:7-43:17. | |
| 7. Defendant HRL formed in 2009. Kanny Decl. ¶ 3, Ex. B ("Midland Dep.") at 44:7-10; Declaration of Mark Midland ("Midland Decl.") at ¶ 6. | 7. Undisputed. |
| 8. In 2009, HRL launched Horse Racing Nation ("HRN"), a free online community for horse racing fans. Midland Dep. at 44:7-46:4; Midland Decl. ¶ 6. | 8. Undisputed. |
| 9. In October 2011, HRL launched Derby Wars, a website that offers free and pay-to-play horse racing fantasy games of skill. Midland Dep. at 69:14-19, 72:3-74:25; Midland Decl. ¶ 7. | 9. Disputed that these are fantasy games of skill. These are based upon the outcome of real sporting events, so not a fantasy event, and "games of skill" is an undefined (or recognized) term. Declaration of Diane L. Ellis ("Ellis Dec."), ¶ 8. Docket No. 62-7; Declaration of Diane L. Ellis in Opposition to Motion for Summary Judgment, ("Ellis Dec. Opp. to MSJ"), ¶ 3, Exh. A, Midland Depo., 180:16-181:21. |
| 10. The amount a person may wager on horse races under a pari-mutuel wagering system generally is not fixed in advance and can vary. Daruty Dep. at 84:15-85:11, 87:7-13; Ritvo Dep. at 60:6-62:11; Midland Decl. ¶ 51. | 10. Undisputed. |
| 11. The payout on bets on horse races in a pari-mutuel wagering system generally is determined by the size of the wagering pool, which can fluctuate depending on the number and amount of pari-mutuel wagers placed, and the wagering odds, which can change up to the time the race closes. Daruty Dep. at 85:12-16, 85:22-86:2, 87:7-13; Ritvo Dep. at 52:6-55:23; Midland Decl. ¶ 51. | 11. Disputed.  Exchange wagering is a form of pari-mutuel wagering, with none of those characteristics. (see California *Business & Professions Code* §19604.5) |
| 12. The "host" track on horse races in a pari-mutuel wagering system generally | 12. Undisputed. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| retains a specified fixed percentage of the wagers (called the "take-out") before it pays out money to the winners of the bets on a particular race. Daruty Dep. at 87:14-25; Ritvo Dep. at 52:6-55:23, 56:2-57:8; Midland Decl. ¶ 51. | |
| 13. Players entering Derby Wars' pay-to-play contests pay a fixed entry fee in exchange for the opportunity to participate in the contests. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 13. | 13. Undisputed. |
| 14. The fixed entry fee is set in advance and does not change, and every player pays the same entry fee in a given contest. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 14. | 14. Undisputed. |
| 15. The entry fee also provides contest participants with access to additional services, such as an online chat feature, a leaderboard, a display of other participants' selections, and a graphic that displays how many people selected each horse. Midland Dep. at 76:11-25, 125:2-127:13; Midland Decl. ¶ 15. | 15. Disputed that this is dependent upon the payment of an entry fee. Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people selected each horse, without paying an entry fee. Ellis Dec. Opp.to MSJ, ¶ 7. |
| 16. In January 2015 (prior to filing this action), Stronach Group executive Scott Daruty (a lawyer) referred to Derby Wars' contests as non-pari-mutuel. Daruty Dep. at 439:5-441:16. | 16. Disputed. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 439:12-22; 440:16-441:12. |
| 17. The contests consist of a number of specified contest races (usually a minimum of six races in each contest) to be run at various horse racing tracks across the United States. Midland Dep. at 151:25-152:12, 155:18-156:3; Midland Decl. ¶ 10. | 17. Undisputed. |
| 18. Players entering a contest select one horse for each designated race in the contest, along with a backup if that horse scratches. Midland Decl. ¶ 10. | 18. Undisputed. |

| | |
|---|---|
| 19. After the race, Derby Wars computes a point score for each player's pick. Midland Dep. at 134:6-135:20; Midland Decl. ¶ 12. | 19. Undisputed. |
| 20. The points allocated to each player is based on one point per mythical dollar of payout at the track, subject to maximum caps set according to the contest's rules. Midland Dep. at 134:6-135:20; Midland Decl. ¶ 11. | 20. Disputed that the points are based on "mythical dollar[s]".  The points are based on the actual payouts at the track. Ellis Dec. Opp. to MSJ, ¶ 3, Exh. A, Deposition of Mark Midland, 135:21-24; 180:16-22. |
| 21. After all races have been run, the players with the highest point scores win the prize. Midland Dep. at 175:11-176:10, 180:12-14; Midland Decl. ¶ 12. | 21. Undisputed. |
| 22. Like the entry fees, the prizes awarded to the winner of each contest are set in advance and do not change. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 14; Daruty Dep. at 94:15-24. | 22. Undisputed. |
| 23. The prizes are awarded to the player who achieves the highest score in the game, and the prizes awarded are the same regardless of the number of points scored. Midland Dep. at 175:11-176:10, 180:12-14, 192:17-193:14; Midland Decl. ¶ 16. | 23. Undisputed. |
| 24. The prize for each contest is not made up of monies collected from entry fees paid by contest participants. Midland Decl. ¶ 16. | 24. Disputed.  Derby Wars pays the prizes, and Derby Wars' only source of revenue is entry fees. Ellis Dec. Opp. to MSJ, ¶ 4, Exh. B, Deposition of Mike Shutty, 21:17-22. |
| 25. There are three general formats of Derby Wars' fantasy horse racing contests, each subject to contest rules: (i) Open, (ii) Lockdown, and (iii) Survivor. Midland Decl. ¶ 18. | 25. Undisputed. |
| 26. In Open contests, players can change their picks up until the race closes. Midland Dep. at 132:12-22; Midland Decl. ¶ 19. | 26. Undisputed. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| 27. In Lockdown contests, players must make all of their selections before the start of the first race. Midland Dep. at 132:23-25; Midland Decl. ¶ 20. | 27. Undisputed. |
| 28. Open and Lockdown contests comprise the majority of contests run by Derby Wars. Midland Decl. ¶¶ 19-20. | 28. Undisputed. |
| 29. In the Survivor format, players must pick a horse that finishes first, second or third in each race in order to advance to the next race. Midland Decl. ¶ 21. | 29. Undisputed. |
| 30. Predetermined prizes in Survivor contests are awarded to the players who survive to the end of the contest. Midland Decl. ¶ 21. | 30. Undisputed. |
| 31. Skill predominates over chance in Derby Wars' contests. Kanny Decl. ¶ 6, Ex. E (Expert Report of Randal Heeb, Ph.D. ("Heeb Rep.")) ¶¶ 1- 22. | 31. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |
| 32. Derby Wars designed its contests to maximize the skill required to win. Midland Dep. at 21:12-22:8, 69:14-19, 130:11-131:4, 136:22-137:4, 138:9-139:20, 141:16- 25, 198:7- 199:14; Midland Decl. ¶ 22. | 32. Disputed.  Misstates the testimony. None of the cited deposition testimony supports that statement of fact.  Midland Decl., ¶ 22 states: "When we designed Derby Wars' contests, we designed them to involve a substantial amount of skill." |
| 33. Derby Wars' contests involve intra-game strategy skills, where players may adjust their selections to take best advantage of the relative probabilities of winning relative to the scores of their opponents. Heeb Rep. ¶¶ 14, 32-33. | 33. Disputed.  See, objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion.  That is not true in Lockdown games, where picks are made all at once, such that there is no intra-game strategy (see Derby Wars' Fact 27 above). |
| 34. Derby Wars' contests also involve the skill of anticipating the overall slate of races that is likely to yield a high or low scoring game, and to predict the score likely necessary to win. Heeb Rep. ¶¶ 15, 34. | 34. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| 35. Derby Wars' contests also involve the skill of evaluating opponents to determine their tendencies and relative strengths and weaknesses. Heeb Rep. ¶¶ 16, 35. | 35. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |
| 36. Winning outcomes in Derby Wars' contests reflect the relative knowledge and skill of the participants, and participants earn points based on accumulated statistical results of the performance of horses in multiple real world horse racing events, subject to proprietary caps. Heeb Report ¶¶ 10-22. | 36. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion.  Winning outcomes are determined by the results of the horse races, uncertain events in which the player has no control over the outcome. Ellis Dec. Opp.to MSJ, ¶ 3, Exh. A, Deposition of Mark Midland, 177:21-178:13; 211:5-17.  Further, the points are not based on statistical results, but instead the actual results of a real sporting event. Ellis Dec. Opp. to MSJ, ¶ 3, Exh. A, Deposition of Mark Midland, 180:16-181:21. |
| 37. Participating in – and winning – Derby Wars' contests involves applying a variety of skills, including knowledge of horse racing, knowledge of the horses in a given race, and the ability to handicap performance of the horse based on a variety of factors such as weather, prior performance, the particular jockey riding the track, and the track. Heeb Report ¶ 31. | 37. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion.  Winning is based on the outcome beyond the control (or influence) of the Player.  Ellis Dec. Opp.to MSJ, ¶ 3, Exh. A, Deposition of Mark Midland , 211:5-17; Ellis Dec. Opp.to MSJ, ¶ 4, Exh. B, Deposition of Mike Shutty, 66:4-11. |
| 38. Plaintiffs admit that the Interstate Horse Racing Act applies only to pari-mutuel wagers. Ritvo Dep. at 52:6-55:23, 66:1-12. | 38. Disputed. Misstates testimony of Ritvo; and contrary to terms of the Interstate Horseracing Act which is not limited to pari-mutuel wagers.  15 U.S.C. §3002(3). |
| 39. Jockeys typically are engaged by horse trainers to ride in races and work with many different trainers and ride different horses on any given day. Ritvo | 39. Undisputed. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| Dep. at 18:15-21:9, 22:17-23:9; Daruty Dep. at 91:19-92:7. | |
| 40. Bet America does not pay additional compensation to Plaintiffs for use of their tracks in Bet America's contests, because there is not yet an established business model on contest play. Daruty Dep. at 42:10-45:22; 201:11-202:6. | 40. Disputed.  Bet America does not pay additional compensation because it already pays Plaintiffs for the use of their races. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 43:23-44:21. |
| 41. Plaintiffs and Bet America currently do not have a compensation model in place for use of Plaintiffs' tracks in Bet America contests. Daruty Dep. at 354:8-21. | 41. Disputed. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 43:23-44:21. |
| 42. Horse Tourneys, a pure contest site that does not offer ADW pari-mutuel wagering, operates contests using Plaintiffs' tracks without any payment to Plaintiffs. Daruty Dep. at 38:9-39:3, 248:4-254:6, 262:12-264:11. | 42. Disputed.  Horse Tourneys is licensed as an ADW. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 228:8-15. |
| 43. ADW licenses issued by the NDRC do not cover fantasy horse racing contests, as NDRC does not treat contests as pari-mutuel wagering. Midland Decl. ¶ 53. | 43. Disputed. See, Objections to Declaration of Mark Midland. This statement is without foundation and is speculation. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

**B. Defendant's Claimed Undisputed Facts Allegedly Demonstrating That Plaintiffs' Second Cause Of Action For Alleged Violation Of California *Business & Professions Code* Sections 17200, *et seq.*, Fails As A Matter Of Law**

| DEFENDANT'S FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|
| 1. Plaintiffs Los Angeles Turf Club, Inc., Los Angeles Turf Club II, Inc., Pacific Racing Association, Pacific Racing Association II, Gulfstream Park Racing Association, Inc., Oregon Racing Inc., Maryland Jockey Club of Baltimore City, Inc., and Laurel Racing Association, Inc. (collectively, "Plaintiffs") operate horse racing meets at six race tracks located in California, Oregon, Maryland and Florida. Docket No. 31 ("FAC") ¶¶ 3-10; Declaration of Matthew P. Kanny ("Kanny Decl.") ¶ 2, Ex. A ("Daruty Dep.") at 121:9-17; Declaration of Maura K. Gierl ("Gierl Decl.") ¶ 3, Ex. B ("Rogers Dep.") at 35:5-12, 36:5-11. | 1. Undisputed. |
| 2. Plaintiffs are all licensed to offer pari-mutuel wagering on horse races at their tracks. Kanny Decl. ¶ 4, Ex. C ("Ritvo Dep.") at 52:6-55:23; Rogers Dep. at 59:22-60:23; Daruty Dep. At 375:10-377:16, 382:11-388:4. | 2. Undisputed. |
| 3. Plaintiffs' race tracks accounted for about $3 billion in "handle" in each of 2015 and 2016. Daruty Dep. At 363:23-364:5, 409:8-24; Gierl Decl. ¶ 2, Ex. A ("Confidential Ritvo Dep.") at 85:12-86:17; Rogers Dep. At 36:12-37:8. | 3. Undisputed. |
| 4. The total handle at all race tracks in the United States was about $10 billion in each of 2015 and 2016. Daruty Dep. | 4. Undisputed. |

| | |
|---|---|
| At 363:23-364:5, 409:8-24; Confidential Ritvo Dep. at 85:12-86:17; Rogers Dep. at 36:12-37:8. | |
| 5. Plaintiffs are all wholly owned by TSG Developments Investments, Inc. (hereafter, the "Stronach Group"). Daruty Dep at 121:9-17, 126:6-11; Rogers Dep. at 32:16-36:11. | 5. Undisputed. |
| 6. The Stronach Group owns, directly or indirectly, Monarch Content Management ("Monarch"), a simulcast purchase and sales agent for numerous racetracks and wagering outlets; XpressBet, an Advanced Deposit Wagering ("ADW") service provider that allows customers to place pari-mutuel wagers via internet or telephone; Elite Turf Club, an ADW that caters to high volume, computer assisted pari-mutuel wagering ("CAW"); and AmTote, a provider of totalizator services. Daruty Dep. at 68:8-12; 71:16-72:23; 121:18-122:16, 127:22-128:18; Rogers Dep. at 32:7-43:17. | 6. Undisputed. |
| 7. Defendant HRL formed in 2009. Kanny Decl. ¶ 3, Ex. B ("Midland Dep.") at 44:7-10; Declaration of Mark Midland ("Midland Decl.") at ¶ 6. | 7. Undisputed. |
| 8. In 2009, HRL launched Horse Racing Nation ("HRN"), a free online community for horse racing fans. Midland Dep. at 44:7-46:4; Midland Decl. ¶ 6. | 8. Undisputed. |
| 9. In October 2011, HRL launched Derby Wars, a website that offers free and pay-to-play horse racing fantasy games of skill. Midland Dep. at 69:14-19, 72:3-74:25; Midland Decl. ¶ 7. | 9. Disputed that these are fantasy games of skill.  These are based upon the outcome of real sporting events, so not a fantasy event, and "games of skill" is an undefined (or recognized) term.  Ellis Dec., ¶8; Ellis Dec. Opp. to MSJ, ¶ 3, Exh. A, Midland Depo., 180:16-181:21. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| 10. The amount a person may wager on horse races under a pari-mutuel wagering system generally is not fixed in advance and can vary. Daruty Dep. at 84:15-85:11, 87:7-13; Ritvo Dep. at 60:6-62:11; Midland Decl. ¶ 51. | 10. Undisputed. |
| 11. The payout on bets on horse races in a pari-mutuel wagering system generally is determined by the size of the wagering pool, which can fluctuate depending on the number and amount of pari-mutuel wagers placed, and the wagering odds, which can change up to the time the race closes. Daruty Dep. at 85:12-16, 85:22-86:2, 87:7-13; Ritvo Dep. at 52:6-55:23; Midland Decl. ¶ 51. | 11. Disputed. Exchange wagering is a form of pari-mutuel wagering, with none of those characteristics. (see California *Business & Professions Code* §19604.5) |
| 12. The "host" track on horse races in a pari-mutuel wagering system generally retains a specified fixed percentage of the wagers (called the "take-out") before it pays out money to the winners of the bets on a particular race. Daruty Dep. at 87:14-25; Ritvo Dep. at 52:6-55:23, 56:2-57:8; Midland Decl. ¶ 51. | 12. Undisputed. |
| 13. Players entering Derby Wars' pay-to-play contests pay a fixed entry fee in exchange for the opportunity to participate in the contests. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 13. | 13. Undisputed. |
| 14. The fixed entry fee is set in advance and does not change, and every player pays the same entry fee in a given contest. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 14. | 14. Undisputed. |
| 15. The entry fee also provides contest participants with access to additional services, such as an online chat feature, a leaderboard, a display of other participants' selections, and a graphic that displays how many people selected | 15. Disputed that this is dependent upon the payment of an entry fee.  Every visitor to the Derby Wars website has access to the leaderboards, a display of other participants' selections, and a graphic that displays how many people |

-12-

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| each horse. Midland Dep. at 76:11-25, 125:2-127:13; Midland Decl. ¶ 15. | selected each horse, without paying an entry fee.  Ellis Dec. Opp.to MSJ, ¶ 7. |
| 16. In January 2015 (prior to filing this action), Stronach Group executive Scott Daruty (a lawyer) referred to Derby Wars' contests as non-pari-mutuel. Daruty Dep. at 439:5-441:16. | 16. Disputed. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 439:12-22; 440:16-441:12. |
| 17. The contests consist of a number of specified contest races (usually a minimum of six races in each contest) to be run at various horse racing tracks across the United States. Midland Dep. at 151:25-152:12, 155:18-156:3; Midland Decl. ¶ 10. | 17. Undisputed. |
| 18. Players entering a contest select one horse for each designated race in the contest, along with a backup if that horse scratches. Midland Decl. ¶ 10. | 18. Undisputed. |
| 19. After the race, Derby Wars computes a point score for each player's pick. Midland Dep. at 134:6-135:20; Midland Decl. ¶ 12. | 19. Undisputed. |
| 20. The points allocated to each player is based on one point per mythical dollar of payout at the track, subject to maximum caps set according to the contest's rules. Midland Dep. at 134:6-135:20; Midland Decl. ¶ 11. | 20. Disputed that the points are based on "mythical dollar[s]".  The points are based on the actual payouts at the track. Ellis Dec. Opp. to MSJ, ¶ 3, Exh. A, Deposition of Mark Midland, 135:21-24; 180:16-22. |
| 21. After all races have been run, the players with the highest point scores win the prize. Midland Dep. at 175:11-176:10, 180:12-14; Midland Decl. ¶ 12. | 21. Undisputed. |
| 22. Like the entry fees, the prizes awarded to the winner of each contest are set in advance and do not change. Midland Dep. at 192:17-193:14; Midland Decl. ¶ 14; Daruty Dep. at 94:15-24. | 22. Undisputed. |
| 23. The prizes are awarded to the player who achieves the highest score in the | 23. Undisputed. |

-13-

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| game, and the prizes awarded are the same regardless of the number of points scored. Midland Dep. at 175:11-176:10, 180:12-14, 192:17-193:14; Midland Decl. ¶ 16. | |
| 24. The prize for each contest is not made up of monies collected from entry fees paid by contest participants. Midland Decl. ¶ 16. | 24. Disputed.  Derby Wars pays the prizes, and Derby Wars' only source of revenue is entry fees.  Ellis Dec. Opp.to MSJ, ¶ 4, Exh. B, Deposition of Mike Shutty, 21:17-22. |
| 25. There are three general formats of Derby Wars' fantasy horse racing contests, each subject to contest rules: (i) Open, (ii) Lockdown, and (iii) Survivor. Midland Decl. ¶ 18. | 25. Undisputed. |
| 26. In Open contests, players can change their picks up until the race closes. Midland Dep. at 132:12-22; Midland Decl. ¶ 19. | 26. Undisputed. |
| 27. In Lockdown contests, players must make all of their selections before the start of the first race. Midland Dep. at 132:23-25; Midland Decl. ¶ 20. | 27. Undisputed. |
| 28. Open and Lockdown contests comprise the majority of contests run by Derby Wars. Midland Decl. ¶¶ 19-20. | 28. Undisputed. |
| 29. In the Survivor format, players must pick a horse that finishes first, second or third in each race in order to advance to the next race. Midland Decl. ¶ 21. | 29. Undisputed. |
| 30. Predetermined prizes in Survivor contests are awarded to the players who survive to the end of the contest. Midland Decl. ¶ 21. | 30. Undisputed. |
| 31. Skill predominates over chance in Derby Wars' contests. Kanny Decl. ¶ 6, Ex. E (Expert Report of Randal Heeb, Ph.D. ("Heeb Rep.")) ¶¶ 1- 22. | 31. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |
| 32. Derby Wars designed its contests to maximize the skill required to win. | 32. Disputed.  Misstates the testimony. None of the cited deposition testimony |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| Midland Dep. at 21:12-22:8, 69:14-19, 130:11-131:4, 136:22-137:4, 138:9-139:20, 141:16- 25, 198:7- 199:14; Midland Decl. ¶ 22. | supports that statement of fact.  Midland Decl., ¶ 22 states: "When we designed Derby Wars' contests, we designed them to involve a substantial amount of skill." |
| 33. Derby Wars' contests involve intra-game strategy skills, where players may adjust their selections to take best advantage of the relative probabilities of winning relative to the scores of their opponents. Heeb Rep. ¶¶ 14, 32-33. | 33. Disputed.  See, objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion.  That is not true in Lockdown games, where picks are made all at once, such that there is no intra-game strategy (see Derby Wars' Fact 27 above). |
| 34. Derby Wars' contests also involve the skill of anticipating the overall slate of races that is likely to yield a high or low scoring game, and to predict the score likely necessary to win. Heeb Rep. ¶¶ 15, 34. | 34. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |
| 35. Derby Wars' contests also involve the skill of evaluating opponents to determine their tendencies and relative strengths and weaknesses. Heeb Rep. ¶¶ 16, 35. | 35. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion. |
| 36. Winning outcomes in Derby Wars' contests reflect the relative knowledge and skill of the participants, and participants earn points based on accumulated statistical results of the performance of horses in multiple real world horse racing events, subject to proprietary caps. Heeb Report ¶¶ 10-22. | 36. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb Report.  Further this is not a fact, but an unsupported opinion.  Winning outcomes are determined by the results of the horse races, uncertain events in which the player has no control over the outcome. Ellis Dec. Opp.to MSJ, ¶ 3, Exh. A., Deposition of Mark Midland, 177:21-178:13; 211:5-17.  Further, the points are not based on statistical results, but instead the actual results of a real sporting event. Ellis Dec. Opp.to MSJ, ¶ 3, Exh. A., Deposition of Mark Midland, 180:16-181:21. |
| 37. Participating in – and winning – Derby Wars' contests involves applying | 37. Disputed.  See, Objections to Kanny Decl., and to the excerpts of the Heeb |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| a variety of skills, including knowledge of horse racing, knowledge of the horses in a given race, and the ability to handicap performance of the horse based on a variety of factors such as weather, prior performance, the particular jockey riding the track, and the track. Heeb Report ¶ 31. | Report.  Further this is not a fact, but an unsupported opinion.  Winning is based on the outcome beyond the control (or influence) of the Player.  Ellis Dec. Opp.to MSJ, ¶ 3, Exh. A., Deposition of Mark Midland, 211:5-17; Deposition of Shutty, 66:4-11. |
| 38. Plaintiffs admit that the Interstate Horse Racing Act applies only to pari-mutuel wagers. Ritvo Dep. at 52:6-55:23, 66:1-12. | 38. Disputed. Mistates testimony of Ritvo; and is contrary to terms of the Interstate Horseracing Act which is not limited to pari-mutuel wagers.  15 U.S.C. §3002(3). |
| 39. Jockeys typically are engaged by horse trainers to ride in races and work with many different trainers and ride different horses on any given day. Ritvo Dep. at 18:15-21:9, 22:17-23:9; Daruty Dep. at 91:19-92:7. | 39. Undisputed. |
| 40. Bet America does not pay additional compensation to Plaintiffs for use of their tracks in Bet America's contests, because there is not yet an established business model on contest play. Daruty Dep. at 42:10-45:22; 201:11-202:6. | 40. Disputed.  Bet America does not pay additional compensation because it already pays Plaintiffs for the use of their races. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 43:23-44:21. |
| 41. Plaintiffs and Bet America currently do not have a compensation model in place for use of Plaintiffs' tracks in Bet America contests. Daruty Dep. at 354:8-21. | 41. Disputed. Deposition of Scott Daruty, 43:23-44:21. |
| 42. Horse Tourneys, a pure contest site that does not offer ADW pari-mutuel wagering, operates contests using Plaintiffs' tracks without any payment to Plaintiffs. Daruty Dep. at 38:9-39:3, 248:4-254:6, 262:12-264:11. | 42. Disputed.  Horse Tourneys is licensed as an ADW. Deposition of Scott Daruty, 228:8-15. |
| 43. ADW licenses issued by the NDRC do not cover fantasy horse racing contests, as NDRC does not treat contests as pari-mutuel wagering. | 43. Disputed. See, Objection to Declaration of Mark Midland. This statement is without foundation and is speculation. |

| Midland Decl. ¶ 53. | |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

**C. Defendant's Claimed Undisputed Facts Allegedly Demonstrating That Plaintiffs' IHA Claim Is Barred By The Statute Of Limitations**

| DEFENDANT'S FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|
| 44. Beginning as early as September 2011, Stronach Group executives communicated with HRL's Mark Midland about potentially doing business together. Daruty Dep. at 141:14-147:22, 148:5-150:19, 152:16-154:16, 155:10-156:17, 156:23-158:15, 159:12-160:5, 160:10-161:24, 164:11-167:10, 168:5-170:7, 171:3-24, 172:4-173:19, 189:21-194:3; Rogers Dep. at 112:12-113:25, 115:17-117:21, 118:8-119:22, 121:8-125:4, 126:8-12, 128:24-134:2, 135:13-23, 138:6-141:9, 144:2-146:16, 147:23-151:5, 152:20-153:1, 162:4-164:19, 164:23-165:17, 166:23-167:7; Midland Decl. ¶¶ 26-27; Gierl Decl. ¶¶ 4-13, 21, Exs. C-O, T. | 44.  Undisputed. |
| 45. In the fall of 2011, Stronach Group executives communicated with each other and with Mr. Midland regarding the potential of doing business with HRL and Derby Wars. Daruty Dep. at 141:14-147:22, 148:5-150:19, 152:16-154:16, 155:10-156:17, 156:23-158:15, 159:12-160:5, 160:10-161:24, 164:11-167:10, 168:5-170:7, 171:3-24; Rogers Dep. at 112:12-113:25, 115:17-117:21, 118:8-119:22, 121:8-125:4, 126:8-12; Gierl Decl. ¶¶ 4-10, Exs. C-I. | 45. Disputed.  There is no evidence of any such communications concerning doing business with Derby Wars.  For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs.  Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21.  Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 395:13-21.   There is no evidence of any communications regarding doing business with Derby Wars, the separate entity; this only relates to doing business |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| | with Horse Racing Nation, which counsel for Defendant redefined as Derby Wars for purposes of the deposition only. |
| 46. In September 2011, Mike Calderone (the then-Chief Marketing Officer of the Stronach Group) referred to HRL in an e-mail to Stronach Group executives as an up-and-coming website. Daruty Dep. at 141:14-145:5; Rogers Dep. at 112:12-113:25, 115:17-117:21; Gierl Decl. ¶ 4, Ex. C. | 46. Undisputed. |
| 47. In October 2011, Mr. Calderone wrote an e-mail to Mr. Midland (copying Scott Daruty) inviting Mr. Midland to follow up on a discussion they had regarding using Derby Wars in a joint venture program. Daruty Dep. at 148:5-150:19; Midland Decl. ¶ 31; Gierl Decl. ¶ 6, Ex. E. | 47. Disputed.  For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21.  Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 395:13-21.   There is no evidence of any communications regarding using Derby Wars, the separate entity, in a joint venture program. |
| 48. In fall 2011 through November 2012, Mr. Midland had numerous discussions with Mr. Calderone about Derby Wars' pay-to-play contests, the fact that those contests use the results of horse races run at Plaintiffs' tracks, and how Derby Wars could integrate, cross promote and partner the Stronach Group properties, including Plaintiffs' race tracks. Midland Decl. ¶¶ 27-37. | 48.  Disputed.  Calderone has never been affiliated with any Plaintiff, nor had any authority to act on behalf of any Plaintiff.  Declaration of Mike Rogers, ¶¶3. |
| 49. In December 2011, in an e-mail to | 49.  Disputed.  The cited evidence does |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| Stronach Group executives, including Mr. Rogers, Mr. Calderone proposed to implement Derby Wars' contests across the Stronach properties, including Plaintiffs' tracks. Daruty Dep. at 160:20-161:24; Gierl Decl. ¶ 9, Ex. H. | not even discuss implementing Derby Wars' contests across Plaintiffs' tracks. |
| 50. Mr. Calderone "spoke very highly" of Mr. Midland to Mr. Rogers and was a proponent of Plaintiffs entering into an arrangement with either Horse Racing Nation or Derby Wars. Rogers Dep. at 115:9-15. | 50.  Disputed. The cited testimony does not discuss Plaintiffs entering into an arrangement with Horse Racing Nation or Derby Wars. |
| 51. Mr. Calderone and Mr. Rogers had discussed on numerous occasions the possibility of investing in or acquiring Derby Wars. Rogers Dep. at 121:8-125:4, 135:13-23, 137:17-138:5, 152:13-153:1; Gierl Decl. ¶ 19, Ex. R. | 51.  Disputed.  The cited evidence does not reflect any discussion of investing in or acquiring Derby Wars.  Ellis Dec. Opp.to MSJ, ¶ 6, Exh. D, Deposition of Mike Rogers, 120:25-121:3. |
| 52. In October 2012, Mr. Calderone sent an e-mail to senior officers of the Stronach Group about a business relationship with HRL, in which Mr. Calderone promoted an investment in HRL if Derby Wars would agree to provide (among other things) free versions of its contests. Daruty Dep. at 168:5-170:7, 171:3-24, 172:4-11; Rogers Dep. at 138:6-141:4; Gierl Decl. ¶ 11, Ex. J. | 52. Disputed.  The cited evidence does not reflect any such promotion. |
| 53. In response to Mr. Calderone's October 2012 email, Mr. Rogers and Mr. Calderone discussed the opportunity with Derby Wars. Daruty Dep. at 172:4-173:19; Rogers Dep. at 138:6-143:13, 146:13-147:22. | 53.  Disputed.  The cited evidence does not support the fact concerning Derby Wars.  For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs.  Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21.  Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

|  | Exh. C, Deposition of Scott Daruty, 395:13-21.   There is no evidence of any communications regarding Derby Wars, the separate entity.  Ellis Dec. Opp.to MSJ, ¶ 6, Exh. D, Deposition of Mike Rogers, 120:25-121:3. |
|---|---|
| 54. Mr. Midland met with Mr. Rogers in person at the Breeders' Cup on or about November 2, 2012. Midland Decl. ¶ 36; Rogers Dep. at 148:1-150:13. | 54. Undisputed. |
| 55. At the meeting with Mr. Rogers at the Breeder's Cup on or about November 2, 2012, Mr. Midland visually showed Derby Wars' pay-to-play fantasy horse racing contests to Mr. Rogers on Mr. Midland's iPad, which involved races run at Plaintiffs' tracks. While Mr. Rogers watched, Mr. Midland clicked through the website pages and explained to and showed Mr. Rogers the pay-to-play contests and specifically including contests with races run at Plaintiffs' tracks, including Santa Anita. Midland Decl. ¶ 36; Rogers Dep. at 1481-150:13. | 55.  Disputed.  Declaration of Mike Rogers, ¶¶4-6. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

**D. Defendant's Claimed Undisputed Facts Allegedly Demonstrating That Plaintiffs' Claims Are Barred By The Equitable Doctrines Of Estoppel And Waiver**

| DEFENDANT'S FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|
| 44. Beginning as early as September 2011, Stronach Group executives communicated with HRL's Mark Midland about potentially doing business together. Daruty Dep. at 141:14-147:22, 148:5-150:19, 152:16-154:16, 155:10-156:17, 156:23-158:15, 159:12-160:5, 160:10-161:24, 164:11-167:10, 168:5-170:7, 171:3-24, 172:4-173:19, 189:21-194:3; Rogers Dep. at 112:12-113:25, 115:17-117:21, 118:8-119:22, 121:8-125:4, 126:8-12, 128:24-134:2, 135:13-23, 138:6-141:9, 144:2-146:16, 147:23-151:5, 152:20-153:1, 162:4-164:19, 164:23-165:17, 166:23-167:7; Midland Decl. ¶¶ 26-27; Gierl Decl. ¶¶ 4-13, 21, Exs. C-O, T. | 44.  Undisputed. |
| 45. In the fall of 2011, Stronach Group executives communicated with each other and with Mr. Midland regarding the potential of doing business with HRL and Derby Wars. Daruty Dep. at 141:14-147:22, 148:5-150:19, 152:16-154:16, 155:10-156:17, 156:23-158:15, 159:12-160:5, 160:10-161:24, 164:11-167:10, 168:5-170:7, 171:3-24; Rogers Dep. at 112:12-113:25, 115:17-117:21, 118:8-119:22, 121:8-125:4, 126:8-12; Gierl Decl. ¶¶ 4-10, Exs. C-I. | 45.  Disputed.  There is no evidence of any such communications concerning doing business with Derby Wars.  For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs.  Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21.  Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 395:13-21.   There is no evidence of any communications regarding doing business with Derby Wars, the separate |

| | |
|---|---|
| | entity; this only relates to doing business with Horse Racing Nation, which counsel for Defendant redefined as Derby Wars for purposes of the deposition only. |
| 46. In September 2011, Mike Calderone (the then-Chief Marketing Officer of the Stronach Group) referred to HRL in an e-mail to Stronach Group executives as an up-and-coming website. Daruty Dep. at 141:14-145:5; Rogers Dep. at 112:12-113:25, 115:17-117:21; Gierl Decl. ¶ 4, Ex. C. | 46. Undisputed. |
| 47. In October 2011, Mr. Calderone wrote an e-mail to Mr. Midland (copying Scott Daruty) inviting Mr. Midland to follow up on a discussion they had regarding using Derby Wars in a joint venture program. Daruty Dep. at 148:5-150:19; Midland Decl. ¶ 31; Gierl Decl. ¶ 6, Ex. E. | 47. Disputed. For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21. Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 395:13-21. There is no evidence of any communications regarding using Derby Wars, the separate entity, in a joint venture program. |
| 48. In fall 2011 through November 2012, Mr. Midland had numerous discussions with Mr. Calderone about Derby Wars' pay-to-play contests, the fact that those contests use the results of horse races run at Plaintiffs' tracks, and how Derby Wars could integrate, cross promote and partner the Stronach Group properties, including Plaintiffs' race tracks. Midland Decl. ¶¶ 27-37. | 48. Disputed. Calderone has never been affiliated with any Plaintiff, nor had any authority to act on behalf of any Plaintiff. Declaration of Mike Rogers, ¶¶3. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| 49. In December 2011, in an e-mail to Stronach Group executives, including Mr. Rogers, Mr. Calderone proposed to implement Derby Wars' contests across the Stronach properties, including Plaintiffs' tracks. Daruty Dep. at 160:20-161:24; Gierl Decl. ¶ 9, Ex. H. | 49.  Disputed.  The cited evidence does not even discuss implementing Derby Wars' contests across Plaintiffs' tracks. |
| 50. Mr. Calderone "spoke very highly" of Mr. Midland to Mr. Rogers and was a proponent of Plaintiffs entering into an arrangement with either Horse Racing Nation or Derby Wars. Rogers Dep. at 115:9-15. | 50.  Disputed. The cited testimony does not discuss Plaintiffs entering into an arrangement with Horse Racing Nation or Derby Wars. |
| 51. Mr. Calderone and Mr. Rogers had discussed on numerous occasions the possibility of investing in or acquiring Derby Wars. Rogers Dep. at 121:8-125:4, 135:13-23, 137:17-138:5, 152:13-153:1; Gierl Decl. ¶ 19, Ex. R. | 51.  Disputed.  The cited evidence does not reflect any discussion of investing in or acquiring Derby Wars.  Ellis Dec. Opp.to MSJ, ¶ 6, Exh. D, Deposition of Mike Rogers, 120:25-121:3. |
| 52. In October 2012, Mr. Calderone sent an e-mail to senior officers of the Stronach Group about a business relationship with HRL, in which Mr. Calderone promoted an investment in HRL if Derby Wars would agree to provide (among other things) free versions of its contests. Daruty Dep. at 168:5-170:7, 171:3-24, 172:4-11; Rogers Dep. at 138:6-141:4; Gierl Decl. ¶ 11, Ex. J. | 52. Disputed.  The cited evidence does not reflect any such promotion. |
| 53. In response to Mr. Calderone's October 2012 email, Mr. Rogers and Mr. Calderone discussed the opportunity with Derby Wars. Daruty Dep. at 172:4-173:19; Rogers Dep. at 138:6-143:13, 146:13-147:22. | 53.  Disputed.  The cited evidence does not support the fact concerning Derby Wars.  For purposes of the deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 11:25-12:8; 395:13-21.  Horse Racing Labs in actuality includes two separate Companies, Horse Racing Nation and |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

|  |  |
|---|---|
|  | Derby Wars. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 395:13-21. There is no evidence of any communications regarding Derby Wars, the separate entity. Ellis Dec. Opp.to MSJ, ¶ 6, Exh. D, Deposition of Mike Rogers, 120:25-121:3. |
| 54. Mr. Midland met with Mr. Rogers in person at the Breeders' Cup on or about November 2, 2012. Midland Decl. ¶ 36; Rogers Dep. at 148:1-150:13. | 54. Undisputed. |
| 55. At the meeting with Mr. Rogers at the Breeder's Cup on or about November 2, 2012, Mr. Midland visually showed Derby Wars' pay-to-play fantasy horse racing contests to Mr. Rogers on Mr. Midland's iPad, which involved races run at Plaintiffs' tracks. While Mr. Rogers watched, Mr. Midland clicked through the website pages and explained to and showed Mr. Rogers the pay-to-play contests and specifically including contests with races run at Plaintiffs' tracks, including Santa Anita. Midland Decl. ¶ 36; Rogers Dep. at 1481-150:13. | 55. Disputed. Declaration of Mike Rogers, ¶¶4-6. |
| 56. In June 2013, Mr. Midland communicated directly to Michael Nyman, marketing director at Gulfstream Park (one of Plaintiffs' tracks), about running handicapping contests for Gulfstream on the Derby Wars website. Daruty Dep. at 172:4-173:19; Ritvo Dep. 122:16-124:18; Midland Decl. ¶ 38; Gierl Decl. ¶ 12, Ex. K. | 56. Undisputed. |
| 57. In the fall of 2014, Mr. Midland had several conversation with Nate Newby, marketing director of Santa Anita, about doing a joint sponsorship deal that would promote Derby Wars to Santa Anita customers. Midland Decl. ¶ 39; Daruty | 57. Disputed. For purposes of the Daruty deposition cited by Defendant, counsel for Defendant defined the term "Derby Wars" as Defendant Horse Racing Labs. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| Dep. at 393:11-395:2, 396:4-399:12; Rogers Dep. at 159:25-160:8, 162:2-164:19. | 11:25-12:8; 395:13-21.  The cited Rogers testimony does not support the assertion that "In the fall of 2014, Mr. Midland had several conversation with Nate Newby, marketing director of Santa Anita, about doing a joint sponsorship deal that would promote Derby Wars to Santa Anita customers." |
| 58. As part of a joint partnership agreement, Santa Anita delivered literally thousands of e-mails to its customers promoting Derby Wars, including an e-mail to over 10,000 customers in November 2015. Midland Decl. ¶ 43, Exs. E, F; Daruty Dep. at 247:14-248:3; 393:11-395:2, 396:4-399:12. | 58.  Disputed.  The evidence proffered does not support the assertions that "Santa Anita delivered literally thousands of emails" or that Santa Anita sent an email to over 10,000 customers. |
| 59. In November 2015, Mr. Midland communicated with Sal Sinatra, marketing director at Laurel Park (another of Plaintiffs' tracks), about Derby Wars offering handicapping contests. Midland Decl. ¶ 46; Ritvo Dep. at 135:18-138:19; Gierl Decl. ¶ 20, Ex. S. | 59.  Undisputed. |
| 60. In late November 2015, Mr. Midland sent an e-mail to Mr. Rogers, seeking to expand the Santa Anita relationship. Midland Decl. ¶ 47, | 60.  Undisputed. |
| 61. Prior to filing the lawsuit, Stronach Group executives never once wrote to, spoke to or met with Derby Wars objecting to the use of, or demanding that Derby Wars stop using, Plaintiffs' tracks in Derby Wars' fantasy horse racing contests. Midland Decl. ¶ 48; Daruty Dep. at 181:25-183:11, 185:23-186:2, 209:24-210:9; Rogers Dep. at 173:1-174:20, 179:12-180:15, 184:12-25, 198:22-200:25; Gierl Decl. ¶ 14, Ex. M. | 61.  Undisputed. |
| 62. Stronach executives claim that the | 62.  Disputed.  The only executive who |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| "light bulb" went off about Derby Wars' use of their content in fantasy contests around October 2014, and began to investigate a claim. Rogers Dep. at 160:6-161:2, 171:5-19. | stated that was Mike Rogers. |
| 63. No one from the Stronach Group asked Derby Wars to stop using Plaintiffs' tracks in Derby Wars' contests at any time prior to the lawsuit being filed. Daruty Dep. at 181:25-82:21, 183:7-11, 185:23-186:2; Ritvo Dep. at 145:6-14; Rogers Dep. at 173:1-174:17, 179:12-180:15, 184:12-25, 192:12-19, 195:7-19, 198:22-200:16; Gierl Decl. ¶ 14, Ex. M. | 63. Undisputed. |
| 64. Several fantasy horse racing contest sites using Plaintiffs' races in their contests, including Bet America and Horse Tourneys, without payment to Plaintiffs. Daruty Dep. at 37:12-39:3. | 64.  Disputed.  Bet America does pay Plaintiffs for the use of their races. Ellis Dec. Opp.to MSJ, ¶ 5, Exh. C, Deposition of Scott Daruty, 43:23-44:21. |
| 65. A few months after this lawsuit was filed, Horse Tourneys became licensed for the first time as an ADW in North Dakota, even though it does not operate as an ADW, and even though it has run a contest site for years. Midland Decl. ¶ 54, Ex. K. | 65.  Disputed.  See Objection to Declaration of Mark Midland. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

**E. Defendant's Claimed Undisputed Facts Allegedly Demonstrating That The Court Should Abstain From Adjudicating Plaintiffs' Claims, In Deference To Legislative Function**

| DEFENDANT'S FACTS AND EVIDENCE | PLAINTIFFS' RESPONSE |
|---|---|
| 66. Plaintiffs routinely engage in lobbying activities, including, for example, before state legislatures and Racing Boards and Commissions. Daruty Dep. at 109:6-113:16; Rogers Dep. at 48:1-12. | 66.  Disputed.  Cited evidence does not support fact, and there is no evidence that Plaintiffs routinely engage in lobbying activities. |
| 67. New York, Massachusetts, Virginia, Tennessee, Mississippi, Indiana, Missouri, Kansas, and Colorado have all successfully enacted legislation to regulate daily fantasy sports ("DFS"). Midland Decl. ¶ 56; Kanny Decl. ¶ 8; Colo. Rev. Stat. § 12-15.5-105; Kan. Stat. § 21-6403; Miss. Code. § 97-33-305; Tenn. Code § 47-18-1611; Ind. Code § 4-33-24-1; Va. Code § 59.1- 569; N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1411; 940 Mass. Code Regs. 34. | 67. Undisputed that various states have enacted legislation to regulate DFS, but disputed that any state has ever approved DFS based on the results of horse races. In particular, Indiana and New York's legislation excludes DFS based on the results of horse races from the legislation.  See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § § 1401 (7) (15), 1402, 1404 (1) (r), Ind. Code § 4-33-24-9. |
| 68. New York and Indiana have enacted legislation to regulate DFS with respect to horse racing contests. Midland Decl. ¶ 56; Kanny Decl. ¶ 8. | 68. Disputed that the legislation "regulates" DFS related to horse racing contests.  The Indiana legislation expressly excludes DFS based on the results of horse races and the New York legislation contains language barring horse-racing fantasy contests despite explicitly authorizing the contests on nearly all other sports.  (See, N.Y. Rac. Pari-Mut. Wag. & Breed. Law § § 1401 (7) (15), 1402, 1404 (1) (r), Ind. Code § 4-33-24-9.) As a result, Derby Wars does not accept players from New York or Indiana. Ellis Dec. Opp.to MSJ, ¶ 8, Exh. E. |
| 69. There are ongoing efforts to enact | 69. Disputed that the efforts are |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| | |
|---|---|
| DFS legislation in at least fifteen states, including in Florida and Oregon. Kanny Decl. ¶ 8. | "ongoing." |
| 70. California has considered whether to regulate fantasy contests, and Plaintiffs have been involved in those efforts. Daruty Dep. at 108:4-111:6; Midland Decl. ¶ 56. | 70.  Disputed.  The cited evidence does not support any efforts by Plaintiffs to regulate fantasy contests. |
| 71. Before Plaintiffs filed this action, there was a "public debate" at a California Horse Racing Board ("CHRB") meeting regarding the CHRB's treatment of DFS and handicapping contests. Daruty Dep. at 187:20-188:15. | 71.  Disputed.  The cited evidence does not reflect debate regarding CHRB's treatment of DFS and handicapping contests. |

DATED:  April 3, 2017

CORBETT, STEELMAN & SPECTER
A Professional Law Corporation


By:     /s/ *Richard B. Specter*
Richard B. Specter
Attorneys for PLAINTIFFS

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS